TYGER CONSTRUCTION
CO. INC., Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 468–88C, 526–88C and 90–134C.

United States Court of Federal Claims.

Feb. 18, 1994.

As Amended March 15, 1994.

Order on Reconsideration May 4, 1994.

Randall W. Wulff, San Francisco, CA, for plaintiff. Stephen R. Lowenthal, Farella, Braun & Martel, San Francisco, CA, of counsel. Andrew W. Stephenson, Holland & Knight, Washington, DC, for John J. Kirlin, Inc.

Richard E. Rice, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. Anthony M. Alexis, Dept. of Justice, and Jeffrey Robbins, Office of the Gen. Counsel, Dept. of Health and Human Services, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after trial. The claims that were tried involved the mechanical portion of a construction contract between Tyger Construction Co., Inc. ("plaintiff"), and the Food and Drug Administration (the "FDA"), an agency of the United States Department of Health and Human Services ("DHHS"), for an Animal Testing

Facility in Beltsville, Maryland.[1] Plaintiff was the prime contractor in the project and seeks recovery on behalf of itself and one of its subcontractors. In reviewing the testimony and documentary and physical evidence, the court deems that the true picture of this beknighted contractual relationship emerges through a chronological history, with principal reliance on documents contemporaneously generated. Rarely is a fact-intensive construction contract case tried so long after the operative events took place. The challenged specifications issued in 1983; the disputed work was performed in 1984–1986; the key problem was not solved until 1989; the contract was completed in 1991.[2] In these circumstances the court reposes a great deal of confidence in the documentary record.

The bedrock issue is whether one contracting party—the FDA, on the one hand, or the prime and its mechanical subcontractor, on the other—bears the ultimate responsibility for this contentious, frustrating, counterproductive, and exorbitantly costly construction project.

## FACTS

### 1. *The solicitation and bids*

The DHHS issued the Invitation for Bid documentation, Solicitation No. IFB–131–0003–83, on March 15, 1983. From the onset of bidding on the subject contract, the bid documents included one set of original specifications, one set of original drawings, and a series of amendments to those original documents. Only amendments pertinent to the present controversy will be discussed. On April 15, 1983, Contracting Officer Calvin E. Watkins, Sr., issued Amendment No. 2 that modified a Constant Volume Regulator ("CVR") dimension shown in Drawing M–71. Two weeks later on April 29, 1983, Amendment No. 4 issued, changing the bid opening date from May 4, 1983, to May 12, 1983. Then, on May 4, 1983, Amendment No. 5

issued, shifting the bid opening date to May 24, 1983.

Approximately one week later, on May 13, 1983, Contracting Officer Watkins issued Amendment No. 6. Amendment No. 6 consisted of 57 pages, including sketches. Clause 6, entitled "Supervision and Coordination of the Work," from the "General Conditions" section, was revised. The substitution set forth the following: "The plans and specifications are, in part, [diagrammatic] and show the general arrangement of the work. In such cases, the Contractor, directly or by subcontract, shall complete the design and select and arrange equipment, materials, or components as necessary to provide a complete facility."

Amendment No. 6 modified section 15920 of the original contract to give the contractor responsibility for installing a fully functional, tested, and wholly compliant Air Flow Control System. Paragraph 1.02D set forth that differential pressure transmitters ("DPT") could be of only one original equipment manufacturer ("OEM") industrial instrument manufacturer system source and that any product mix would not be permitted. The same paragraph provided that all of the integral system interaction and individual instrument performance must be as specified and in accordance with all manufacturer requirements. Further, the contractor was required to furnish certification from the manufacturer that the installation of equipment was in accordance with the manufacturer's requirements. A new paragraph, ¶ 1.02F, added the requirement that the airflow system work must be performed by a specialty subcontractor. General Conditions Clause 20 defined specialty subcontractor as a "subcontractor regularly engaged in the manufacture or installation of the contract items." The clause further specified:

The specialty subcontractor shall select and combine the materials involved, maintain and have available ... workmen skilled in the specified work. The Special-

---

1. On September 17, 1993, the court issued an unpublished order denying cross-motions for summary judgment. Some of the undisputed facts found in that opinion are recited herein.

2. Docket No. 90–134C concerns the claims that were tried. The parties have agreed, however, that this trial resolves all pending claims. Incident to trial the parties settled all remaining claims and counterclaims. *See Tyger Constr. Co. v. United States*, 28 Fed.Cl. 35 (1993).

ty Subcontractor shall be the manufacturer, be licensed by the manufacturer as an installer, or work under direct supervision of the manufacturer.

Another portion of Amendment No. 6 modified ¶ 2.02 entitled "Control Instruments and Indicators." Paragraph 2.02A was amended to permit the contracting officer to request that the contractor supply certain specified testing information from the OEM related to verification of performance requirements. The failure of the OEM to provide such corroborating data would be grounds for rejecting the equipment. The original title of ¶ 2.03 was changed from "Process Air Volume Pitot Primary Element" to "Air Flow [sic] Measuring Station (AFM)" ("AMS"), and the first line of ¶ 2.03A was amended accordingly. The original ¶ 2.03G was substituted to require coordination with section 15800 for the installation of the AMS into the ductwork. Paragraph 2.04 entitled Constant Volume Regulator was substantially amended. These amendments will be discussed in detail below.

Paragraph 3.01 entitled "Installation, System Calibration, Start-up and Service" was also amended to require that the contractor provide calibration and testing services to guarantee the proper operation of the system for one year following the contracting officer's acceptance. The contractor also was tasked with furnishing evidence that successful supervision, calibration, and start-up services had been provided for similar type projects over a two-year period. A further amendment required that project names and references be provided for the approval of qualifications by the contracting officer.

Finally, Amendment No. 6 contained several general comments that applied to the specifications as a whole. One comment put potential bidders on notice that nothing in the specifications could be construed to create any contractual relationship between the FDA and any of the subcontractors. Pursuant to this comment, contractors were informed that they must employ specialty subcontractors where required in the specifica-

tions at no additional expense to the FDA. (The contract work at issue was performed by a specialty subcontractor.) Another comment sought reinforcement of these requirements by holding the contractor responsible for the manufacturer's performance, including testing and verification, of all specification requirements.

A third general comment notified bidders that all items specified in the contract were to be furnished by the contractor and not the FDA. A last general comment substituted the contracting officer for any references to any authority of the FDA under the contract granted to any entity other than the contracting officer.

John J. Kirlin, Inc., plaintiff's mechanical subcontractor, received bids for airflow instrumentation from three CVR manufacturers—Ultratech Inc.; Brandt Instruments, Inc. ("Brandt"); and Air Monitor Corp. ("Air Monitor"). Ultratech's bid was $2,244,500.00. After accepting Ultratech's bid, Ultratech and Kirlin negotiated a purchase order for $1,275,950.00. Ultratech was a specialty subcontractor on the project.

A February 22, 1983 pre-bid letter from the Director of Regional Office for Facilities Engineering and Construction (Contracting Officer Watkins) to the Project Officer, Stephen J. Lakner, evidences coordination problems from the outset. Plaintiff asserts that, despite these problems, DHSS issued the bid documents. Mr. Watkins stated that he was of the view, after a limited review of the bid documents, that the plans and specifications still lacked specific and coordinated detail, even though he had examined them in response to an earlier comment of the same nature. The prior comment had been related by the FDA's design engineer, LBC & W, a Division of C.E. Maguire, Inc. ("LBC & W" or the "design engineer").[3] Mr. Watkins further stated that this project would likely require a greater number of interpretations, clarifications, and changes than would normally be expected for a project of the same nature and size.

---

**3.** Although LBC & W underwent a series of name changes, the individuals involved with the project remained the same. For purposes of clarity, the court refers to all of its successor designations as "LBC & W."

On February 23, 1983, Mr. Lakner dispatched a letter to Vincent A. Megna, P.E., Director of Engineering at LBC & W, informing him that the final design documents were accepted. He noted that the FDA was not responsible for checking or coordinating the design documents and indicated that the FDA expected the drawings and specifications to be reasonably free of errors and contradictions. Mr. Lakner also suggested that the final documents should be examined carefully before initiation of construction in order to reduce the work that might be necessary to prepare interpretations, clarifications, or changes to the documents during construction.

The construction project is a four-story building containing approximately 220,000 square feet. The main portions of the building include animal holding quarters, laboratories, office space, a loading dock, support facilities and mechanical areas. The pertinent portion of the Module I [4] project for the present controversy is the heating, ventilation, and air conditioning ("HVAC") system. This system basically includes an airflow control system, an air distribution system, air handling units ("AHUs"), and exhaust fans. The airflow control system consists of CVRs, AMSs, DPTs, controllers, and related circuitry. The air distribution system consists essentially of ductwork and devices installed in the ductwork to assist airflow. The AHUs are built-up centrifugal fans, including coils and filters. The exhaust fans are the fans that carry the return airflow out of the building.

The airflow control system was required to achieve three basic control functions: constant static pressure control, constant volume control, and airflow synchronization. Constant static pressure control is achieved by sensing the duct static pressure at an AMS and a corresponding static pressure signal is sent to a static pressure transmitter. Constant volume control is achieved by sensing a fan or duct airflow rate at an AMS with velocity sensing signals sent to a velocity pressure transmitter. Airflow synchroniza-

tion is achieved by sensing the airflow of a supply (duct or fan) and a return or exhaust (duct or fan) at AMSs located in or at the respective ducts or fans. These signals are sent to a dual input controller, which adjusts fan volume to maintain a constant volume relationship between the two air rates.

York International Corp. ("York"), a Division of Borg–Warner Corp., originally submitted its fan unit CS–578–FO AFHP for AHU Nos. 1–4.[5] This fan has a 33–inch wheel diameter and operates at 1,480 revolutions per minute ("RPM"). Unit Nos. 2–4 were upgraded to larger units because the AHU cooling coil banks required downsizing to fit into their location. This downsizing, among other effects, caused an increase in static pressure. Further, an additional 0.3 inches of static pressure was later added to the total static pressure calculation. AHU No. 1 remained a CS–578–FO AFHP unit expected to produce 7.55–inches static pressure and 32,200 cubic feet per minute ("CFM") at 1,530 RPM. AHU Nos. 2–4 were changed to a CS–666–FO AFHP fan unit expected to produce 7.86–inches static pressure and 34,800 CFM at 1,352 RPM. The notes portion of the drawing for AHU Nos. 2–4 attached with the resubmittal dated December 7, 1983, contain a comment that the units have a fan wheel diameter of 40 inches. The model 666 unit, however, only comes with a 36–inch fan wheel diameter. The model 666X unit has a 40–inch fan wheel diameter, which was correctly noted in the notes portion of the drawing for AHU No. 6 in the same resubmittal. The error in the drawing notes for AHU Nos. 2–4 was made by one of York's Sales Engineers. The AHU submittal was recommended for and received approval on January 20, 1984.

The velocity, or speed, of air is measured customarily in units of feet per minute. In the CVR Schedule of Contract Drawing M–65, the volumetric flow rate for each of the various sizes of CVRs, is specified in CFM. The CFM value is calculated by multiplying the velocity, in feet per minute, times the

---

4. The building in the present contract is the first Module, or building. Module II is under construction at present.

5. Although some 13 AHUs were constructed for the Module 1 project, AHU Nos. 1–4 are germane to the present controversy.

cross-sectional area of the AMS portion of the CVR.[6] Based on Bernoulli's Principle, the airflow velocity can be calculated from the velocity pressure of the airflow because of the mathematical relationship between the two: The velocity at any point is equal to the square root of the velocity pressure. The velocity pressure is defined as the difference between the total pressure and the static pressure and is measured in units of inches water column ("Inches W.C.").[7]

The CVR contains basically three portions—an airflow straightening portion, an AMS portion, and an opposed-blade damper portion. The airflow straightening portion contains a honeycomb air straightener, which smooths the airflow before it enters the AMS portion. The AMS portion of the CVR contains a total pressure manifold and a static pressure probe, which measure the total pressure and static pressure, respectively, and send a separate signal for each to a DPT. The DPT portion measures the differential pressure, or the difference in pressure between the two signals, which, based on theory, is the velocity pressure of the airflow. The DPT also amplifies the velocity pressure signal into a control signal that is compared with a programmed set point. A controller then generates control signals to the pneumatic actuator of the damper which reacts accordingly to maintain the airflow at a constant air volume.

A substantial dispute arose concerning the specifications related to the size of the CVRs. The CVR schedule on Drawing M–65 specifies, in addition to the volumetric flow rate in CFM, the CVR "size," with a "W × H" designation, and a maximum pressure drop, designated "MAX.P.D. (in H₂O)." Contract Drawing M–71 contains two figures above the heading "TYP[ICAL]. CONSTANT VOLUME REGULATOR INSTALLATION DETAIL." One figure portrays a CVR and related ductwork. All of the CVR portions and the surrounding ductwork are shown on this figure to be of a uniform height. Amendment No. 2 changed a dimension "L"

so that it now represented the clearance between the opposed blade damper and the airflow measuring device (the AMS portion of the CVR). The original "L" dimension included the damper, as well. Note 2 on Contract Drawing M–2 states that the duct runs (directly upstream of every CVR) were to be in-line straight runs of a minimum length (to be calculated by a given formula) "in the same size as [the] CVR."

The CVR portion of the specifications, section 15920, ¶ 2.04, was substantially amended. The first sentence of ¶ 2.04A originally read, as follows: "The CVR assembly shall consist of a process air volume pitot primary element and a low leakage, air-foil [sic], opposed blade damper in a single housing. In addition, damper linkages shall be provided to accept a pneumatic operator (actuator) which shall be factory installed by the Airflow control manufacturer." This original paragraph was substituted with the following ¶ 2.04A: "The CVR assembly shall consist of an air flow [sic] monitoring station with air straightener, total and static pressure probes and manifolds, and a volume damper, all in a single factory fabricated housing. Damper linkage shall be provided to accept a factory furnished and installed pneumatic operator (actuator)." Ultratech interpreted the single factory fabricated housing requirement using the typical installation details from drawing M–65 to mandate a uniform outside dimension along the entire length of the CVR housing.

The revision of ¶ 2.04A.1. required that the CVR dampers contain opposed blades with polyurethane foam, flexible aluminum jamb seals, or an approved alternate. In addition, the interlocking edges of the blades were modified from felt, rubber, or neoprene to self-fastening, molded PVC gasketing, the stated goal of which was to minimize air leakage. Originally, maximum damper leakage was specified, and the contractor was required to furnish leakage factor curves. The revision omitted the specified leakage

---

6. The project contains two types of AMSs, both of which consist of essentially the same equipment. One type is the stand-alone AMS; the other is the AMS portion of the CVRs. The latter contains a damper; the former does not.

7. The unit is equal to the pressure balanced by the weight of a 1–inch column of liquid.

and verification curve requirements. The original version required a minimum 14–gauge steel damper casing with flanged duct connections, whereas the revision omitted any mention of duct connections. Although the revision deleted, but did not prohibit, the flanged duct connection requirement, plaintiff read the newer version as supporting its interpretation of a single factory-fabricated housing requirement. Finally, ¶ 2.04D originally required the "CVR casing" to be at least 12–gauge steel with flanged duct connection and welded seams. The revised ¶ 2.04D set forth that the "CVR housing" was required to be 14–gauge or heavier galvanized steel with flanged duct connections and welded seams.

On February 27, 1984, LBC & W received Ultratech's Submittal No. 1 containing Ultratech's design for its proposed CVR. Pursuant to the requirements of the submittal process, Ultratech proffered a physical sample of its proposed CVR under the specifications. This sample could be no smaller than an 8– × 8–inch unit. According to LBC & W's shop drawing log, Ultratech submitted its sample CVR three times, on the following dates: April 20, 1984; June 25, 1984; and September 6, 1984.

Defendant argues that Buck Bobbitt, former owner of Ultratech, now deceased, was solely responsible for the design and construction of the Ultratech CVRs. Plaintiff counters that LBC & W was responsible for the CVR design and that Mr. Megna assumed responsibility for overseeing design compliance throughout the submittal review process.

In its "Memoranda for the Record," LBC & W recorded concerns regarding the CVR submittal history. These memoranda were forwarded directly to the appropriate subcontractor for response, in this case Ultratech, to expedite the submittal process. An entry dated May 1, 1984, reflected LBC & W's concern that, based on Ultratech's submittal, the subcontractor may not meet the specifi-

cation requirement that Ultratech present evidence of successful supervision, calibration, and start-up services for similar projects over a two-year period. LBC & W stated that Ultratech's submittal failed to provide evidence that it could support the Module I project with a large, well-organized, and qualified team that had worked together successfully on similarly large projects. LBC & W's expressed concern, which was "underscored" by one of the Ultratech's references, was that Ultratech had performed only small projects, even though some were complex. Ultratech responded that the FDA project consisted of simple units in large, mostly identical quantities, whereas its earlier projects were more complex. It could produce these units with greater ease than producing a smaller number of highly-varied and complex units.

LBC & W further noted that the pitot array [8] did not comply with specifications and that the damper frame was an excessive and abrupt obstacle to airflow. Ultratech stated that it considered an averaging, multi-point static sensing array as superior to a single-point static sensor, but in the resubmittal complied by providing the single-point static sensor. With respect to the damper frame, Ultratech asserted that the damper frame was the smallest one available that included all specified components. Further, Ultratech stated that even though the damper frame appeared large with respect to the small duct area of the sample submitted,[9] it would be relatively small on larger CVRs.

LBC & W's Mr. Megna testified that a drawing from Ultratech's January 11, 1985 Submittal No. 3, which portrayed the damper location within the CVR housing, showed the damper blades reaching the extreme portions of the housing without depicting a damper frame. This same drawing is referenced, as well, by Ultratech at the beginning of the same submittal in the Specification with Commentary Section. After the specification

---

8. A pitot array is the heart of the AMS, consisting of a total pressure manifold and a static pressure probe. The measurements from the pitot array are sent to a DPT. The pitot array, in combination with an airflow straightener and damper, constitute a CVR.

9. Section 15920, ¶ 1.03F required the sample CVR to be an 8– x 8–inch size or greater.

subsection referring to damper requirements, which include a reference to a damper frame, the Ultratech comment directed the reader's attention to the drawing at page 24 for damper installation.

On September 19, 1984, Thomas P. Glavin, the FDA's Resident Engineer, approved Submittal No. 2, seven months after the first submittal. The CVRs were approved with the original damper frame. Mr. Megna testified that the submittal was approved based upon Ultratech's response to the comment, which noted that the damper frame appeared obstructive; Ultratech's written guarantee, as the specialty subcontractor, that the system would properly perform; and other assurances. Although Mr. Megna could not testify as to informal assurances given him by the deceased former president of Ultratech, he did testify that, based on Ultratech's submittal, its pressure drop for the AMS portion of the CVR was lower than that of Air Monitor. It was his interpretation that this lower pressure drop for the AMS could offset the pressure drop of the damper. Submittal No. 3 appears to have been a resubmittal for an instrumentation change, presumably the use of Brandt DPTs instead of Air Monitor DPTs.[10] Ultratech provided approximately 555 CVRs to the project and approximately 61 stand-alone AMSs for installation into the ductwork.

Ultratech ordered Ruskin CD–35 dampers utilizing screwed construction—braced at the corners, rather than welded. In addition, the damper frames were of 16–gauge, four-bent channel construction, rather than the 14–gauge steel specified in the contract. Plaintiff asserts that the Ruskin damper frame construction is substantially compliant with the CVR specifications and did not detract in any way from the damper's performance.

Kirlin's sheet metal subcontractor, Hamilton & Spiegel, Inc., sent a March 6, 1984 letter to Gary M. Grandchamp, Kirlin's Senior Project Manager, regarding ductwork conflicts in the utility corridors.[11] Hamilton & Spiegel stated that the system needed a complete redesign so that the ductwork and components could be placed in the utility corridors, in the general locations depicted in the drawings and achieve the design criteria. Further offsets would be required for ductwork in the utility corridors along with more expensive fittings. If the redesign described by Hamilton & Spiegel were not implemented, static pressure and airflow requirements could not be achieved.

On October 16, 1985, Anglo–American Associates, Inc., an insulation subcontractor, sent a letter to Kirlin documenting a telephone conversation of the same date. The letter recorded an agreement that the insulation subcontractor would not be held responsible for correcting or repairing any insulation work that later became damaged as a result of leaks in the ductwork because of Kirlin's direction to install the insulation on all pipes and equipment whether or not it had been previously tested for leaks.

At a February 15, 1984 meeting between representatives of plaintiff, Kirlin, LBC & W, and the FDA, Kirlin asserted its position that additional compensation should be awarded because the number of offsets required was excessive. In Kirlin's opinion it was responsible for coordinating work so that the work fit into the required space, but Kirlin was not responsible for costs attributable to a poor design or internal conflicts between architectural, structural, and mechanical drawings. In a February 29, 1984 letter to plaintiff, Mr. Grandchamp emphasized Kirlin's position that Kirlin would not proceed with further coordination efforts until it received detailed drawings resolving the matter. The FDA and Hamilton & Spiegel took the position that the contractor had the responsibility to coordinate the work using as many offsets as required to fit the equipment into the proper location. Finally, in a claim letter to Contracting Officer Cynthia A. Hawley in early March 1984, plaintiff echoed the subcontractor's assessment that a design deficiency caused the equipment location problems

---

10. Brandt supplied the DPTs for the project.

11. This project was designed with utility corridors located adjacent to the animal testing laboratories, so that mechanical building maintenance can occur without disturbing laboratory testing.

which went beyond its contractual obligations.

After a March 20, 1984 decision denied the demand for revised detailed drawings and after a March 28 meeting between the parties, Contracting Officer Hawley, who was the FDA contracting officer with continuing responsibility for the administration of the contract, issued a final additional compensation decision on April 6, 1984. Plaintiff's request for additional compensation was denied based on the contracting officer's opinion [12] that composite drawings showing equipment coordination derived from the architectural, structural, and mechanical drawings had to be created by the contractor. The contracting officer further stated that plaintiff agreed that there were no conflicts in the drawing if offsets were used. Based on the foregoing and the contract, plaintiff was deemed responsible for providing any offsets needed for coordination at no extra cost to the FDA.

On April 5, 1985, William H. Hoffman, the FDA's Project Officer and a mechanical design engineer, strongly recommended to Mr. Megna that the "numerous design conflicts, errors and omissions" that occurred during the pre-bid and construction phases of Module I be considered in preparing for Module II, the second phase of the project, which at that time was in the design phase. He suggested that the "extremely large" numbers of Module I bid addenda and clarification requests be reviewed to eliminate or reduce any problems with the Module II design documents.

Defendant maintains that Drawing M–65 established pressure drop performance requirements that Ultratech submissions did not meet. Plaintiff argues that LBC & W required no pressure drop certification or testing from Ultratech for the CVRs. Further, plaintiff points to the lack of a written submittal record mentioning Drawing M–65 or referring to pressure drops, nor any specification for a test of pressure drops. Defendant counters that Ultratech's submittal record does contain mention of Drawing M–65.

Defendant further contends the contract obligates the contractor to meet the pressure drop performance requirements scheduled on Drawing M–65 and asserts that the contractor could not achieve these requirements without performing engineering tests on the CVRs. As previously mentioned, Mr. Megna testified that Ultratech's January 11, 1985 Submittal No. 3 did contain mention of pressure drops for its standard AMS product which comprises one of the portions of a CVR. In the Specifications for Standard Units section, the submittal listed AMS "Unrecovered Head Losses" of less than 0.13 Inches W.C. for the standard option and less than 0.065 Inches W.C. for an option G. Although this figure does not include any pressure drop attributable to the damper portion of the CVR, it demonstrates that pressure drop information is generally provided by AMS manufacturers and can be important when choosing equipment for an application. Defendant also refers to LBC & W's comment about the inadvisability of Ultratech's damper frame selection, which LBC & W considered to pose an excessive and abrupt obstacle to airflow.

### 2. Problems with testing and balancing the AMS system

A meeting between Kirlin and the construction engineer took place on March 10, 1986. In a letter of the same date from Kirlin to plaintiff summarizing the meeting, Kirlin asserted that the CVRs gave erroneous airflow readings because of problems with the configuration of the ductwork and equipment. Kirlin recommended that the DPT spans be adjusted to make the gauge readings correspond with flow hood readings taken by the air balance subcontractor. According to Kirlin, another flow hood reading would then be taken and the DPT readjusted, if necessary. The reading should then be close to the set point. This process would be repeated until the DPT gauge read zero with no airflow and indicated a flow equal to the set point when flow hood measurements equaled the set point flow. Kirlin stated that

---

12. All references to the "contracting officer" refer to Mrs. Hawley. Other individuals with con- tracting officer authority are identified by name.

correct readings at these two points should signify that correct gain has been established and the gauges should read properly over the whole range. Kirlin guaranteed that the gauges would read properly at the set point based on the above adjustments. Two days later plaintiff forwarded Kirlin's letter to the FDA.

On March 20, 1986, the contracting officer conditionally approved plaintiff's above-described request to adjust the DPTs. One of the three prior conditions that plaintiff was to satisfy in the presence of an FDA–authorized individual was performing a visual inspection of the following: the ductwork to ensure no debris was present; the holes in the total pressure manifold tubes and the static pressure probes to check if they were blocked or clogged; the distance between the manual volume damper and the sensing elements to see if this was affecting the airflow; and, finally, the ductwork system to identify any possible leaks. The other conditions required that all of the adjustments be recorded in the balancing report, all DPTs be labeled to show the changes made to them, and all of the readjusting be accomplished at no cost to the FDA. Paul S. Pinkston, Ultratech's Technical Director, performed the DPT adjustments from March to June 1986 with the assistance of Kirlin personnel and a Brandt employee.

Thomas P. Glavin, the FDA's Resident Engineer, sent plaintiff a letter dated April 17, 1986, expressing concern that all of the DPTs apparently needed adjustment, whereas when the conditional approval was given by the contracting officer, it was the FDA's understanding that originally only approximately 25 percent would require the work. The DPT adjustments were allowed to continue based upon an agreement that Ultratech provide the FDA with a letter explaining why all the DPTs needed adjustment and that Ultratech assure the FDA that the adjustments would in no way impact on CVR function or life span. George K. Rowe, an LBC & W draftsman and engineering technician, recommended to Mr. Glavin in an April 21 memorandum that the AHU and exhaust measurement and control systems be calibrated, adjusted, and verified by Ultratech so

that the gauges correctly indicated the actual flow through the AMS. Mr. Rowe believed that such a calibration would facilitate assessment as to whether the system was improving as a result of Ultratech's ongoing DPT adjustments. In an April 24, 1986 letter, Mr. Glavin, following Mr. Rowe's recommendations, instructed plaintiff to ensure that the above calibrations be performed.

Kirlin sent its field personnel a letter dated May 7, 1986, confirming a meeting with the FDA and presenting the meeting minutes. As recorded in the meeting minutes, the letter noted that Ultratech did not have a problem complying with the FDA's testing and balancing instructions after being informed of the April 24 FDA letter concerning testing and balancing. According to another FDA letter dated June 9, 1986, Ultratech agreed to obtain and provide to the FDA before and after readings of static pressure, total pressure, and velocity pressure for selected CVR units. Another item recorded that Ultratech anticipated finishing by June 14, 1986, in the absence of problems.

The FDA's building manager made an entry into his logbook on April 30, 1986. The entry addressed Module II of the FDA project and queried whether Mr. Glavin, as Resident Engineer of Module I, possessed any insights into improving the resident engineer's job with respect to Module II. Mr. Glavin suggested that more inspectors throughout the project were needed and that he could use a full-time assistant. He also suggested that the inspectors be government employees, rather than contract employees, as with Module I. An entry of May 23, 1986, from the same logbook noted that James R. Penn, plaintiff's Area Manager, noted that the HVAC balancing would be completed by the end of June 1986. Another entry of the same date recorded that Seneca Air Balance, Inc. ("Seneca"), Kirlin's balancing subcontractor, had convinced Kirlin that Ultratech was the source of the balancing problems.

By letter on May 8, 1986, the FDA expressed the following concerns to plaintiff regarding the apparent lack of progress in testing and balancing the air systems: The air handlers had yet to operate at their in-

tended design airflow and pressure based on the Ultratech panel gauges; the air handler gauges had not been calibrated yet to match pitot traverse airflows; the recalibration of Ultratech gauges and transmitters remained unfinished; and approximately 70 Ultratech panel gauges, removed because of holes in Bourdon tubes, had yet to be reinstalled. A Seneca balance test report sheet dated June 10, 1986, indicated that the airflow for AHU No. 2 was 16 percent below design. Another sheet indicated that AHU No. 3 was 10 percent below design.

Kirlin first inquired of Ultratech by letter on June 9, 1986, why the latter had not complied with its agreement to provide before and after readings of static pressure, total pressure, and velocity pressure for selected CVR units. Kirlin requested that Ultratech provide the information by June 13, 1986. Apparently, the information had still not been received by the end of June, as Kirlin made a second request for the information on June 30, 1986.

On August 15, 1986, Thomas W. Humen, York's Senior Sales Engineer, sent Kirlin a letter and a copy of a report issued by York. The letter summarized the following conditions noted in the report: 1) Although Fan Nos. 2, 3, and 4 had identical design conditions, they had different system designs; 2) air leaks existed in unit Nos. 1 and 2; discharge dampers in some units create a loss; notable losses were recorded in the damper leading to system No. 4; and losses existed at the fan transition.

On July 21, 1986, the contracting officer participated in a meeting at which plaintiff's Mr. Penn and the FDA's Mr. Hoffman were present. Contracting Officer Caroline P. Dean's minutes recorded that plaintiff had achieved the static pressure for AHU Nos. 2 & 3, but not the flow. A suggestion was voiced that the extra flow could be obtained out of AHU No. 4.[13] Mr. Hoffman expressed concern that using AHU No. 4 to augment airflow would result in inconclusive test results. According to Mr. Hoffman, if flow were diverted to the system, it would not be

known whether more static pressure was necessary to push the airflow through the ductwork. This suggestion appears to be similar to a test later performed by LBC & W. Mrs. Dean declared after trial that plaintiff gave the contracting officer two documents entitled "FAN STATUS 7/17/86" at the meeting. The sheets list AHU Nos. 4–13 as "ok" and the CVRs for System Nos. 1–3 as "ok."

In a letter dated July 30, 1986, Kirlin's Mr. Grandchamp stated that testing of the equipment revealed nothing; the equipment functioned as designed. According to Mr. Grandchamp, after considerable testing Kirlin determined that the CVR construction was causing a higher static pressure drop in the ductwork that prevented proper airflow delivery. Mr. Grandchamp informed plaintiff of Kirlin's intention to ignore the low airflow and have the system balanced and set into automation. Mr. Grandchamp testified that it was Kirlin's intention to see if the FDA would accept a working building with low airflow.

By the end of July 1986, after months of unsuccessful efforts to achieve sufficient airflow to balance the HVAC, plaintiff sought a meeting with the contracting officer to discuss the situation. The contracting officer responded in a letter dated August 1, 1986, that such a meeting would be premature and requested that the contractor present a detailed definition of the HVAC problems, including evidence to support its findings, recommendations for a remedy, and alternatives. Plaintiff replied under a cover letter dated August 15, 1986, with various evaluations and proposals received from its subcontractors to remedy the problem. The following subcontractors prepared and submitted evaluations and proposals: Kirlin, York, Trane Co., Seneca, and Ultratech. These evaluations and proposals will be discussed serially.

In its August 15, 1986 letter, Kirlin presented a summary of submittals and its own recommendations based on the submittals of the subcontractors. Seneca, Kirlin's air bal-

---

**13.** AHU No. 4 is a stand-alone backup unit which can be connected via transition ductwork to sup-

ply any one of AHU Nos. 1–3.

ance contractor, found constant low CFM delivery to the rooms when attempting to air balance the systems with CVRs installed. According to Kirlin, the CFM reading of rooms served by systems with CVRs installed in the supply and the return ranged from 5 percent low to 75 percent low. In a section captioned "Results of tests performed," Kirlin noted that York mentioned air leaks at the duct and the dampers, but asserted that Kirlin corrected both problems. Kirlin stated that York believed its fan equipment capable of delivering design CFM and static pressure. Kirlin did not summarize Trane's evaluation of its fan equipment, but stated that both manufacturers' reports indicated that the equipment was capable of performing as specified. Finally, Kirlin stated that Kirlin and Hamilton & Spiegel, plaintiff's sheet metal subcontractor, with the assistance of Seneca, the balancing subcontractor, inspected the entire ductwork for air leaks and were unable to find any leaks of consequence.

Kirlin proposed alternatives to remedy the airflow problems. First was Ultratech's suggested replacement of the type and location of the damper described below. Kirlin estimated that it would take roughly three months to implement. Another suggestion proposed increasing the CFM and static pressure by replacing the York fans and potentially the Trane fans, as well. Kirlin projected that it would take six months to complete this modification. Finally, Kirlin suggested removing the damper in the CVR and connecting controls between the CVR and the motor operated damper, thereby changing the damper from a two-position damper to a modulating damper. Kirlin estimated an approximate two-month duration for implementation of this alternative. Kirlin suggested that the impact of the above alternatives on the CFM and static pressure performance requirements could only be evaluated by the owner's design team, but expected no significant impact on the life of the equipment. Kirlin referred to Attachment "F" for Ultratech's position concerning design errors and noted that the York and Trane fan equipment and the Johnson Controls, Inc. motor-operated dampers appeared to be functioning according to specification.

By Inter–Office Correspondence on July 2, 1986, York submitted a summary of problems and a suggestion that elimination of all losses would result in the York AHUs producing the designed static pressure and CFM airflow. The problems included the following: Inlet vanes on the drive side of Unit No. 7 fan did not open wide unless the main control air was applied directly to the operator; all ductwork from the units was not the same; air leaks were visible in the cabinet and ductwork (especially AHU Nos. 1 and 2); dampers were positioned in the outlet of some units and not others; short radius turning vanes were used in elbows, rather than turning vanes with extended trailing edges; and losses occurred in the transition from the fan section to the coils. In comparing the performance curves of the fans to the design curves, York stated that the actual system curve fell to the right of the design curve and below the fan curve line of that particular RPM. According to York, the Sheet Metal & Air Conditioning Contractors National Association (the "SMACNA") HVAC manual states that when the actual system curve falls to the right of the calculated duct system curve, the design fan is capable of delivering sufficient static pressure to the system. York suggested that this indicates a possibility that system effects were not added to the calculated system pressure losses to determine the actual system curve.

In a July 3, 1986 letter, Trane concluded that the fans operated properly, but that problems in the system design affected fan performance. Based on the fan design, airflow losses were caused by leakage, damper settings, or inlet air conditions. Trane recommended that inlet air conditions be checked first to ensure adequate clearance on both sides of the fan inlets. Trane noted that the Seneca balance reports also indicated problems with the dampers and the damper linkages which could effect airflow. According to Trane, the low airflow most likely resulted from fan inlet conditions or abnormally high restrictions within the CVRs. Trane suggested that the CVRs were "apparently operating with a very small percentage of the required area for proper operation." Trane presented Seneca's opinion that another diffuser might reduce the above design

static pressure and thereby increase the below design CFM for Exhaust Fan No. 31. Alternately, Trane recommended providing a new drive to increase the speed of the fan and offset the increase in static pressure.

At Kirlin's request Seneca took a series of static pressure drop readings at CVRs. According to Kirlin's cover letter, the materials submitted by Seneca indicated a 0.45–, 0.75–, and 0.9–inch static pressure drop across the CVRs. The first pages of data, however, gave the static pressure drop across 25 CVRs located in various portions of the supply and exhaust ductwork. The average pressure drop across these 25 CVRs is 0.39 inches static pressure. Seneca also performed a static pressure profile of three CVR units. This profile revealed that the majority of the pressure drop occurred across the damper section of the CVRs.

In a letter dated August 12, 1986, Ultratech provided its opinion as to the source of the airflow problem. Ultratech identified the inadequate performance of at least three fans as a contributing factor that affected approximately one third of the CVRs. Ultratech further voiced its suspicion that other fans were undersized. In addition, Ultratech suggested that other factors, including the Johnson Controls motor-operated damper, the manual damper, the hot water coil, and the humidity sensor, contributed to the pressure drop. In Ultratech's opinion the pressure drop across these elements, and especially the motor-operated damper, were quite significant. Finally, Ultratech noted pressure drops associated with the turns in the duct, general layout of the duct, and the size of the duct. Ultratech asserted that given the detailed specification requirements with respect to the CVRs and the damper within the CVRs, the design engineers effectively established the performance characteristics of the CVRs.

In the same letter, Ultratech proposed modifying and altering the written CVR specification with the following: 1) Canceling the CVR single-housing requirement and then removing the flexible jamb seal requirement by not seeking a goal of minimizing air leakage; 2) eliminating the damper self-fastening and interlocking-edge requirement; and 3) revising the CVR and damper specification to require a separate damper housing with flanged duct connections. Ultratech suggested that certain CVRs be removed from the duct and the damper end section separated from the CVR. Consistent with the revised specification, a new damper (inside its own housing and with flanged duct connections) would be attached to the CVRs and reinstalled into the ducts.

Along with Ultratech's proposal and other manufacturers' submittals sent to the plaintiff, and in turn to the contracting officer on August 15, Kirlin inserted a copy of the Memorandum for the Record. This memorandum, written by LBC & W for the CVR submittal history discussed above, see supra pp. 184–85, was enclosed to show that there had been concern with the CVR damper frame from the time of Ultratech's first submittal.

Plaintiff argues that Ultratech responded to the contracting officer's August 5, 1986 letter with an accurate diagnosis of the point of airflow constriction at the CVR damper and damper frame. In addition, according to plaintiff, Ultratech proposed a specification revision to modify the CVR configuration toward removal of the damper frame from the airflow and easement of the damper leakage requirements, the practical offshoot of which was to disrupt and obstruct the flow of air. Defendant correctly notes that the Ultratech August 1986 proposal to modify the dampers was not the only alternative presented by Kirlin and plaintiff in response to the contracting officer's letter. Kirlin and plaintiff presented a total of five different alternatives. A close inspection of Kirlin's proposal reveals three alternatives and two comments regarding the alternatives. The FDA decided to proceed with the fan problem first.

On August 28, 1986, a meeting/system test respecting airflow problems took place at which Mr. Grandchamp, among others, was in attendance. Mr. Rowe stated in a Memorandum for Record dated the next day that supply Air System Nos. 1–4 "appear to be of sound construction with minimal air leakage." [14] Mr. Rowe further recorded that,

---

14. Air system is used to distinguish the ductwork and equipment contained therein (e.g. CVRs)

based on tests performed and a visual inspection, those present held the general opinion that the duct system was performing properly within design conditions. This opinion was based upon a test whereby AHU No. 4 was connected to feed Air System No. 1. AHU No. 4 was placed on line with variable inlet vanes open wide and then AHU No. 1 was started to operate in parallel with AHU No. 4. These efforts were to increase the CFM and static pressure of Air System No. 1 to design. Mr. Rowe noted that the inlet vanes of AHU No. 1 opened approximately 10 percent according to the panel gauge. The inlet vanes were controlled by the system pressure. The combined AHUs produced 34,000 CFM with 1.1 inches static pressure. Both the CFM and static pressure readings were taken from panel gauges. Design CFM is 32,200 CFM for AHU No. 1, and the static set point, or desired static pressure, is 1.2 inches. Next, with the system operating as described above, the airflow panels were observed. Mr. Rowe noted that the airflow into the rooms varied from above set point to below set point, with many rooms at set point. There was also testimony that Mr. Rowe of LBC & W observed the CVR° damper actuators modulating. The tests indicated that the CVRs were receiving sufficient airflow to allow the system to operate in automation. Mr. Rowe testified that he went to the furthest room and measured the airflow, which seemed to be at the levels indicated on the AHU schedule of Drawing M–62. Finally, Mr. Rowe noted in the memorandum that the above test indicated that the duct system, including the CVRs, would perform as designed. In his opinion this eliminated the "duct system" effect as the cause of the low airflow problems.

On September 9, 1986, Mr. Rowe sent a letter to the contracting officer stating that, based on the above test of the duct system, the CVRs would perform as designed when adequate airflow was supplied. Mr. Rowe characterized as misleading the tests performed by York and Seneca because the design static pressure was not included in one test nor the CFM in another. He further questioned York's interpretation of the

actual system curve versus the design system curve. Mr. Rowe explained that when the actual system curve falls to the right of the design system curve, the system will operate at a lower pressure loss than designed. Also, a fan is not performing up to design when the actual pressure-volume point falls below the design pressure-volume curve. This contradicts York's earlier assertion that under the SMACNA manual the design fan is capable of meeting the actual system pressure loss. According to Mr. Rowe, based on the above duct system test, the problem appeared to be within the AHU. He noted that with respect to an AHU, if the supply air duct, including the discharge damper, contributed to the airflow constriction, the result would be an increase in static pressure. It would not result in the measured static pressure reading below actual flow design. He also stated that air leakage appeared negligible and that no unusual coil and filter arrangements were present. Based on his analysis of the AHUs, Mr. Rowe concluded that the fans were failing to perform in accordance with the approved submittals. Mr. Rowe further added that the York fans did not have cutoffs to help assure good pressure distribution. He explained that the supply air problems were being resolved before the exhaust fan flow problems. Finally, Mr. Rowe noted that the CVRs were not the cause of the fan deficiencies.

On September 25, 1986, the FDA's Project Officer, Mr. Hoffman, sent the contracting officer a letter after having reviewed plaintiff's August 15, 1986 submission and LBC & W's response. Mr. Hoffman noted that while plaintiff's submission identified possibilities for solving the airflow problem, it failed to give a specific cause. He also pointed out that the York, Trane, and Ultratech analyses consisted largely of defenses for their respective equipment. In Mr. Hoffman's opinion, LBC & W's response, while disagreeing with the York and Ultratech positions, was also defensive in nature. Mr. Hoffman stated that, as expected, no one came forward to take responsibility for any problems. He described the situation as classic "finger-pointing." He noted that if the equipment

from the AHU which consists of the fan and fan discharge leading to the ductwork.

installed at the project by plaintiff did not meet the specification requirements, plaintiff would be responsible for any delays. If, however, the design engineer did not properly calculate the static pressure drop across system elements or the distribution ductwork, the FDA would be required to seek compensation from LBC & W. Finally, Mr. Hoffman recommended that another consultant be hired to ascertain the cause of the airflow problem.

The contracting officer sent plaintiff a letter on September 26, 1986, chastising the contractor for not having a person with authority at the job site as required under the contract. The contracting officer noted the serious HVAC balancing problems and mentioned that winter was approaching [15] while equipment still remained untested. On September 29, 1986, in a letter to plaintiff, the contracting officer, after consultation with LBC & W, suggested that Trane and York should provide factory engineer representatives at a proposed October 1 meeting. Neither Hamilton & Spiegel nor Ultratech representatives were considered to be essential participants, but they could attend if plaintiff so desired.

In an October 1, 1986 letter to plaintiff, Kirlin disputed the test results of the August 28, 1986 meeting/system test. According to Kirlin, the testing occurred at 34,000 CFM, rather than the design airflow of 32,200 CFM. Kirlin's interpretation of the reasons for low airflow included the following: unacceptable turbulence and a static pressure drop caused by the designed fan discharge transition fitting; turbulence caused by the design of the Glycol Coils and Heating Coil; and a lack of a smooth transition caused by the design of the fan plenum discharge. Based on its testing of AHU No. 3, found to deliver 99.65 percent of design airflow, but downstream delivering as low as 60 percent airflow, Kirlin reiterated its earlier stance that the design airflow at the outlets and the static pressure drop at the CVR would not be met even if design airflow and static pressure could be provided. In conclusion Kirlin stated its opinion that when designing the system, the design engineer failed to take into account either the conditions of the design or the allowance of proper design tolerances.

3. *Replacement of the York fans*

On October 1, 1986, a meeting was held at which representatives from the following companies or firms were in attendance, in addition to the contracting officer: LBC & W; plaintiff; Kirlin; York; Ultratech; Johnson Controls; Hamilton & Spiegel; Seneca; Comfort Control, Inc.; and Goldman Associates. Comfort Control was hired to assist Seneca in balance testing. Goldman Associates was apparently a consulting firm hired by the FDA to look into fan performance. Mr. Megna expressed that the August 28 test delivered adequate airflow at the proper static pressure. According to Mr. Megna, this test verified the adequacy of external static requirements, which, in turn, were verified again by computer. He explained that the addition of the standby AHU No. 4 fan allowed delivery of the design airflow, yet did not exceed the design external static pressure. Mr. Megna also explained that such a system is designed by calculating the exterior and total static pressures with respect to the longest run of ductwork. Therefore, the unit test measurements were taken during the test at the longest duct run.

Mr. Megna further stated that the purpose of the test was to explore the total system static pressure and that the test demonstrated that the AHU accounted for the majority of the pressure drop. If the system static pressure losses exceeded the design, normally the design CFM would correspondingly drop. Here, however, both the CFM and static pressure were below design. Therefore, LBC & W had concluded that a fan performance problem was present.

Wayne T. Day, President of Kirlin, asked where the system static pressure measurement had been taken. Mr. Rowe explained how York had taken its readings across the fan coil, filters, and other components, which included the discharge and intake plenums

---

**15.** During the winter the building temperature needed to be maintained at a minimum of 55 degrees.

and some measurements on the suction side of the fans. Mr. Megna added that LBC & W's analysis went further by taking fan motor current readings; these readings were converted to brake horsepower to confirm that system static pressure was below design. Mr. Megna explained that the fans were not performing the work that was intended because the static pressure was down and the CFM was down, as well. In his opinion the current readings were low because the fans were not performing to design specifications.

Initially, LBC & W investigated the fact that the York fans have much less pronounced cutoffs than Trane or other competitor fans. Comparing the York fans with similar fans of the same physical size, Mr. Megna stated that there were significant differences in performance. According to his research, the York fan was really a medium pressure fan, both by its listing and per Air Movement & Control Association ("AMCA") ratings, rather than a high-pressure fan as the contract specifications and second submittal contemplated. Mr. Megna further suggested that the contractor might consider testing the performance of other equivalent manufacturer fans by placing them under the system and field conditions.

Mr. Megna also stated during the October 1, 1986 meeting that he was comfortable with the design characteristics of AHU No. 1. He mentioned that York assured the design engineer that the fans could meet the performance requirements. Pat Sanabria, of Goldman Associates, added that the system external static pressure was verified both in the field and through a design computer program. The field measurement was taken at the longest duct run and included all components. Mr. Sanabria asked whether the contractor had any data demonstrating that static pressure losses exceeded the architect's numbers. Stanley Fleischer, of Seneca, responded that Seneca had been unable to test the system while throttled down and that the tests performed up to the date of the meeting had been performed with the system open wide manually.

Mr. Day of Kirlin asked if the field test was performed at 34,000 CFM or at the design CFM of 32,200. LBC & W advised him that the sensor reading was 1.1 inches and 700 CFM at the longest run. Mr. Grandchamp added that this delivery was measured with the damper 50 percent closed (or throttled). Mr. Hoffman noted that, with AHU Nos. 1 and 4 operating simultaneously, the CVRs were observed modulating. This indicated to him that there was excess pressure available at the CVR. Mr. Day next asked what reading was measured at the discharge of the fan. He was informed that the reading at the Y-duct junction was 1.9 inches. Mr. Day inquired why 34,000 CFM was used, rather than design. He was told that allowance was made for leakage. He then asked why Room 3901, the location of the longest duct run, was throttled and was advised that it would normally be operating slightly throttled.

Mr. Rowe stated that no excessive drop from the fan discharge to the inlet was found. He was attempting to prove by this test that the discharge loss was not excessive. Mr. Fleischer mentioned that the longest duct run may not be the run that requires the highest static pressure. Mr. Megna replied that by taking the longest duct run with a CVR in it, any shorter duct run could be assured to have more static available. Mr. Day questioned why tests show insufficient static readings from the unit. Mr. Megna replied that, according to his research, the low static pressure readings at the AHU directly result from inadequate fan performance. Mr. Day inquired why the fans were not rejected initially during the submittal phase when LBC & W reviewed them. Mr. Megna responded that LBC & W trusted the York representations and literature and that there was no reason to verify data such as fan curves.

Len Crawford of Johnson Controls was asked to state what value he obtained when measuring the static pressure loss across the discharge damper. He responded that the value was low, approximately 0.06 Inches W.C. Mr. Day next asked if more static pressure is required than design when the filters are dirty. Mr. Rowe explained that the documents only give the external static pressure requirement and the maximum

pressure drops through the coils and filters. The total static pressure was calculated in the second submittal by utilizing a 50–percent loading filter factor under the assumption that all filters would not be dirty at the same time.

Mr. Megna next addressed other factors that he took into account in his review of the problem. According to Mr. Megna, at 28,000 CFM the total static pressure was lower than 7.55. Further, the brake horsepower was down, and the RPM was greater than the submittal value, yet the current and static pressure were lower. Gary G. Wilkins, York's Zone Sales Manager, who was requested to address the issue by Mr. Day, stated that York would rely on its July 1986 report. It was York's position that the design of the fan transition exceeded current SMACNA requirements. Mr. Wilkins asserted that this transition was the cause of the decrease in velocity and suggested that a false bottom be placed in the transition to reduce the losses. Mr. Megna mentioned that his firm had used the present transition on many similar projects and the transition is a common one. He asserted that it is not a common practice to redesign transitions or discharge plenums to enhance performance.

Michael Margolis, Comfort Control's Vice President of Operations (now President), stated that AHU No. 3 demonstrated 99.6 percent of design CFM and that static pressure had been met for this unit. He further stated that a government representative verified that the unit operates at sufficient external static pressure. According to Mr. Margolis, the combined AHU Nos. 1 and 4 were determined to have an external static pressure loss of 10 to 15 percent in excess of design at 32,250 CFM. Mr. Megna asserted that either the pitot traverses were incorrect or excessive duct leakage exists because the sum of the air quantity did not check out. He also stated that the air quantity problem could be resolved by speeding up the fan, but the present fans do not have the capacity to compensate. Mr. Rowe added that the static pressure calculations based on field measurements were made using the worst fan loading conditions and yet the calculated total static was higher than indicated during York's test,

but still approximately 2 inches below design. This reinforced Mr. Rowe's opinion that the fan is 58 percent efficient, rather than the 69 percent stated in the submittal.

Mr. Day next asked if Mr. Megna was of the opinion that the York fan would not deliver if taken out and tested. Mr. Megna responded that a test outside of field conditions would be invalid. Mr. Day inquired as to the extent of the fan's failure to perform. Mr. Megna informed him that the fan was lacking about 10 percent of the design CFM and about 2 inches of static pressure. Plaintiff's Mr. Penn questioned whether the designed 32,200 CFM was contemplated under normal or ideal conditions. Mr. Megna answered the former. Mr. Megna suggested that the York fans be tested independently or that York investigate whether or not they are truly high-pressure units. Mr. Penn asked the contracting officer to give a directive under the contract Inspection Clause to prove or disprove fan performance as the source of the problem. The contracting officer declined, stating that the FDA was not yet at the point of inspecting.

Mr. Sanabria, the consultant to the FDA, asserted that nothing had demonstrated that the specifications either created or contributed to the problem. In his opinion the meeting revealed that the fans were incapable of delivering the design CFM and static pressure, suggesting an equipment problem, rather than an engineering problem. Finally, he emphasized the fact that no one had challenged or discredited the figures dictated by the design engineer. Mr. Penn stated that his supplier asserted that the fan meets the specifications and questioned whether he had any alternative. Mr. Sanabria informed him that a fan producing less than 32,200 CFM does not meet the specifications. Mr. Penn asserted that his supplier would certify that the fans were operating properly, but that a downstream problem impedes their performance. Mr. Sanabria noted that external static pressure had been verified and questioned what is impeding performance.

Mr. Wilkins again stated that the fan transition was impeding fan performance. Mr. Day asked if the transition detail was to scale and if the transition is a normal one. Mr.

Wilkins replied that there are better transition designs. Mr. Megna asked why York failed to raise the issue when the 7.55–inches system static pressure was agreed to during a meeting regarding the second submittal. He asked Mr. Wilkins to explain how the present transition adversely affects performance. Mr. Wilkins stated that York's position was that the units can meet the required 32,200 CFM if the transition was of standard design. Mr. Megna inquired what was such a "standard design." According to Mr. Wilkins, the discharge duct at about 10 feet or more before the transition should be of uniform cross section. The contracting officer asked John E. Leigg, then with Hamilton & Spiegel, whether he would describe a duct design held straight for 10 or more feet before a transition as standard. Mr. Leigg answered no. She also asked him whether in his experience it was common to see such a design in the field. He again answered in the negative.

The contracting officer questioned Mr. Penn about his proposed course of action and he stated that he would seek a remedy from Kirlin. Mr. Day stated that he had no further questions and indicated that Kirlin would conduct additional tests and complete its investigation. The meeting was then adjourned.

By telegram during early October 1986, York's Mr. Wilkins reiterated York's position to Mr. Grandchamp that the fans were being inhibited by the system design and effect. With the expressed intention of maintaining good will, York informed Mr. Grandchamp that it would increase the RPM of one fan in an attempt to overcome the inhibitions. This process was to be finished within three weeks. On October 14, 1986, Fred M. Butler, plaintiff's Senior Vice President, wrote a letter to the contracting officer concerning the FDA contract. Discussing the balancing of the HVAC system, Mr. Butler mentioned that Kirlin was pursuing the matter vigorously and was proceeding with fan replacement "since the problem seems to have narrow [sic] to obtaining and installing higher capacity air movement fans."

A letter dated October 23, 1986 from Mr. Wilkins to Mr. Grandchamp communicated York's determination, based on testing a day earlier, that the modified fan could overcome the system effect and meet the design CFM and static pressure requirements. York indicated that it would proceed immediately with modifications unless it heard otherwise. A postscript at the bottom of the letter relates a phone conversation with Mr. Grandchamp on the same date wherein Mr. Grandchamp informed Mr. Wilkins of Kirlin's intent to replace the York fans.

The contracting officer sent plaintiff's Mr. Butler a scathing letter dated November 14, 1986. The letter expressed the frustration experienced by the FDA when attempting to perform pre-final inspections. She communicated that when the FDA representatives arrived to perform inspections of certain areas, they were unable to do so because the areas were not yet prepared. The contracting officer stated her understanding of Mr. Butler's position from his three prior letters (one is in the record) that the only problems remaining were the HVAC balancing and defective paint. She asserted that there were "countless other serious deficiencies in the building." The contracting officer also suggested that Mr. Butler's knowledge and analysis as to the state of the project was incomplete and possibly misinformed. With respect to HVAC balancing, she stated that extensive testing of components still must be performed and noted "glaring deficiencies" with respect to Mechanical Equipment Room No. 1 and AHU Nos. 1 and 2, which were set forth in an attachment (it does not appear in the record). Based on these deficiencies, she asserted that plaintiff was not investigating the status of the project. The contracting officer further noted that the AHU casings had air losses as a result of large gaps and a significant condensate carryover problem. Finally, she pronounced as unrealistic Mr. Butler's December 15, 1986 completion date. In closing, the contracting officer requested a meeting between the FDA and plaintiff's top management to discuss the schedule and FDA damages. It is unclear whether such a meeting took place.

By letter dated December 2, 1986, Thomas W. Humen, York's Senior Sales Engineer, informed Mr. Grandchamp of modifications

made to AHU Nos. 1 through 4. The units received new shafts, new bearings, an additional pulley and belt, additional exterior steel bracing on the side of the unit with the sheave, and a modified base support for larger motors. Mr. Humen stated that the changes were necessary so that the units could operate at an increased speed to produce the necessary CFM and static pressure to overcome the system effect. He attached a report with post-modification readings. In the summary of the report, York suggested that AHU Nos. 2 and 3 receive increased 100 horsepower ("hp") motors to attain the sufficient CFM or static pressure. He stated that the motors of AHU Nos. 1 and 4 may require additional horsepower depending on the system balance results.

A meeting between FDA, plaintiff, and subcontractor representatives was held on December 4, 1986. At the beginning of the meeting, the York representatives were not in attendance. (The attendance page is missing from both exhibits.) Mr. Grandchamp stated that as a result of the October 1 meeting Kirlin defined the fans as the probable cause of the air balancing problems. He mentioned that after that meeting York requested an opportunity to make the system work. Kirlin gave York four weeks to attempt to do so. According to Mr. Grandchamp, Comfort Control verified that the modifications achieved the specified CFM and static pressure for AHU No. 2. The problem with the modifications was that the 75 hp motor ran at 110 amperes, which exceeded the motor's safe current operating range. Mr. Grandchamp explained that this was the reason that York proposed 100 hp motors.

Mr. Grandchamp informed those present that Kirlin advised York to procure four 100 hp motors. He also stated that he would acknowledge the increased motor size as outside the specifications. The projected completion schedule was three to four weeks to rough balance, two weeks to final balance, and two weeks to start the training and walk through the remaining equipment. He stated that he was hoping for a turnover date of February 1.

Mr. Hoffman questioned why shop drawings were not formally submitted for the modifications and noted that data from the original submittals were no longer valid for the modified fans. Mr. Grandchamp stated that the York representatives would respond to these questions, but added that the present units were not stock items. Mr. Hoffman responded that certified fan curves are the only means to predict increases in performance and capability for additional CFM at a higher speed. He emphasized that the FDA would be unable to approve the modifications and accept the units without performance or test data to show that no problems would surface. He also mentioned that all indications were that the other fan manufacturers could meet the requirements with 75 hp motors.

Mr. Megna expressed that the original certified York fan data were relied upon in approving the submittal. According to Mr. Megna, if the FDA accepted the units without such data, it would have no way of knowing where the modified units were operating on the fan curve, because the FDA had no such curve. Mr. Grandchamp stated that he notified plaintiff of the changes and that the specifications allow sheave changes at no additional cost to the contract. Mr. Megna replied that the specifications do not allow the major changes of modified shaft and bearings and a reinforced casing. Mr. Grandchamp stated that he left the October 1 meeting with the knowledge that there was a fan problem. The measures taken by York were an attempt to solve this problem. The contracting officer stated that these modifications were unauthorized because there was no approved shop drawing submittal. Mr. Grandchamp responded that he orally had notified Mr. Penn of the modifications and had no data from York to submit. He also noted that FDA inspectors were aware of the modifications. The contracting officer responded that no one with approval authority was apprised.

Mr. Grandchamp asserted that no work outside the specifications was performed, that the same model that was approved was still in place at the project, and that York had made a simple shaft change. Mr. Megna

disagreed, stating that not just a motor change was involved, but a major fan change. He said that LBC & W had approved a submittal that no longer applied to the units and that a 100 hp motor was beyond the specifications. Mr. Megna emphasized that under no circumstances would he accept a custom fan curve. Mr. Grandchamp responded that the system designed by the design engineer was not an off-the-shelf system. Mr. Megna stated that he specified a cabinet fan with performance requirements and asserted that other manufacturers' fans could be shown to meet these requirements. It was Mr. Grandchamp's position that he had stayed within the specification requirements and that he would assume full responsibility for what needed to be done. Mr. Megna noted that the specifications contain performance requirements to be met by the contractor and that Kirlin was responsible for guaranteeing performance. Mr. Grandchamp expressed that he was following this approach and had proceeded at his own risk, but noted that the fans could not be certified without the change to a 100 hp motor. Mr. Megna stated his opinion that a Trane cabinet fan would perform, but the York fan would not.

Mr. Grandchamp responded to Mr. Hoffman's question why York failed to submit a proper fan with the statement that York honestly believed that its fan would perform. When asked how the FDA knew the Trane fan would perform, Mr. Megna responded that the published data so stated.

The three York representatives arrived at this point in the meeting. The contracting officer reviewed with the representatives what had been discussed up to that point. York's Mr. Humen informed her that preparing a submittal would not be a problem. He indicated however, that the 100 hp motor was the only equipment that could meet the specified CFM and total static pressure.

Mr. Megna gave his recommendation that the FDA not consider the proposed modifications unless the following conditions were met: 1) Proper credit would be given for all increased energy costs; 2) all parties agreed no claim would be brought against the FDA; 3) there would be no increase in sound levels

from the increased RPM; and 4) the FDA would be given an extended warranty. Mr. Megna explained that Air-Conditioning and Refrigeration Institute ("ARI") does not certify a fan for a particular application, but by product line. One of the York representatives stated that an individual fan could be factory tested in accord with ARI procedures and then the package could be reviewed and approved by ARI. This was the process by which the York unit could become ARI-certified. Mr. Megna remarked that the fan should be tested at the factory. The results then could be submitted as ARI data and the FDA would know whether the fan curve was unstable. The representative informed the FDA that, when the specifications were written, there was no ARI data available for fans with variable inlet vanes.

The contracting officer asked York to present a complete submittal related to the modified fans that included the advantages and disadvantages of the proposed modifications. She inquired as to the length of time necessary to test modified units and was informed that building a replica of the AHU would take some time. The representative later stated that the testing probably could be conducted in eight weeks.

Mr. Hoffman inquired as to what York perceived to be the design problem. The representative responded that the inlet and outlet connections and transitions created most of the problem. Mr. Megna mentioned that he was aware of other manufacturers installing fans that worked in similar systems. The representative responded that York has nine other fans working properly at the project. He later stated that in York's opinion the problem is the design flow and the system effects. The term "system effects" referred to his suggestion that the actual system, as constructed, affected the output of the AHUs.

The contracting officer requested that York give notice of an intent to file a claim for design deficiencies, if it were going to do so, along with the submittal. Mr. Megna noted that the static pressure was still below the required level and that the modified RPM of 1,773 exceeded the original submittal of 1,500 RPM.

By letter dated December 15, 1986, Contracting Officer Donald W. Broome instructed plaintiff to replace the AHU No. 4 York fan with a 33–inch diameter Trane high pressure cabinet fan. The fan supplied was to be capable of achieving 34,800 CFM at 7.86 TSP, 1,569 RPM and 71.6 Brake Horsepower ("Bhp") by means of a 75 hp high-efficiency motor. Plaintiff was reminded to use the regular submittal process. Mr. Broome informed plaintiff that if "this test" revealed that the existing work was defective, the cost would be borne by plaintiff.

The contracting officer informed plaintiff in a letter of December 22, 1986, that the FDA could not consider the modifications performed by York discussed at the December 4 meeting unless plaintiff provided further information such as: 1) an acceptable submittal; 2) a complete description of changes including mechanical and electrical; 3) certified ARI test data; 4) detailed sound level information; and 5) an estimate of increased energy costs. On January 8, 1987, Kirlin sent the Trane fan submittal to plaintiff.

In a letter dated January 15, 1987, Mr. Wilkins informed Mr. Grandchamp that a normal stock York fan tested at an AMCA facility in Illinois could meet the specification requirements operating at 1,425 RPM and using less than 75 Bhp. He explained that if the unit were operated above 1,425 RPM, then it would have to be modified like the other units at the job site.

On January 29, 1987, Kirlin wrote plaintiff, providing the information requested by the FDA in order to approve the following York modifications: 1) The existing shafts were changed from a ¼-inch to ½-inch wall thickness; 2) the external bearings were changed to a heavier weight from 2 & ¹¹⁄₁₆ to 2 & ¹⁵⁄₁₆; 3) the pulley was changed from a four-belt to a five-belt pulley; 4) the casing was reinforced and the isolation was replaced to receive a 100 hp motor. Mr. Grandchamp suggested that, except for the RPM, the modifications did not change the fan characteristics and therefore the unit was still a model CS–666–FO AFHP with variable inlet vanes. He noted that another non-modified model CS–666–FO AFHP with variable inlet vanes and

a 75 hp motor tested at an Illinois AMCA-certified facility showed the unit capable of producing 9.28 inches static pressure at 35,-430 CFM thereby exceeding the project requirements. However, the test results showed that to produce these figures, the fan was tested at approximately 1,541 RPM, rather than at the 1,400 rating. Sound levels were unavailable for the increased RPM of the modified York fans.

In a letter to plaintiff dated February 17, 1987, Mr. Grandchamp set forth Kirlin's position and gave an overview of the airflow problem. He reiterated Kirlin's opinion that the low airflow problem was caused by a design deficiency. He further asserted that Kirlin had fully complied with the contract requirements in that a standard York model 666 fan was shown to meet the contract requirements and the air systems were installed according to the contract documents. He suggested that Kirlin's role was as mechanical contractor, not design engineer; yet Kirlin went the extra step of suggesting ways to remedy what was obviously a design problem. He next advised plaintiff of Kirlin's position that the Trane test results would be inconclusive contractually. He noted that the system deficiency had caused Kirlin severe financial hardship and requested that plaintiff attempt to convey to the FDA the urgency of the matter. Finally, Mr. Grandchamp advised plaintiff that it would be a change to its subcontract if the FDA directive changed the specifications. He suggested that Kirlin had experienced delay since March 1986 and would submit to plaintiff the direct and impact costs related to the changed and delayed work as soon as they could be ascertained based on the FDA's directive.

Plaintiff forwarded Kirlin's letter of February 17 to the FDA under a cover letter dated February 18, 1987. The cover letter reiterated Kirlin's position and also stated that Kirlin hoped the FDA did not intend to find the York fan defective if the Trane fan happened to work. The letter also informed the FDA of plaintiff's intent to submit a claim for the extra costs and delays that resulted from the airflow balancing problem.

On March 2, 1987, the contracting officer responded to plaintiff's letter of January 30, 1987, which presented the submission for the York fan modifications rejecting the submission and disagreeing with York's conclusion about the system effect. She asserted that, at worst, the "additional system effect" was no greater than 0.3 inches static pressure, being well under the extra 1.8 inches available during the 1,545 RPM testing. She also mentioned that tests showed the contract requirements could be met by combining two AHUs.

In a letter dated March 30, 1987, Albert Sanchez, Vice President of Syska & Hennessy, who had been hired by the FDA as a consultant, gave Mr. Hoffman his observations and recommendations after having witnessed a March 16 test performed by Comfort Control for plaintiff. The test involved using AHU No. 4 to supply either Air System Nos. 1 or 3. Mr. Sanchez stated that the test demonstrated that the Trane unit "apparently" could meet the design requirements. Measurements were taken at various points in the systems. With AHU No. 4 supplying Air System No. 1, the readings at a measuring point located just after the cross-connection to Air System No. 1 were lower than design. At a measuring point just downstream of AHU No. 4 near the beginning of the cross-connection duct, however, the readings were considerably above the System No. 1 requirements and even slightly above the AHU No. 4 rated capacity. With AHU No. 4 supplying Air System No. 3, readings taken just after the connection to Air System No. 3 were slightly below design. Yet at a measuring point just downstream of AHU No. 4, the readings were above the Air System No. 3 requirements and the AHU No. 4 rated capacity. Additional measurements at the end of the distribution system were taken to ensure that the Trane fan could provide sufficient air to the distribution system. Depending on the CVR damper adjustment, the fan delivered from below to just at the design airflow for that portion of Air System No. 1. The fan delivered 425 CFM, whereas the design requirement is 570 CFM for that portion of Air System No. 3.

Mr. Sanchez concluded that, based on the testing, the Trane unit was capable of supplying sufficient airflow for the two systems tested. He suggested that the unit could be expected to meet the system requirements after the systems were checked, adjusted and air balanced. He explained that the airflow losses in the cross-connection duct were above what was expected and suggested that duct leakage or possibly damper leakage could be the cause. Mr. Sanchez set forth a checklist and a testing regimen for the system components before attempting to balance the system. He recommended that the York units be replaced with Trane units. He also stated that the tests apparently indicated that the distribution system was not at fault for the low airflow. In order to make a more definitive recommendation from more conclusive data, he suggested that testing comparisons be made between both the York and Trane fan unit operations.

By letter of April 9, 1987, the contracting officer confirmed a conversation with plaintiff regarding the fans. She stated that she had been advised that neither plaintiff nor its subcontractor was able to show that the York fans met the performance criteria of the contract. She asserted that the March 16, 1987 testing showed the Trane fan was capable of meeting the design requirements. She directed plaintiff to furnish the equipment necessary to replace AHU Nos. 1–3 with Trane fans in light of plaintiff's "unwillingness and/or inability to independently analyze or review" the inadequacy of the York units. Finally, the contracting officer informed plaintiff that it had to comply with the normal submittal process with respect to the replacement units.

In a letter dated April 15, 1987, plaintiff requested that the contracting officer identify specifically the performance criteria that the York fans failed to meet. Plaintiff stated that it believed that the fans met the specification criteria, but would still comply with the directive. Contracting Officer Dean in a letter dated May 19, 1987, notified plaintiff that its Trane fan submittal was approved as noted and directed plaintiff to proceed with ordering the fans. She further stated that she would make a decision regarding fan

installation immediately after a York fan test which was expected to occur within four to six weeks.

By letter dated May 21, 1987, Mr. Sanchez informed Mr. Hoffman that AMCA-certified testing of the York fan at ETL Testing Laboratories, Inc. ("ETL" or "ETL Testing Laboratories") in Cortland, New York, could not be performed because the fan outlet area of the test duct was too small. Further, ETL was not an AMCA-certified test facility. Apparently, Syska & Hennessy never checked before shipping the fan to New York. Mr. Hoffman and those present decided to run a test even though the results would not be binding in court. The test results showed that the modified fan met the design requirements. All agreed that an AMCA-certified test must be performed and that either AMCA representatives should witness the test at ETL Testing Laboratories or the test should be carried out at an AMCA-certified test facility. After the test Mr. Sanchez stated his opinion that the testing indicated only that the modified fan likely could meet the system requirements and that it was "not unreasonable" to speculate that the unmodified York fans would be unable to meet the system requirements operating at the lower speed of 1,355 RPM.

In a letter dated June 22, 1987, the contracting officer informed plaintiff that she had received oral information that Kirlin would not order the fans unless it received a change order. (She had already given Mr. Grandchamp his requested immediate verbal approval (and a written confirmation) of the Trane fan submittal on May 19 so that the fans could be obtained by June 18.) She stated that because of plaintiff's failure to follow her directive to order the fans, the FDA was considering partial termination of the contract. She gave plaintiff the opportunity to present within ten days any facts related to the issue. In another letter to plaintiff of June 25, 1987, the contracting officer stated that she was advised on June 23 that plaintiff had the Trane fans in its possession. She directed plaintiff to deliver the fans to the site and submit proposed installation drawings for approval. Plaintiff was instructed to install the Trane fans after

approval in AHU Nos. 1 and 2, but not until directed to do so in No. 3.

On July 6, 1987, plaintiff forwarded a York letter of June 24 to the FDA requesting that the testing of the modified York fan not be performed at Buffalo Forge Company because Buffalo Forge is one of York's competitors. York raised the issues of proprietary information and bias as reasons for its request. The contracting officer responded to plaintiff in a letter dated July 14, 1987, stating that the FDA had "vigorously" searched for an independent laboratory where the York fan could be tested at full RPM without any extrapolation. No such facility could be found at which such a true test could be carried out. She informed plaintiff that AMCA officials would be present to observe and certify the test and that plaintiff's own representatives could observe the testing. The FDA must have these tests performed because of allegations by plaintiff's subcontractors that the York fans would work even though they did not perform within the Module I facility. She stated that the FDA had performed a detailed system design analysis that showed no design defects and asserted that an off-the-shelf competitor fan was performing within the system. She expressed that an actual-RPM test was needed to complete the FDA's analysis. Finally, she informed plaintiff that it was very important that complete performance curves be developed and that, therefore, the test would take place at Buffalo Forge as planned.

In a letter of August 18, 1987, the contracting officer responded to a letter by plaintiff (that does not appear in the record) purportedly asserting that the fan replacement was a change under the contract. She gave notice that the replacement directive resulted from plaintiff's failure to comply with the requirements of the contract and, as such, it was remedial work. The contracting officer also asked for an explanation of plaintiff's letter to Capt. James W. Rolofson, the FDA's Resident Engineer, which stated that the fan replacement would commence following the York fan testing. This, she stated, was in apparent disregard of her June 25 directive to install the fans. (This installation was to

occur after plaintiff received approval of its proposed installation drawings.)

In a letter of November 19, 1987, Contracting Officer Broome informed plaintiff that the FDA had yet to receive promised air balance reports for AHU Nos. 5–13 and instructed that these be sent as soon as possible. This is the first of a number of written requests sent by the contracting officer.

On November 30, 1987, Mr. Sanchez of Syska & Hennessy, the FDA's consultant, sent the draft report from the Buffalo Forge test of the York unit to the contracting officer. The unit tested came out of AHU No. 4. The unit was tested twice, once using the modified belt and pulley drive and a second time using the original belt and pulley drive. According to Mr. Sanchez, the non-modified fan was incapable of meeting the system requirements and was a marginal selection based on a review of the York catalog data. Mr. Sanchez superimposed the system operating point onto the performance curves from the Buffalo Forge data. He stated that the figure "clearly indicates" that the unmodified fan could not meet the data from York's catalog. Further, the catalog data showed that the manufacturer does not recommend operating the unit above 8 inches static pressure. A York factory note that related to units with variable inlet vanes states that the unit must be operated below the solid line on the performance table. According to Mr. Sanchez, this table clearly indicated that the limiting speed is below 1,400 RPM. Finally, Mr. Sanchez calculated that based on the fan laws, the York unit would have to operate at 1,464 RPM to deliver the required airflow and static pressure. Defendant's fan expert at trial calculated about 1,400 RPM.

On December 8, 1987, Capt. Rolofson sent plaintiff a letter expressing his concerns regarding the system. During recent observations with both the supply and exhaust fans operating together, the FDA became concerned with the Ultratech gauges and the system performance. First, the Ultratech gauge readings for airflow, static pressure, and control air were examined for overall accuracy and reliability. Second, excessive air leaks both into and from the fan enclosures were found—especially with respect to AHU No. 5 and Exhaust Fan No. 2. Third, during and after rainstorms, water was observed standing both on top of and inside several exhaust fans. Finally, differences were noted with respect to the filter manometer gauge readings located on the fan enclosures and the Johnson Control panel readings.

On December 15, 1987, plaintiff received from the contracting officer a copy of the Syska & Hennessy Draft Report. About the same time, Mr. Grandchamp received a December 18 memorandum communicating the preliminary test results of the Seneca and Comfort Control balance data for Air System Nos. 1 and 2. The memorandum concluded that the Trane unit exceeded the exterior static pressure, but noted that, even after replacing the York fans, the small CVR diffusers still had low airflow.

Donald W. Bast, plaintiff's Construction Manager, forwarded to FDA's Capt. Rolofson the results of the preliminary test for AHU Nos. 1 and 2 under a cover letter dated December 21, 1987. Mr. Grandchamp had submitted the results to plaintiff under his own cover letter of the same date in which he stated that the test indicated that the balancing of the systems could not be completed and that Kirlin was awaiting instructions.

The contracting officer threatened plaintiff with partial termination of its contract for default if plaintiff did not respond to questions in her letter dated February 3, 1988, on or before February 10, 1988. She noted that she was advised by FDA employees that the preliminary air balance data were "grossly incomplete" and that plaintiff was reluctant to give the data after repeated requests that it do so. She related the following with respect to the data: 1) They were incomplete (in Mr. Hoffman's estimation less than 10 percent of the total rough balance data was submitted); 2) they were poorly organized; and 3) they failed to comport with contract specifications that required explicitly that Associated Air Balance Council ("AABC") procedures be followed. This failure disturbed her in that Seneca, which was once a member of the AABC, lost that status and did not then belong as required by the contract. The contracting officer gave a listing of all

data furnished by plaintiff to the FDA, which consisted of three reports. The balancing data received by the FDA up to that time related to only nine of the 62 fans in the building. She insisted that data must be submitted for all of the systems. She also stated that she was unaware of the limitations on the available data. She communicated that plaintiff and Mr. Grandchamp had assured her that there was sufficient data to indicate that rough balance could be achieved for AHU Nos. 5–13. Finally, the contracting officer listed specific questions concerning plaintiff's conduct related to the air balancing work.

Most pertinent to the present facts were the questions related to the following areas of concern. She requested that plaintiff provide certified test data from Ultratech, if available, displaying that the static pressure losses across its AMSs and CVRs at the required CFM were equal to or less than the maximum pressure drops listed on Drawing M–65. She also requested that plaintiff state whether Seneca checked its instrument calibration or whether Ultratech field personnel recalibrated their controls, as most readings by Seneca were slightly different from the Ultratech panel readings. With respect to Seneca's awareness that some CVRs were not factory preset, she asked that plaintiff state whether or not Seneca or Ultratech field personnel ever attempted to reset the CVRs in the field during the testing and balancing procedures, as required by AABC procedures. Also, she requested plaintiff to give the number of readings normally taken at each CVR during balancing, since repeated measurements are required by AABC procedures.

The contracting officer desired further information as to whether or not Ultratech field personnel were present during all phases of the testing and balancing. Finally, she asked plaintiff whether it took the position that it had performed an adequate job of trouble-shooting the HVAC system. She stated that a deficiency appeared in this regard and related that the total air delivered to outlets was from 10 to 15 percent below the total CFM at the main fan discharge for AHU Nos. 1–3 and 18 to 25 percent below the total exhaust CFM at the main discharge

for Exhaust Fan Nos. 1, 2, 5A, and 35. She expressly noted that this was evidence that excessive air leakage was occurring from some of the air systems for which plaintiff provided data. The FDA would be available to meet with plaintiff on February 16 if the contracting officer received answers to the above questions and additional submittal data.

Mr. Grandchamp responded to the contracting officer's letter of February 3 in a letter to plaintiff dated February 9, 1988. He expressed his puzzlement that a reference to a final test and balance report appeared in the FDA's comments. Only rough field data sheets were submitted to review the project situation. He stated that it was not Kirlin's or Seneca's intent that the data be construed as a final balance report. Some of the comments by the contracting officer show that the data were not properly analyzed nor were they utilized as intended. He mentioned that during balancing procedures, the FDA was present and could have witnessed any readings taken that they desired. Mr. Grandchamp asserted that Seneca is now a fully certified National Environmental Balancing Bureau ("NEBB") balancing contractor and is a certified AABC contractor under a grandfather clause for purposes of this project. Further, according to Mr. Grandchamp, proper test procedures were utilized, and the AABC procedures were not necessary because the data were not a final balance report. He expressed that it was difficult to accept criticism for submitting incomplete data when Kirlin was reluctant to submit the data because they were incomplete.

Mr. Grandchamp's answers to the contracting officer's questions follow. Regarding certified test data for static pressure losses across the AMSs and CVRs, he referenced Drawing M–65 as a schedule based on design calculations, not actual measurements. He explained that the specifications state that the duct size/effective area will remain constant to the inlet of the CVR. He noted that the flanges on the inlet damper reduce the effective area, which may be causing an increased pressure loss that exceeds the loss anticipated by the schedule. It appeared that the "majority of the problems" in the

airflow system was directly linked to this CVR inlet sizing, particularly with the smaller CVRs. He informed plaintiff that only the design professional could make a determination whether the pressure drop and its effects were acceptable. Finally, Mr. Grandchamp noted that the CVR construction concerns were raised and discussed some four times during the submittal process and also in the Kirlin's August 15, 1986 letter to which LBC & W responded on August 29 and September 9.

Regarding discrepancies between the Seneca and the Ultratech panel readings, Mr. Grandchamp stated that the readings were "for the most part, close." He communicated that extensive calibration and other work was performed to resolve any discrepancies and that all CVRs were recalibrated and readjusted to deliver maximum CFM in a joint effort between Seneca, Ultratech, and Kirlin. He referenced an attached Seneca letter of February 9, 1988, for the number of CVR readings taken and stated that representatives from Ultratech were present during the majority of the testing and balancing procedures.

Mr. Grandchamp responded to the contracting officer's pointed question whether plaintiff considered that it had performed an adequate job of trouble-shooting the HVAC system. He asserted that Kirlin and the subcontractors had performed a "more than adequate job" of trouble-shooting, noting that they were not design professionals and that it was not their place to dictate to the professionals the system as planned or its actual capabilities. He stated that it appeared clear to them, and the Seneca data confirmed, that a significant drop in pressure was present across the CVRs, which, he asserted, were designated and installed according to the amended specifications. It was Kirlin's opinion that the fans were not the problem, but, when directed to replace them, Kirlin did so and that the data from Seneca confirmed that the replacement of the York fans did not solve the CVR and static pressure drop problems. Further, Kirlin believed that the failure to resolve the small CVR issue was resulting in an over-stressing of the ductwork, which was causing leaks. Although Kirlin considered that Seneca was performing properly to date, Kirlin would replace Seneca with Comfort Control in order to perform a complete balance report on one system per AABC and the contract specification procedures. Kirlin deemed an additional test "wasted time, effort and money" since no new information would result; nonetheless, he would direct Comfort Control to perform the testing if the result would be the design professional addressing the actual problem.

4. *Unsolved problems with air balancing*

On February 16, 1988, the above-referenced meeting took place to discuss the status of the air balancing efforts. Mr. Sanchez for Syska & Hennessy stated that the data submitted by plaintiff were not sufficient to state that even preliminary balancing was attempted. When the contracting officer questioned the present status of balancing, Mr. Grandchamp replied that Kirlin had yet to reach the set-up stage for AHU Nos. 1–4. He informed those present that they had undertaken investigations to determine the cause of the problem. He stated that he was forced to give all rough data on portions of the set up and his investigation before it was completed.

Jeffrey Robbins, an attorney with the Office of the General Counsel of the DHHS, asked Kirlin whether sufficient information on balancing for AHU Nos. 1–13 was available to identify the small CVRs as the problem. He also asked whether Kirlin could be certain that this was the cause if full "set up" had not yet been achieved for AHU Nos. 1–4. Mr. Grandchamp replied that his rough interpretation of the data obtained up to that point indicated the problem, but that what was done was not the same as "rough balance." Mr. Day, Kirlin's President, stated that he had no way of knowing whether all fans met the contract performance criteria. Mr. Grandchamp added that supply side fans 1–13 were performing according to schedule, but the same was not the case for the exhaust side. Mr. Sanchez commented that, from the submittal data, it did not appear that data were available for all of the fans.

The contracting officer stated that, based on information available to the FDA (appar-

ently from the FDA inspector's log of all personnel on site), Ultratech was not assisting with the balancing. Mr. Grandchamp responded that work tickets proved that both Ultratech and Johnson Controls were working. He noted that neither was on site full-time, but that Kirlin had coordinated with both to make adjustments. The contracting officer also asked Kirlin to state whether all of the ductwork was checked to ensure against any leakage problems. Mr. Grandchamp replied that Kirlin had checked all ductwork for leakage. The contracting officer reminded Kirlin that the responsibility was continuing in nature. Mr. Day communicated that the complete system was checked and that in every case where a leak was found corrective work was performed. He noted that any system will have some leakage. Mr. Grandchamp added that FDA inspectors observed the ductwork, read the test gauge measurements, and signed off that the duct had been properly sealed. The contracting officer responded that even if the ductwork had been inspected, acceptance was not signified.

The contracting officer remarked that Kirlin had indicated that sufficient airflow was not achievable based on the static pressure and airflow readings at each AMS. When she asked Mr. Grandchamp whether other stations had been checked in AHU Nos. 1–4, Mr. Grandchamp informed her that, while such data were available for other systems, they were not available for AHU Nos. 1–4 because rough balance had not been attempted yet. Because these systems were still in the "setting up" stage, he explained that Kirlin could not obtain rough balance information after the installation of the four Trane fans. When questioned whether AHU Nos. 5–13 were in rough balance, he replied that all of the preliminary data demonstrated that they were. The contracting officer noted that she had requested airflow and static pressure readings for all major systems and was informed that Kirlin was not able to produce such information. She asserted that the data submitted contained no readings from the fan to the end of the ducts. Mr. Grandchamp asserted that insufficient time was preventing them from providing anything beyond preliminary information. She again requested rough balance data on AHU Nos. 1–13.

The contracting officer asked for the status of the Ultratech CVR certified test data. Mr. Grandchamp informed her that no such data were available at that time. She asked if such testing was ever performed and noted that, during the submittal process, the FDA or the design engineer was told that the test data were available and would be forwarded. Mr. Grandchamp responded to the contracting officer's suggestion that some of the CVRs be tested in a certified laboratory that they had been tested when installed. When she asserted that the pressure losses from Seneca were roughly seven times those represented by the submittal, Mr. Grandchamp stated that Seneca had measured static pressure and the velocity pressure was given in the submittal. The FDA's Mr. Hoffman asserted that Submittal Revision No. 3 gave a table describing pressure drops across the CVRs, and the contracting officer requested that the contractor investigate this issue. She noted that Ultratech informed Syska & Hennessy that the CVRs had never been tested. She communicated that there were three divergent figures—the design static pressure, Ultratech's represented static pressure, and the measured field static pressure. She asked Mr. Grandchamp whether the CVR pressure drop was any different since the fan replacement, and he replied that none had been taken post-fan replacement.

When Mr. Hoffman questioned Kirlin whether the design airflow was achieved at the diffusers, Mr. Grandchamp stated that in August 1986 it was not achieved, but in December 1987 it was, except areas affected by the small CVRs. Mr. Grandchamp responded to the contracting officer's inquiry that he had no such documentation on whether Seneca or Ultratech had recalibrated controls to coincide with one another, but again noted that the readings were close. Mr. Megna agreed, stating that Seneca's data would be used where there were any discrepancies. When the contracting officer questioned why the panels did not register at zero, Mr. Grandchamp informed her that the adjustments made to give accuracy to airflow read-

ings were the reason. He also informed her that three readings were taken by Seneca at each CVR.

Mr. Megna queried Kirlin as to what assurances it could offer that no excess leakage was taking place in the duct system. A representative from either Kirlin or plaintiff stated that prior to starting up the AHUs, the ductwork and dampers had been carefully checked. Mr. Grandchamp told Mr. Megna that Kirlin had done everything possible to seal leaks and that it was his opinion that it had done enough to determine that excessive pressure drops existed. Mr. Megna asserted that the pressure drop documentation should be checked again, stating that he could not believe the CVRs could create such a loss. The representative stated that there was documentation of the significant static pressure losses and that possibly the fan capacity should be increased. Mr. Megna stated that the fan should only have to deliver what is specified. Mr. Grandchamp explained that Kirlin had done all that it could to find the cause of the problem other than have Comfort Control test at the contracting officer's direction. The contracting officer questioned why she should direct that this step be taken. Andrew W. Stephenson, Kirlin's counsel, communicated that the data taken to date point to a problem, but the data were insufficient to make recommendations. He stated that Kirlin would continue to go forward and that more data was necessary to reach a full, complete conclusion. Mr. Stephenson told the contracting officer that the small CVRs obviously had something to do with the problem, but he could not pinpoint them as the only problem. The contracting officer also questioned why she was advised that the balancing was not possible if the data were incomplete. Mr. Grandchamp responded that Kirlin had been working diligently and would continue to investigate. Mr. Stephenson stated that Kirlin was not trying to state that the CVRs were the only problem; there could be some duct leakage.

The contracting officer next stated that in July 1986 she was informed that the systems would be balanced within six weeks. In December 1986 plaintiff's vice president told her the problem had been identified as the fans

and was being resolved. In 1988 she was still requesting data to illuminate the problem. To avoid extra work she suggested that, additional data, if necessary, could be witnessed by representatives in the field, so that only a final balancing report would have to be submitted. FDA technical representatives, she stated, had advised her that the balancing attempts appeared to have been disorganized and noncompliant. The FDA therefore could not determine if the balancing effort had been properly carried out. Mr. Stephenson stated that Kirlin was offering to hire Comfort Control for two to three weeks of testing.

Mr. Robbins questioned why Kirlin did not independently investigate the CVR problem. Mr. Stephenson responded that this work would be performed if the contracting officer issued a directive. He asserted that Kirlin had no engineering responsibility and would not try to second-guess the design engineers. He further stated that he was certain that the results that Seneca obtained were not what the design engineer contemplated. Mr. Robbins stated that he was of the opinion that certified independent laboratory test data would be the first step in investigating the CVR problem. When Mr. Hoffman asserted that Kirlin's submittal represented the CVRs as being capable of performing in a certain manner, Mr. Stephenson replied that Kirlin had made no such representation other than that the equipment would meet the contract specifications. He added that Kirlin was offering to direct Comfort Control to test the next week and was requesting that the FDA have a representative present. Mr. Robbins asserted that Kirlin, as a sophisticated contractor, should have assured that field testing was correct and that the system was operating properly. Mr. Grandchamp and Mr. Stephenson responded that they knew the system was not operating properly, but that this problem was for the design engineer to resolve and that the FDA needed to issue a directive.

Mr. Hoffman stated that the CVRs would be laboratory tested to ascertain if they met the shop drawing submission schedule. When he requested that Mr. Stephenson comment, operating under the assumption

that Kirlin had represented that its submission would perform in a certain manner, Mr. Grandchamp asserted that no such assumption could be made.

Raymond A. Kabrick, plaintiff's President and General Manager, asked for someone to comment on LBC & W's 1986 correspondence in which it was asserted that the design engineer had tested the CVRs and the ductwork to determine that these components were not the source of the problems. Mr. Megna replied that, if given adequate air, the system would function based on the August or September 1986 test when both AHU Nos. 1 & 4 supplied airflow to Air System No. 1. Mr. Kabrick asked whether the FDA was ignoring this correspondence. The contracting officer stated that the FDA was using the entire record in its attempt to understand and analyze the problem. When Mr. Stephenson asserted that a problem was present requiring solution, Mr. Megna took the position that Kirlin had prejudged the system without adequate testing. He noted that at the meeting he had heard admissions that the ductwork could still be leaking and mentioned that it was Kirlin's responsibility to construct a tight duct system. Until the duct system was tight, the burden of proof was on Kirlin. Mr. Stephenson again mentioned Seneca's findings (that low airflow persisted even after the fan replacement), and Mr. Megna responded stating that type of finding could be made when one prejudges.

When Mr. Robbins asserted that a more intelligent discussion might take place if the data were more complete and properly organized, Mr. Day informed those present that he knew such an objection would be raised and that was why Kirlin sent the data only under the threat of termination for default. The contracting officer stated that she also had a concern that the data presented be complete and asked Mr. Day how much longer she should have waited. Mr. Day replied that he should not have been threatened with termination. The contracting officer stated that plaintiff had issued the threat, noting that she received a letter stating that the system could not be balanced. She asked the contractor to reconcile the two opposite

arguments in that she was told that Kirlin should have been given more time, and yet she was also told that the system could not be balanced.

Mr. Day proposed that one unit be tested thoroughly during a three-week period. Plaintiff's Mr. Kabrick stated that the testing could be performed with FDA representatives present observing and recording the data. Mr. Robbins emphasized that their representatives would be present only for observation and that their attendance would not create any joint responsibility. Mr. Grandchamp suggested that the system with the most CVRs be selected for testing. He asserted that AHU Nos. 2 or 3 be chosen because he believed that now AHU No. 1 had an oversized fan. When Mr. Kabrick questioned whether one of the AHU Nos. 5–15 (there are only 13 AHUs) might yield faster results, Mr. Grandchamp responded that he wanted to start with the worst possible condition. Mr. Stephenson stated that all of the data for AHU Nos. 5–13 would be given to the FDA. The contracting officer questioned if there was general agreement that Comfort Control would try to balance one system with FDA representatives, observing that the data would be complete and organized for submittal to the FDA. Mr. Stephenson asked which AHU would be selected and suggested that AHU No. 2 would be best since it has the largest number of small CVRs. Mr. Grandchamp stated his desire that the FDA representatives take a more active role in the balancing, but the contracting officer responded that they would be present for observation only.

Mr. Megna questioned how performance could be impossible if the design engineer relied upon a shop drawing submission in approving the equipment. He stated that, in effect, he had required assurance from the equipment supplier that it would perform before it was approved. He asked Kirlin if it had found anything peculiar about this system as compared with other similar systems. Mr. Stephenson stated that there was a significant change in the solicitation addenda changing the CVR to require a single housing. Mr. Megna disputed that this was a change from the original requirement of the

solicitation. When Mr. Day asked Mr. Megna if he was aware of a CVR that would perform in accordance with Drawing M–65, Mr. Megna replied that he could pull off-the-shelf data on Cambridge or Air Monitor equipment. He had spoken with Air Monitor and Cambridge representatives when he designed the system. Mr. Grandchamp questioned whether Air Monitor could offer an alternative if asked to do so. Mr. Megna replied that in designing a system, he would simply go to the Air Monitor Catalog and add from the American Society of Heating, Refrigerating and Air Conditioning Engineers ("ASHRAE") Guide to housing, pressure drops, and so forth. He stated that a CVR should function when partially closed; Mr. Grandchamp stated that this had been the case with the large CVRs.

Mr. Megna noted that during the CVR submittal process he had expressed concern about the damper frame and the ability to meet the performance criteria. He stated that testing data were requested and that the design engineer was given assurances that the equipment met the schedule. Mr. Stephenson was uncertain as to whether static pressure drops were submitted. When he pointed out that Submittal Revision No. 2 reflected approval of the CVRs, Mr. Hoffman asserted that certain portions of Revision No. 3 were essential to approving the CVRs. Mr. Megna took the position that the Revision No. 3 pressure drops were lower than those of the schedule. Mr. Hoffman stated that the reported pressure drops, eight to ten times what was represented by Ultratech, were far greater than anything anticipated in view of the Revision No. 3 assurances. Mr. Stephenson stated that Kirlin was concerned about pressure drops, and he inquired whether the CVR was an off-the-shelf item. Mr. Megna responded that the CVR is a basic air measurement device, which should present a low pressure drop. He noted that Ultratech had represented a lower pressure drop than anticipated. If the damper and frame were added, a slightly increased pressure drop would be expected. He also stated that Ultratech alleged that the total drop was lower than others with the frame and damper. Mr. Megna asserted that the FDA should have been advised before the bid opening if the CVRs could not perform as scheduled because of impossibility. He stated that it was noted that during the submittal process that certified test data had been requested and promised. (This request and promise were unsubstantiated at trial.)

When Mr. Robbins stated that maybe it would be necessary to go to Cambridge or Air Monitor to have a CVR built for testing, the contracting officer emphasized that the FDA wanted the building. After Mr. Stephenson noted that about 500 of the 800 CVRs were small, Mr. Robbins asked if they had achieved balance in areas where no small CVRs were located. Mr. Stephenson thought that some branches were balanced, but added that Comfort Control would check this point. Mr. Hoffman asserted that this was not a subsidiary issue and that the FDA should have such information. Mr. Grandchamp indicated that Comfort Control was not AABC certified, but is a member of the NEBB and informed the contracting officer that Seneca was so certified under a grandfather clause for purposes of the Module I project.

By letter dated February 26, 1988, the contracting officer informed plaintiff that she never had referenced "a final test and balance report," as Mr. Grandchamp stated in his February 9 letter. Much of the data attached to that letter were old data submitted in August 1986 and therefore irrelevant because they were obtained before the York fans were replaced. She noted that plaintiff and Kirlin had previously acknowledged at meetings and in a letter that the York fans were unable to achieve the performance criteria. *See supra* at p. 199.

The FDA had never received a "consistent, definitive answer" on the integrity of the ductwork. The contracting officer had been reassured in 1986 that all leaks were "thoroughly investigated and corrected." Then in March 1987 the FDA and Syska & Hennessy found "significant leakage in the crossover duct." FDA technical representatives had found absurd Kirlin's assertion that the failure to resolve the small CVR issue had caused the ductwork to be over-stressed.

The contracting officer also communicated that she had never received consistent or definitive answers regarding the status of AHU Nos. 5–13. She recounted to plaintiff how she had received a status sheet in July 1986 (from plaintiff's Mr. Penn) which advised her that these AHUs were performing as designed. Even after requesting the status, she did not receive any balance information concerning these units. Later, on February 10, 1988, she was informed by Kirlin that these units were not in rough balance. Now, at the February 16 meeting, she asserted that Mr. Grandchamp reported that they were in rough balance.

The contracting officer also noted that the FDA had questioned whether the balancing efforts of Seneca, Ultratech, and Johnson Controls were "consistent and continuous" after the Trane units were installed on November 1, 1987. She discounted plaintiff's assertion that airflow and static pressure readings could not be obtained until balancing took place and asserted that such data should have been recorded before plaintiff attributed the balancing problems to the CVRs.

The contracting officer characterized plaintiff's response to the request for certified CVR test data as an attempt to assail the system design and as nonresponsive. She asserted that the design engineer relied upon the contractor's representations regarding the AMSs and the CVRs when the submittal was approved and that Ultratech had advised that the actual pressure drops were much larger than those outlined in the contract or represented by Ultratech's February 7, 1985 shop drawing submittal. Mr. Grandchamp responded in a letter of February 22, 1988, with the assertion that the "DP" (differential pressure) designation did not mean Drop in Pressure as the FDA suggested, and that Ultratech's CVR Submittal No. 2 was approved on September 19, 1984. He noted that Submittal No. 3 was issued after a January 5, 1985 meeting regarding a change of instrumentation and claimed that the static pressure drops were not required during the submittal process.

The contracting officer informed plaintiff that the CVR equipment would be inspected and tested at her discretion. She stated that if the testing demonstrated that the equipment did not perform as outlined, the testing would be at plaintiff's expense. Kirlin's statement at the February 16 meeting that the York fans had not improved the performance was completely contradicted by the data, according to the contracting officer.

5. *The procurement of CVRs*

On March 10, 1988, LBC & W, acting for the FDA, sent a request for proposal for reprocurement of 12 CVRs to Air Monitor and Tek–Air Systems, Inc. (acting with Brandt Instruments).[16]

By facsimile transmission Mr. Pinkston responded to Mr. Grandchamp's request on February 18, 1988, regarding the "DP" designation on Submittal No. 3. He first explained that Ultratech, Inc., no longer existed and that he worked for Ultratech Industries, Inc. He stated that the information was being supplied to Kirlin as a "courtesy." Mr. Pinkston asserted that a change was made to the submittal information based on Mr. Rowe's request that the revised CVR schedule display that the maximum CFM on the control panel gauge and velocity pressure be between 40 and 80 percent of the DPT transmitter span. He attached the first page of the CVR schedules from Submittal Nos. 2 and 3 to show how the column designations were modified between the two. He noted that two additional columns were added to Submittal No. 3: "GAUGE" and "% AT MAX." He stated that for some reason the column headings "DESIGNATION" and "V.P." from Submittal No. 2 became "CVR NO." and "DP AT CFM" in the Submittal No. 3 schedule. He also guessed that the "FPM" column was removed from Submittal No. 3 for spacing reasons. The velocity pressure or differential pressure column received an additional decimal place to increase the number of significant digits. The later schedule allowed Mr. Rowe's requested calculation to be performed by simply dividing

16. At some point during the CVR reprocurement Tek–Air abandoned the process, and Brandt proceeded alone. Because an exact date was not set forth, Brandt is named as the participating party unless the record shows that Tek–Air was participating.

the span by the differential pressure to obtain the percentages. Mr. Pinkston stated that the table was intended to demonstrate that Ultratech properly had selected the DPT spans to measure the velocity pressure output from the CVR.

Contracting Officer Dean also requested that LBC & W make general comments regarding two letters from plaintiff. The first letter, dated February 9, 1988, forwarded York's reply to the Syska & Hennessy Report dated January 15, 1988. Kirlin's cover letter informed the contracting officer that Kirlin intended to file a claim related to the air systems, including delay costs. Victor R. McCloskey, York's Vice President of Sales and Marketing for North America, stated in York's reply that LBC & W's design calculations deviated significantly from York's own calculations and the fan selection would thereby be affected. He presented a table based upon three different methods of calculation—ASHRAE's, Carrier's, and LBC & W's—to illustrate this point. Mr. McCloskey stated that Syska & Hennessy affirmed LBC & W's calculations because they fell between those obtained using the ASHRAE and Carrier methods and because the differences were insignificant. He asserted that the Buffalo Forge data showed that LBC & W's calculations were significantly below the ASHRAE method for static pressure, RPM, and Bhp.

Mr. McCloskey next assailed Syska & Hennessy's claim that the test results indicated that the original speed did not achieve the CFM and static pressure set forth in York's catalog. The Buffalo Forge test proved that the fan speed need only have been increased by 32 RPM to meet design. This small, 2.4 percent increase, he asserted, was about the smallest field change that would result from a change in the drive ratio. It was a common practice in the industry to make even greater speed changes in the test and balance process to achieve required CFM and static pressure. Syska & Hennessy incorrectly calculated the change in static pressure that would result from the change in speed. Instead of following the sloped system line, Syska & Hennessy calculated the static pressure following a horizontal line.

A change from 1,365 RPM to 1,464 RPM would result in fan performance far in excess of design—36,466 CFM, 8.63 inches static pressure, and 71.56 Bhp. He also communicated that the Buffalo Forge test curve plotted against the system line shows that, by simply increasing the speed to 1,397 RPM, the design conditions would be met with the original 75–hp motor (62.2 Bhp would be required). (This was confirmed by Defendant's fan expert, who calculated that an increase to 1,400 RPM would allow the fans to meet design conditions.)

Mr. McCloskey disagreed with a third claim that a retrofitted, or modified, fan would have achieved the required CFM and static pressure; the fan performance test of his report demonstrated that no modifications were needed to meet the system design requirements. He stated that the modifications were made during early testing and balancing, when it appeared from the Comfort Control data that the speed and horsepower limits must be exceeded to achieve the actual system CFM and static pressure requirements. He noted that neither plaintiff nor the FDA had been charged the cost of the modifications to date.

According to Mr. McCloskey, the Buffalo Forge test data demonstrated that the York fan performs differently and significantly better outside of the Module I system. He suggested that this result could be due to inaccurate field measurements or an obstruction in the air systems that significantly reduced the static pressure and air delivery beyond the fan discharge. The former was supported by Syska & Hennessy's acknowledgment that the tests were conducted under less than "normal" testing conditions. The latter was verified by Syska & Hennessy's acknowledgement of a system loss of over 5,000 CFM. Mr. McCloskey found Comfort Control's system test data taken after the Trane fan replacement "highly significant," since it showed a similar degradation of static pressure when compared to Trane's published performance data. (The copy of his curve in evidence is unreadable.)

Finally, Mr. McCloskey stated that York considers that the FDA's testing showed that the York fans, while performing slightly be-

low the submitted data, could meet the design requirements with a minor drive speed modification. York's fans were within ARI Standard 430 tolerances and the Buffalo Forge tests indicated a major system deficiency far beyond any deviation in York fan performance. Even though fan speeds beyond those indicated by the Buffalo Forge tests were required during field testing, adequate airflow was still not achieved. Therefore, he maintained that the York fans should not have been replaced.

Plaintiff's second letter dated March 2, 1988, sent Kirlin's proposed testing schedule pursuant to the discussion of the February 16 meeting. Kirlin stated that testing of AHU Nos. 1 & 3 and one CVR would begin on February 24, 1988. In addition to rough balancing the system regardless of any low airflow, isolated testing would also be performed to search for ductwork leakage. Kirlin communicated that testing would take three weeks for each AHU and that a report would be submitted in the proper format within one week of the testing.

Milan W. Walker, LBC & W's Chief of Mechanical Engineering, sent a March 11, 1988 request for cost proposal to Tek–Air Systems, Inc., and a March 16, 1988 request for cost proposal to Air Monitor to supply six CVRs to be tested at AMCA in Arlington, Illinois. The specification, provided with the request, included a copy of the CVR portion from the original unamended Section 15920 from the original contract. In addition to the information listed on the Drawing M–65 schedules, the CVR schedule listed the inlet/outlet duct size in inches, which, significantly, was the same as the unit size width and height of Drawing M–65 and also the CVR unit length.

During a March 14–18, 1988 field site inspection requested by Mr. Hoffman, Mr. Rowe noted in his report that the turning vanes in the discharge of AHU No. 4 were "falling apart" and that the turning vanes were of incorrect size and radius. He also recorded that the plenum of Exhaust Fan No. 1 was still leaking and that the leakage was noted during an earlier site inspection on December 3, 1987. In addition, the discharge damper operating rod for Exhaust Fan No. 1 was broken. Mr. Rowe suggested that the standby exhaust fan could be operated in parallel with Exhaust Fan No. 1 to assess the proper duct system operation for the exhaust side. An earlier field inspection was performed by LBC & W on February 26, 1988.

On April 5, 1988, Rocky K. Styer, LBC & W's Project Manager, sent Air Monitor a letter of intent to purchase the six units discussed in the above request for cost proposal. He enclosed a copy of the CVR specification stating that it included Amendment No. 1. The specification, however, actually included portions of Amendment No. 6, the most detailed amendment to the CVR specifications.

In a letter of April 5, 1988, the contracting officer directed plaintiff to remove the identified CVRs for testing. Plaintiff was instructed to install spool pieces to replace the CVRs removed so that the system could still be operated. Plaintiff was further directed to install an inspection door into the ductwork just ahead of an elbow identified in the Comfort Control Report.

On the same date, the contracting officer dispatched another letter to plaintiff setting forth inconsistencies in information provided her at a March 28, 1988 meeting. According to the contracting officer, Mr. Grandchamp stated that the Ultratech gauges were not recalibrated and that Ultratech was not on site during the rough balance attempts performed after November 1987. He also stated that Air System Nos. 5–13 were not in balance. Finally, the contracting officer advised plaintiff that such contradictory statements could lead to her making final decisions based on incorrect information.

Brandt sent Ruskin Mfg. Co. ("Ruskin") a facsimile transmission on April 26, 1988, ordering six CVR dampers for the six CVRs requested by LBC & W. Brandt asked Ruskin to check its CD–35 damper or another model against the specifications provided to ensure they would be met. The specifications were not transmitted with the copy of Brandt's original order admitted into evidence. Another subsequent copy was not admitted.

On April 29, 1988, the contracting officer directed plaintiff to proceed as swiftly as possible to balance both the supply and the exhaust sides of Air Systems No. 5–13. She noted that the data provided the FDA demonstrated that the proper balance procedures had not been followed, and therefore the submitted material was rejected. The data showed low CFM and static pressure, indicating that some of the fans or the CVRs needed to be replaced.

Plaintiff's Mr. Kabrick sent Kirlin's Mr. Day a letter of May 3, 1988, to express plaintiff's "extreme concern" with Kirlin's "apparent lack of commitment and responsibility" in completing Module I. Mr. Kabrick stated that Kirlin apparently was "intentionally dragging out its efforts." He noted the following problems: an absence of site supervision of subcontractors, a failure to remove and bench test the CVRs, a lack of progress in installing the access door in the ductwork, a failure to provide adequate and complete balancing data for AHU Nos. 5–13, and a delinquency in repairing AHU No. 6. He asked Kirlin to develop and commit to a prompt schedule to reexamine air system Nos. 5–13 and to remove and test the designated CVRs.

On May 19, 1988, L. Ronald Thompson, plaintiff's Director of Procurement and Contract Administration, sent a letter to the contracting officer stating that the testing and balancing would begin on June 1 and would be completed on July 15, with the report to be issued by August 1, 1988. It was Kirlin's intent to have Seneca complete this work, with Comfort Control monitoring its performance.

On May 20, 1988, Mr. Styer sent Air Monitor a letter stating that the pressure drop through the units had not been specified. (This information was not required of Ultratech during the original submittal process.) Later on June 28, 1988, Mr. Styer noted in a telephone log that he had asked Air Monitor whether it would be performing CVR testing before shipment. Air Monitor responded that CVR testing normally is not performed unless required in the specification and that testing would prolong the CVR delivery.

Mr. Thompson dispatched a letter to Mr. Grandchamp on June 6, 1988. He informed Mr. Grandchamp that Kirlin planned to begin the testing and balancing of Air System Nos. 5–13 on June 1; on June 3 one technician from Seneca arrived to "*begin*" a review of the Syska & Hennessy Report (emphasis in original). It was plaintiff's understanding that Seneca did not have its previous data or records from earlier efforts to balance these systems. Kirlin had stated specifically that it needed the time between May 18 and June 1 to "layout the specifics" and coordinate the work plan with Seneca/Comfort Control and Kirlin. Mr. Thompson suggested that it was obvious that little if any planning had occurred and informed Mr. Grandchamp that the situation was "inexcusable and [could] not be tolerated." He explained that both plaintiff and the FDA had relied on Kirlin's schedule and stated that Kirlin's "immediate attention and action" were required to get the balancing under way and on schedule.

Contracting Officer Broome wrote plaintiff on July 7, 1988, giving LBC & W's comments on Comfort Control's Balance Report for AHU No. 2. The design engineer noted that a comparison of the pitot traverse air quantities with the outlet quantities indicated a possible duct leakage of 9 percent. Excessive leakage of about 15 percent was indicated by a comparison of the system air quantity and the inlet quantities. The design engineer also questioned how 82 amperes consumed by the fan motor could produce 70.69 Bhp, when the design indicated 87 amperes for 69 Bhp. A pitot traverse indicated air "hugging" on one side of the duct, even though the reading was taken downstream from an AMS and should have resulted in all readings being nearly equal. The design engineer suggested that the ductwork be inspected for obstructions or turning vane problems (the report noted that turning vanes were missing in an exhaust duct). LBC & W also stated that the fan curves did not reflect the true operating conditions for the fan because the CFM plot did not include any leakage. The design engineer also questioned why the panel gauges indicated less CFM than was measured at the outlets. The extrapolated CVR pressure drop for selected rooms varied from 0.819 to 1.633 inches static

pressure. This variation was deemed excessive and unacceptable.

In addition the design engineer commented that the pressure drop across the cooling coil (when dry) measured 1.80 inches, whereas York's catalog indicated 1.41 inches at design flow. LBC & W asserted that turning vane problems in a duct elbow could cause the excessive pressure drop. The design engineer noted that the orifice and pitot traverse CFM readings of the test unit differed by 16 and 11 percent. LBC & W also questioned whether the Ultratech velocity pressure or the unit connection readings was more accurate. The latter measured a greater CFM than was indicated by the orifice or traverse. Another comment noted that a CVR pressure drop test revealed a pressure drop of 0.09 inches through the honeycomb section and 1.03 inches through the control damper at 220 CFM. CVR No. 8 was specified to have a total pressure drop of 0.075 inches at 220 CFM, including the honeycomb, the measuring tubes, and the damper. Finally, the design engineer questioned the CVR airflow measuring capability. The pressure drops through the units exceeded the specified pressure drops. Also, the pressure drop through units of the same size, CFM, and duct arrangement varied by as much as 0.81 inches. LBC & W suggested that this situation could result from duct construction, obstruction, lack of turning vanes, or the CVR construction. LBC & W suggested that all of these be checked.

On July 18, 1988, Kirlin's airflow expert, John J. Harmon, P.E., of HC Yu and Associates Consulting Engineers, Inc., noted deviations of the Air Monitor and Brandt reprocurement units from the original specifications in a letter to Mr. Grandchamp at Kirlin. Mr. Harmon pointed out that the units deviated from the single housing, welding, flanging specifications, and the original dimension requirements. The Air Monitor CVR contained an oversized damper assembly bolted to a flange section. The Tek–Air/Brandt CVR contained a tack-welded flanged damper section.

On July 19, 1988, plaintiff sent the FDA a copy of Kirlin's letter dated July 15, 1988, in which Kirlin stated Mr. Harmon's opinion that "it is not possible to construct CVRs in accordance with the contract specifications and, at the same time, meet the desired air pressure loss in the small sizes." Mr. Harmon asserted that the "major reason" Air System Nos. 1–3 could not achieve final balance was a direct result of an "extremely high pressure loss" occurring in the small CVRs. In addition he suggested that Ultratech's CVRs were fabricated strictly in accordance with the contract specifications.

Also on July 19, 1988, LBC & W's Mr. Rowe stated in an Inspection Report commenting on Tek-Air's CVR submittal that the "[d]amper section provides an excessive and abrupt obstacle to [airflow]. . . ." Unlike Ultratech's CVR submittal process, however, Mr. Rowe recommended as a new requirement that all CVR units "should be factory tested prior to owner acceptance." Brandt noted on a copy of Mr. Rowe's July 19 Inspection Report that nothing could be done about the damper being an excessive and abrupt obstacle to airflow. In another Inspection Report of the same date, Mr. Rowe commented that the blade stops of Air Monitor's submittal "partially obstruct airflow."

The contracting officer wrote plaintiff on August 1, 1988, asserting that the Comfort Control testing demonstrated that the Ultratech CVRs did not meet the performance requirements, while the Air Monitor CVRs did. She was advised (presumably by her technical advisor, Mr. Hoffman or LBC & W) that the deficiencies in the Ultratech equipment accompanied by the deficiencies in the York fans "contributed substantially" to the failure to achieve balance. She directed plaintiff to replace all of the Ultratech CVRs with Air Monitor products, noting that each CVR must meet the maximum static pressure drop specified in Drawing M–65. The Air Monitor CVRs did not conform to all of the specification requirements; plaintiff therefore must coordinate with LBC & W so that the production units met the specifications. If plaintiff desired any of the contract specifications to be waived, it could seek approval from LBC & W or the contracting officer, but performance could not be affected adversely.

This directive, the contracting officer stated, was given as a result of plaintiff's failure to correct deficiencies. She suggested that if plaintiff was aware of any other feasible or less costly methods of correcting the performance, the FDA would consider them if they were presented along with full technical details. The least costly and least time consuming corrections that would achieve balance should be implemented.

Also on August 1 Mr. Margolis responded to Contracting Officer Broome's July 7 communication of LBC & W's comments on the Comfort Control balance report. Mr. Margolis stated that it was Comfort Control's opinion that the pitot traverse readings accurately reflected a total system airflow leakage rate of 6 percent. With respect to the fan motors, he noted that the data were accurate and represented the Bhp consumption at the time of testing. The actual Bhp of 70.69 was 2.4 percent greater than the rated Bhp at design flow conditions. The airflow measured downstream from the CVR accurately reflected the airflow. The velocity profile was "apparently reacting" to a square elbow located upstream of the AMS. The fan curve operating point showed the fan performance when tested. Mr. Margolis asserted that the interpretations and calculations did not allow for the system effect on fan performance and that these factors should have been considered prior to extrapolating data.

Since all components require periodic rechecking and calibration, the panel gauges should be rechecked to confirm proper calibration with the CVR performance. With respect to the CVR pressure drop variation, the maximum variation of actual CVR pressure losses between all boxes recorded was 0.135 Inches W.C. Mr. Margolis suggested that variations in extrapolated data may result from actual duct configurations or the location of the manual volume damper— which was checked and found to be open during testing. The calculation and interpretation of the cooling coil data by LBC & W assumed laminar flow and disregarded any system effect. The turning vanes could not be checked at the elbow because no access panel was present. The duct was checked for obstructions that could cause the airflow to travel unevenly, but none were found. With respect to excessive leakage of 15 percent, no response was required. Mr. Margolis suggested that the CVR test unit CFM readings were higher because of the greater velocities caused apparently by the filter frame. The pitot traverse readings may have been affected by the greater CVR velocities. No comment was required with respect to the pressure drop data through the different portions of the CVR. The actual duct installation of the CVRs was in compliance with the contract documents, but tests indicated that the smaller CVRs required greater pressure loss and therefore greater velocities.

In a letter of August 4, 1988, Tek–Air replied to LBC & W's review comments regarding Tek–Air's submittal, stating that it lacked an opportunity to re-engineer the CVR completely in supplying an alternative damper. Factory testing of the CVR was not included in the specification and had not been factored into the expedited delivery schedule.

In a letter of August 8, 1988, Kenneth W. DeBaun, President of Air Monitor, asked Mr. Styer for "a degree of flexibility," subject to FDA approval, to achieve the most technically beneficial results for the project. He also stated that he had been informed that the FDA wished to receive a quotation for replacing all CVRs. Mr. DeBaun, in another letter to Mr. Styer of August 8, noted that it had used oversized damper sections on smaller CVRs because resistance to airflow was revealed during airflow testing. He informed Mr. Styer that Air Monitor did not recommend welding the enlarged damper section, given that the linkage would then become inaccessible for repair. He also stated that 16–gauge steel damper frames were no longer the industry standard. Finally, Air Monitor requested that it be permitted to use aluminum dampers and frames.

On September 2, 1988, Mr. Thompson forwarded Kirlin's estimates for removing and replacing the Ultratech CVRs. Kirlin's Mr. Day expressed that the proposals were delayed because Air Monitor could not supply CVRs that complied with the design and

performance elements of the original contract specifications. Kirlin understood this fact had been confirmed by correspondence between FDA engineers and Air Monitor. Because no manufacturer was capable of achieving both the design and performance criteria, Air Monitor was asked to give pricing based on CVRs that it previously had supplied to the FDA, even though these obviously would fail to comply with the original specifications.

Mr. Day further asserted that any direction to Kirlin to modify or replace the CVRs would be a change for which Kirlin would seek an equitable adjustment. Although Kirlin would request no "deviation" or "waiver" from the specifications, the CVR design in the written specifications could not achieve the design engineer's performance goals. Kirlin had mentioned the CVR problem during the August 1986 correspondence, but LBC & W identified the York fans as the problem, not the CVRs. The FDA now acknowledged that the CVRs prevented the system from performing. Mr. Day asserted that the York fans were never deficient and should not have been replaced.

After stating that Kirlin did not supply any submittals and expected that any submittals required would be obtained by the FDA along with any certifications that it required, Mr. Day set forth the following three proposals to modify or change the Ultratech CVRs. Ultratech could install all CVRs ten months after FDA approval and release. Installing Air Monitor CVRs would take 12 months, and Johnson Controls', six months. Mr. Day stated that Kirlin could not determine independently if any of the three would meet the design requirements of the project; the FDA and its engineers must make this determination. Finally, he communicated that Kirlin would be forwarding to plaintiff the direct costs incurred as a result of the fan replacement directive.

In a September 14, 1988 memorandum to LBC & W's Mr. Styer regarding Air Monitor's August 8, 1988 letter and submittal, Mr. Rowe allowed Air Monitor to manufacture a CVR containing an AMS mechanically attached to a damper section, thereby forming a single unit. Mr. Rowe made the damper

blade style optional, so long as the proposed design met the leakage and control requirements. Mr. Rowe stated that "[t]he CVRs ... shall meet the specified pressure drops as noted on drawings."

In a facsimile transmission of September 21, 1988, Mr. Styer recommended full replacement of all CVRs to the contracting officer. He stated that only full replacement appeared to be acceptable. Any field revisions to dampers would only result in reduced quality assurance and performance, and would not be worth the small savings that would result. In closing, he noted that the Air Monitor units appeared to meet the specification requirements where performance would be affected, but the Tek–Air/Brandt units must be returned for modifications.

The contracting officer sent Plaintiff's Mr. Kabrick a letter of September 22, 1988, again instructing plaintiff to replace all of the Ultratech CVRs with Air Monitor products. She reiterated that each CVR must meet the maximum static pressure drop requirement of Drawing M–65 and that the Air Monitor CVRs must meet "all aspects of the specifications." She informed Mr. Kabrick that the schedule plaintiff presented for replacing the CVRs was unreasonable and that plaintiff needed to furnish a proposed schedule reflecting a "properly manned effort" by October 3, 1988. The directive, she stated, had been issued as a consequence of plaintiff's failure to correct deficient work for which the FDA believed plaintiff responsible.

On October 3, 1988, Mr. Styer informed Tek–Air/Brandt that LBC & W recommended pre-testing the CVRs at the factory to verify the static pressure drops for "Quality Assurance." He also stated that the dampers could be mechanically attached to the AMS portion to form a single housing unit.

In an October 10, 1988 letter to plaintiff, Mr. Day responded to the contracting officer's directives of August 1 and September 22 to replace the Ultratech CVRs with Air Monitor products. It was Kirlin's position that the history of the project revealed that the airflow problems stemmed from defective design specifications furnished by the FDA.

Mr. Day contended that Ultratech identified during the submittal correspondence and in May and June 1984 that the FDA's design specifications mandated using CVRs with excessive pressure drops and restricting airflow. This problem was especially ·acute in the smaller sizes. Nonetheless, the FDA approved Ultratech's Submittal No. 2. He suggested that Ultratech Submittal No. 2 represented the CVRs now installed in Module I.

Mr. Day then reviewed the history of the project. He asserted that the testing at Buffalo Forge "clearly indicated" that the York fan met the design requirements with only a 32 RPM speed adjustment despite the "flawed nature of the testing." In May and June 1988, the FDA procured CVRs from Air Monitor and Kirlin's independent expert, HC Yu & Associates, and later determined that Air Monitor's CVRs were not in accord with the FDA's design requirements; this divergence allowed these CVRs to achieve the FDA's performance specifications. In both the August 1 and September 22, 1988 directives, the contracting officer noted that plaintiff must ensure that the new Air Monitor CVRs met design specifications. Mr. Day asserted that after the August 1 directive, Air Monitor had confirmed to Kirlin that it could not produce a CVR conforming to FDA design specifications that could also achieve the performance criteria. Kirlin had participated throughout the project in attempting to resolve the problem and had provided a "great deal" of research, analysis, and proposals. The fact that the FDA chose to ignore these suggestions did not in any way diminish the input that Kirlin provided.

Mr. Day also asserted Kirlin's opinion that the contracting officer's directive to replace all of the CVRs was "overly broad and unnecessary." (Emphasis in original.) He suggested that Kirlin's analysis throughout the project demonstrated that the small CVR pressure drops were the cause of the airflow problems and only a small number of CVRs required any modification. He asserted that the large CVRs should not be replaced because they met the Drawing M–65 requirements.

He requested that Kirlin be permitted to install the least expensive CVRs if the FDA directed replacement with CVRs that deviate from the specifications. He suggested that there was no evidence that a CVR could be built that achieved both the FDA's design specifications and performance requirements. Both Ultratech and Air Monitor had indicated that no such CVR existed. Kirlin requested that, if the contracting officer required replacement with Air Monitor CVRs, the FDA should certify that this model was in compliance with all design and performance specifications.

Finally, Mr. Day requested a meeting to discuss these matters as soon as possible. He stated that he was still confirming Air Monitor's delivery schedule and would provide the schedule by October 10 or as soon as · it was received. The schedule depended on the size and number of CVRs Kirlin would be directed to replace.

During an October 19, 1988 meeting at which plaintiff, Kirlin, LBC & W and FDA representatives were in attendance, Mr. Grandchamp stated that it was Kirlin's responsibility to ensure that the Air Monitor reprocurement CVRs were in compliance. An issue arose whether an expanded damper section could be used to meet the schedule under the specifications. According to Mr. Hoffman, an expanded damper section was not restricted by the specifications in any manner. Kirlin suggested that only the small CVRs be replaced, and that Ultratech could remanufacture the small CVRs. Mr. Day stated that the problem lay with the damper, not the sensing elements. When Mr. Rowe stated that Ultratech was experiencing difficulty obtaining accurate measurements, Mr. Hoffman stated that the FDA's main concern was performance. Mr. Day suggested that the pressure drop problem was created by the damper frame which obstructed airflow. When asked what units he planned to modify, he identified the 8–inch or smaller units. Mr. Hoffman later stated that he did not care whose equipment was used. With respect to remanufacture, FDA attorney Robbins noted that the FDA had stated that the Air Monitor equipment would meet the specifications. The FDA requested that

either plaintiff or Ultratech certify that its product met the performance requirements.

The discussion focused on what constituted a single housing. Mr. Hoffman stated that flanged connections would still result in a single unit. Mr. Styer added that LBC & W did not specify what type of connections should be used. Mr. Hoffman stated that, except for the performance requirements, the Air Monitor product could meet the specification. Mr. Grandchamp asserted that the Air Monitor product did not enclose the portions in a single factory fabricated housing, but LBC & W responded that it did. The FDA's additional notes of the meeting from this topic are too vague to reconstruct.

On October 19, 1988, the contracting officer issued a cure notice to plaintiff (among other reasons) for its failure to provide CVRs that complied with the contractual performance requirements. She stated that the FDA considered plaintiff's "failure to properly investigate and schedule correction" of deficiencies a situation that endangered the performance of the contract. Plaintiff was given. ten days to cure the failure.

In a letter to Mr. Styer of LBC & W dated October 24, 1988, Air Monitor's Mr. DeBaun took issue with Kirlin's assertion that Air Monitor had stated that it could not produce CVRs in compliance with the contractual specification. Mr. DeBaun noted that Air Monitor issued a reply to an inquiry by Kirlin noting three items that might have been deemed non-compliant. The first item was Air Monitor's decision to maintain the overall length of the Air Monitor CVRs the same as Ultratech's. (Presumably this would allow the new CVRs to be installed into the existing ductwork.) The second item related to the damper manufacture industry's new practice of using a damper frame of stamped multi-fold configuration made of 16–gauge steel, rather than 14–gauge. The third was Air Monitor's use of an oversized damper. Mr. DeBaun stated that Air Monitor did not regard the use or non-use of such a damper configuration as mandated by the specifications. He asserted that it had been a "standard design and fabrication practice" for Air Monitor to use such oversized damper sections. He communicated that Kirlin's conclu-

sion that the Air Monitor CVR could not conform to the design and performance requirements was not shared by his company. He took specific issue with Kirlin's statement that Air Monitor had "confirmed" that it was incapable of producing a CVR that complied with the specifications and met the performance requirements. No such statement was ever made, and he did not believe it to be true.

Mr. Bast forwarded to Capt. Rolofson in a letter also dated October 24, 1988, a confirmation of Kirlin's position from the October 19 meeting regarding the Air Monitor CVRs. In Kirlin's confirmation dated October 19, 1988, Mr. Grandchamp stated that Air Monitor's CVRs did not meet the specifications because, first, the damper was of 16–gauge, rather than 14–gauge, construction and, second, the CVR width and height varied from the design specification requirements by virtue of an expanded-damper section. According to Kirlin, only approximately 100 CVRs of the 8–inch or smaller size needed to be replaced with single blade dampers to remedy the problem. The larger CVRs were believed to supply sufficient airflow. Kirlin proposed proceeding with the small CVR installation on the entire Air System No. 2 and then continue with the replacement on the other air systems to determine whether the small CVR replacement alone would solve the airflow problem.

Kirlin also communicated its opinion that Air Monitor's pricing was unrealistic and proposed that Ultratech be allowed to fabricate a CVR to match the Air Monitor product. A six-week delivery date was given for the first shipment of Ultratech CVRs, with the final shipment coming five weeks later. Mr. Grandchamp stated that these proposals were an attempt by Kirlin to mitigate damages for both parties.

By letter of October 28, 1988, the contracting officer conditionally accepted Kirlin's proposal that only the smaller CVRs be replaced and that CVR reprocurement be competitive. She communicated that, after a review by FDA technical representatives of Kirlin's October 19 letter, she found Kirlin's statement that Air Monitor could not provide a compliant CVR to be "absolutely untrue." Drawing

218

M–65 was a schedule, and the "maximum pressure drop" column gives "explicit notice" of the static pressure drop requirements. The fact that CVR size was given on the schedule did not make this a design element and did not dictate any equipment configuration. The width and height were given to establish the cross-sectional area needed to maintain the proper airflow through the AMS section of the CVR. She asserted that there was no requirement in the contract that the damper section be of the same dimension as the CVR's AMS section or that the damper section be placed within the same cross-sectional area as the air measuring probes in the CVR housing. Air Monitor's use of a welded damper section would meet the "single factory housing" specification language if the damper section was welded to the CVR's air measuring section. The contracting officer also stated that Drawing M–71 showed a typical CVR and was a schematic representation that sets forth the positional relationship and minimum distances between the CVR honeycomb air straightener, measuring probes, and damper section. Critical portions of the project were included in the written specification, which must be read in conjunction with the Drawing M–65 pressure drop schedule and the Drawing M–71 installation detail. It was assumed that each manufacturer had the specialized knowledge and skill necessary to interpret the requirements and to offer a conforming product.

With respect to the 16–gauge, rather than 14–gauge, damper construction, the contracting officer stated that the 14–gauge unit was no longer commercially available and took the position that this change would not affect performance. She also pointed out that a detailed analysis performed by Syska & Hennessy revealed that not one of Ultratech's CVRs met the contract specification requirements and that even the largest sizes had "grossly excessive pressure drops."

The contracting officer further noted that considerably more CVRs had single-blade dampers than the approximately 100 that had been represented in Kirlin's letter. In spite of this fact, she would conditionally allow only the small CVRs to be replaced in an attempt to mitigate Kirlin's damages. Ultratech equipment could be used if it met the system performance requirements. She instructed plaintiff to proceed with the replacement of all small CVRs in Air System No. 2 and then to attempt to achieve balance before replacing the units on other systems. Finally, she stated that allowing this request did not signify that the FDA was sanctioning the viability of the proposal. If plaintiff did not succeed, her prior directive to replace all CVRs would remain in effect.

Tek–Air/Brandt notified LBC & W in a letter of November 9, 1988, that Brandt had refabricated one CVR and wished to have this CVR reviewed before constructing the remaining six CVRs. In a letter dated November 16, 1988, Mr. Styer informed Air Monitor that the Air Monitor CVRs required limited correction because some problems with specification compliance would affect performance. Air Monitor's small CVR had to be of all-welded construction, except for the damper section, and three over-length CVRs must be shortened.

On November 30, 1988, Ultratech submitted to plaintiff a replacement CVR containing an enlarged, separately attached damper. The submittal contained certified CVR pressure drop data demonstrating compliance at 220 and 230 CFM. It listed the number of CVRs to be replaced at 253 units.

Mr. Rowe evaluated and rejected Tek–Air/Brandt's resubmitted CVR based on the obstruction to airflow from the damper frame and blade stops. LBC & W continued to require performance verification as a prerequisite to acceptance. In a December 2, 1988 letter to the contracting officer, LBC & W recommended that the FDA pay for the testing if Tek–Air's unit proved acceptable. On December 6, 1988, LBC & W sent its evaluation and recommendations to Tek–Air, stating that it was concerned that the Tek–Air/Brandt unit would still be unable to meet the pressure drop criteria. LBC & W informed Tek–Air/Brandt that it could not accept the CVR without verification of performance and recommended that either certified test reports be obtained or factory testing witnessed by the FDA be performed.

Tek–Air/Brandt sent Mr. Rowe a facsimile transmission dated December 16, 1988, containing an alternate construction technique for his review and input. This alternate construction proposed attaching a Ruskin CD–50 or CD–60 airfoil-type damper to the AMS section, while noting that the damper section would normally be installed inside of the duct. Tek–Air/Brandt stated that these dampers could be special ordered with an additional width of ½ inch to provide additional free area with the steel construction specified.

In a January 3, 1989 letter to Mr. Styer of LBC & W, Tek–Air/Brandt stated that it would provide the certified test data, but only if it was reimbursed for the cost because the testing was not a specification requirement. Brandt ordered Ruskin SD–50 dampers with actual inside dimensions of 4 × 4 inches. The actual outside damper width and height was increased to 6 × 6 inches.

On February 10, 1989, Mr. Styer forwarded to the contracting officer Mr. Rowe's (LBC & W's) procedure for testing Ultratech's CVRs. Mr. Rowe explained that Ultratech's replacement CVR submittal contained redesigned measuring probes which necessitated that the CVRs undergo certified testing to demonstrate airflow measurement accuracy in compliance with the specification requirements. To his knowledge no standard method for testing CVRs existed. He found a test procedure in a GSA specification and used it as a basis for the proposed CVR test procedure. Mr. Styer informed the contracting officer that LBC & W employees were system design engineers, not experts in testing and certifying manufactured equipment. He stated that he forwarded the proposed procedure at the FDA's request to expedite the situation.

Contracting Officer Dean informed plaintiff in a letter of February 22, 1989, that it must forward the complete static pressure profile for Air System Nos. 5–13, along with field fan performance data, before March 17, 1989. She noted that plaintiff had informed her at a February 2, 1989 meeting that these air systems were not in balance. The data must contain complete information for both supply and exhaust systems. The FDA, she stated, requested this information to determine whether severe problems were present that would delay acceptance of the building. She expressed her concern that the remaining York fans might not be capable of delivering the required CFM and static pressure.

After Contracting Officer Dean and Mr. Hoffman requested that Mr. Rowe look into the DPTs, he sent Mr. Styer an interoffice memorandum dated March 6, 1989. After Mr. Rowe had reviewed the specifications, shop drawings, and installed equipment and made inquiries regarding the transmitters purchased by Ultratech, Capt. Rolofson and he investigated the issue. He noted that they found that Ultratech's transmitters did not conform with its own approved shop drawing or the specified performance requirements. He informed Mr. Styer that the present airflow control system would not perform as he specified.

Mr. Rowe explained the DPT's operation noting the extreme importance of the span selection. While the shop drawing submittal stated that Brandt Model PI–DPT2200 would be utilized, the field investigation revealed that PI–DPT2300 models were installed. He also asserted that Ultratech did not purchase DPTs with the spans stated in the approved shop drawing, but purchased DPTs with a 0.25 Inches W.C. span and then made internal adjustments to achieve the span of the shop drawing. Not only would this adjustment result in inaccuracies outside of specifications, but it might also require replacement of internal hardware.

Mr. Rowe stated that a field investigation of about 20 DPTs revealed that drastic changes had been made to the transmitter spans in an attempt to match the airflow measuring stations with air balancing readings. He noted that the span changes were inconsistent between identical systems, with a variation of 0.5 Inches W.C., or differences in span of 500 percent. In some cases the original span of 0.1 Inches W.C. was changed to 0.99 inches, resulting in an approximate gain increase of about 1,000 percent. He noted that in March 1986, Ultratech was permitted to perform minor span adjustments to match the DPTs to the AMS sections. Ultratech proceeded to make unre-

ported span changes to match the transmitter reading with the air balance readings. Finally, Mr. Rowe suggested that as a result of the DPTs supplied by Ultratech, the airflow control system would be unstable, would be ·very sensitive, and would "hunt" when trying to achieve its set point.

Mr. Rowe attached (to his memorandum to Mr. Styer) Capt. Rolofson's March 6 memorandum regarding destructive testing and examination of the Ultratech CVRs. Capt. Rolofson recorded that Mr. Rowe and he examined six Ultratech CVRs on January 25, 1989. One CVR was disassembled for a detailed examination, and another five were investigated by viewing the interior of the unit after removing the honeycomb air straightener. One of the units had a severely bent static pressure probe, and all the six units had incorrect probe lengths. The sensing port spacing was incorrect between the nose and elbow. Further, the probe tips were not bullet-shaped. He stated that none of the units complied with the Industrial Ventilation standards as Ultratech had assured.

Capt. Rolofson also recorded that the static pressure probe was not parallel to the airflow in approximately 50 percent of the units. Mr. Rowe and he found that the diameter of the tubing varied even to the extent that there were different diameters for units of the same size. The sealant used to seal flanged connections at times protruded into the honeycomb, thereby obstructing the airflow. The dampers were not welded continuously, as was required during the shop drawing process. In addition, it was discovered ·that Ultratech failed to comply with the "L" dimension of Drawing M–71.[17] He also recorded that the static probes were located incorrectly with respect to the total pressure manifold and that the damper leakage exceeded Ultratech's approved submittal. Deformed honeycombs and large damper frames obstructed airflow. In Capt. Rolofson's opinion: "While the Ultratech people portrayed themselves to be experts, they were in fact novices...."

In a letter of March 17, 1989, the contracting officer rescinded her conditional acceptance of a partial CVR replacement. She stated that this decision was based upon a review of destructive testing of CVRs; upon new findings that the CVRs failed to meet design requirements and technical performance criteria, and that the DPTs failed to meet specification requirements; and Ultratech's shop drawing representations. She stated that the DPT supplier had informed the FDA that the units were not purchased with the spans approved in the shop drawing submittals. A different model DPT was supplied than was approved during the shop drawing submittal process. Approximately 65 percent of the DPTs were to have spans of 0 to 0.1 Inches W.C.; those furnished had spans from 0 to 0.25 Inches W.C. The contracting officer also noted that a field investigation had demonstrated that drastic changes were made to the DPTs in an attempt to match the CVRs with the air balance readings.

The CVR problems, when coupled with the DPT deficiencies, had created a situation where the control system would neither properly function nor achieve the contractual performance criteria. The contracting officer issued a directive that plaintiff replace all CVRs with products that met the contract requirements and were accepted by the FDA through the submittal and testing process. She also directed replacement of all DPTs that were not in accord with the specifications and Ultratech's shop drawings. She noted that Mr. Grandchamp stated at a March 15 meeting that no additional data on Air System Nos. 5–13 would be forthcoming and that data presented in 1986 demonstrated that the fans were performing properly. She informed plaintiff that she could find no such data and directed plaintiff to furnish a copy before March 24.

In a letter dated April 6, 1989, Tek–Air/Brandt notified LBC & W that its 4– × 4–inch CVR had passed the specification criteria and that it would certify the CVR's performance. An internal Tek–Air memoran-

---

17. This dimension established the minimum distance between the CVR's air measuring portion and the damper.

dum noted that the unit had passed after the wall-mounted rubber seals provided by Ruskin were replaced with seals that Tek–Air/Brandt had mounted on the damper blade itself. In an April 6, 1989 letter, Tek–Air/Brandt submitted a performance certification for its submittal, and on May 17, 1989, LBC & W's Mr. Styer recommended that the contracting officer grant final acceptance to this Tek–Air/Brandt unit. An attached May 11, 1989 memorandum to Mr. Styer from Mr. Rowe stated that the damper blade style should be optional so long as the leakage and control requirements were met.

By letter dated May 1, 1989, Mr. Thompson informed Mr. Day that the FDA had advised him of its intent to issue a formal show-cause default notice as a result of Kirlin's failure to respond to three FDA requests. Two requests related to Air System Nos. 5–13 and one to the drop pans for the AHU heat-recovery coils. All of these had been communicated to Kirlin previously. Kirlin was directed to supply the requested information by May 3 to prevent issuance of the default notice.

On May 4, 1989, Mr. Thompson sent a letter to Mr. Grandchamp stating that plaintiff had requested the performance data for the seven systems that Mr. Grandchamp indicated were available and, if available, for the other two systems. He informed Mr. Grandchamp that if the two tests must be repeated, the FDA and plaintiff wished to attend. He also asked Mr. Grandchamp to provide Mr. Bast and Captain Rolofson all of the necessary documentation and requested work related to the drip pan issue.

In a May 19, 1989 letter, the contracting officer informed plaintiff that, based on successful testing at ETL, the FDA would accept the revised CVRs submitted in December 1988. She gave two conditions to her acceptance: First, plaintiff must comply with all LBC & W comments made during the submittal process; second, Ultratech must carefully monitor quality control for manufacturing. As part of the second condition, she required that each CVR size be tested initially and at least 10 percent of the total CVRs be randomly tested to ensure that they met performance specification requirements. Finally, she emphasized that the FDA believed the revised work resulted from plaintiff's failure to furnish compliant equipment.

Mr. Grandchamp requested in a letter of June 9, 1989, that plaintiff request that the FDA retain and preserve in original as-tested condition the Air Monitor and Ultratech CVRs that were tested. Mr. Grandchamp noted that the FDA directed replacement of the original Ultratech CVRs with "new Ultratech CVR's manufactured in accordance with the FDA's revised design specifications." Plaintiff's Mr. Bast commented that the quoted assertion was wrong in that the revised specifications were Ultratech's.

Based upon LBC & W's recommendation, Contracting Officer Dean, in a letter to LBC & W of June 15, 1989, authorized Tek–Air/Brandt to remanufacture the remaining five units. In the same letter, FDA communicated that all Tek–Air/Brandt units were to be sent to ETL Testing Laboratories in Cortland, New York, for performance characteristic testing. Thirty-seven CVRs arrived at ETL Testing Laboratories between March and August 1989 to undergo this testing. The testing was authorized by Syska & Hennessy. Although ETL issued its report on October 2, 1989, Syska & Hennessy's report did not issue in final form until July 1990.

On June 19, 1989, Mr. Bast noted in a letter to the contracting officer that plaintiff believed that the May 19, 1989 letter inadvertently accepted the wrong revised CVRs. He suggested that the contracting officer intended to accept the February 17, 1989 submittal, which had been tested at ETL Testing Laboratories. The December 2, 1988 submittal had not been so tested. He enclosed for review and approval Revision No. 3 dated June 15, 1989.

Representatives from FDA, Brandt Instruments, LBC & W, Syska & Hennessy, and plaintiff attended a test at ETL Testing Laboratories on June 21, 1989. An interoffice memorandum from plaintiff dated June 23, 1989, recorded that the FDA ordered the test after discovering that the DPTs installed were not the type approved during the submittal process. Two control panels—each

with four DPTs—had been selected for testing. ETL representatives and Daniel B. Beistel, technician for Brandt Instruments, conducted the testing. During the test set-up, it was noted that three of the four DPTs in the first panel appeared to be damaged. The second panel revealed the same. Mr. Beistel stated that the damage was likely the result of the period of inactivity that caused the DPTs to "gook" up. The damaged DPTs required dismantling and cleaning. He also noted that the transmitters had to be recalibrated because they had been adjusted beyond their range, which potentially damaged the surface gauges.

Ronald B. Thompson, President of Brandt Instruments, and Mr. Beistel explained that the DPTs and surface gauges would require individual inspection to determine if any physical damage occurred. The over-adjustment of the DPTs signified that they would require recalibration. Mr. Thompson and Mr. Beistel stated that this work must be performed in a certified laboratory. Also, an overall review was required to determine whether DPT replacement would be a better solution than individual repair, in terms of time and cost. Plaintiff's Mr. Bast noted that the FDA was uneasy about the York fans' performance, since the fan data still had not been received. He also noted that the FDA inquired why the remaining CVRs had not been removed.

In a letter of June 28, 1989, the contracting officer expressed "serious reservations" to plaintiff whether Kirlin could complete the unfinished work at Module I or could correct the severe deficiencies existing in the project. She stated that these reservations were based on the June 22 testing at ETL Testing Laboratories and a review of plaintiff's most recent submission. The record demonstrated that Kirlin had provided substandard equipment in at least three different critical areas. She noted that the FDA was forced to perform testing and to direct plaintiff to perform the remedial work in the building. She recapped the ETL tests, which revealed that seven of the eight DPTs tested did not function and that DPT adjustment rendered the system incapable of performing. She also asserted that Kirlin had failed to use

normal procedures to purge the system before start-up, which resulted in contamination or damage so severe that the DPTs required either repair or replacement.

The contracting officer informed plaintiff that although she had approved the use of a revised CVR, plaintiff's proposed schedule revealed that plaintiff refused to proceed with the removal and procurement of this equipment in a timely manner. Plaintiff ignored FDA's quality control requirements, and Ultratech's proposed manufacturing schedule would not provide the quality assurance required by the FDA. She also expressed concern that Kirlin would fail to investigate the status of Air Systems Nos. 5–13 in an efficient manner.

According to the contracting officer, Kirlin's past history of production inefficiencies, and lack of quality control in both original CVR production and installation, as well as in the control panels, led the FDA to believe that Kirlin either lacked the required skill and technical knowledge to perform and complete the work, or had become so preoccupied with other concerns that it had become extremely hesitant about completing the project in accordance with the specifications. Since acceptable solutions had been agreed upon, no other explanation for Kirlin's conduct was evident. It was plaintiff's responsibility as the prime contractor to control its subcontractors and assure that the work was being performed. Since the parties' agreements related to the mechanical work were not being carried out, she gave only two alternatives. Plaintiff was ordered either to take the necessary action to get Kirlin to perform or arrange for another mechanical subcontractor to complete the work. If one of these two alternatives was not implemented by July 15, she threatened to terminate plaintiff's entire contract.

A July 11, 1989 meeting was held regarding the status of the DPTs and surface gauges. On July 13, 1989, Swadesh Chatterjee, Vice President of Brandt, sent a facsimile transmission to the contracting officer explaining that Brandt was not responsible for the span changes performed during the spring and early summer of 1986. He stated that Brandt, in fact, had cautioned Ultratech

after becoming aware of the drastic change in the spans. He noted that Ultratech had subcontracted one of its technicians for only a week, whereas the DPT adjustments lasted at least two to three months.

Mr. Chatterjee attached a facsimile received from Mr. Pinkston on the same date asserting that Brandt was aware of the changes that he had made, although these were not performed at Brandt's recommendation. Mr. Pinkston explained that the DPTs were adjusted in about March 1986 so that the output gauges would be in agreement with the flow hood or pitot traverse readings used to measure the room supply or exhaust air. This adjustment was necessary because of either the duct configuration, design/manufacturing problems, or both. The span changes were expected to be about 20 percent, but some of the units received adjustments "quite a bit larger" than expected. He also stated that these larger adjustments to the DPTs were at least partially a result of insufficient airflow through the CVR. This low airflow, he explained, in turn caused the adjustment to be made in the very low portion of the DPT operating range and then extrapolated. Adjusting below the operating point was a temporary step that would result in close readings at the time when sufficient airflow was delivered.

Mr. Pinkston related that Mr. Beistel had assisted in these adjustments for approximately one week and informed Brandt that larger than expected span changes were performed. He stated that Mr. Chatterjee called Jo Bobbitt, owner of Ultratech, and arranged for a meeting with Mr. Thompson, Mrs. Bobbitt, Mr. Pinkston, and himself. He recalled that during the meeting Brandt expressed concern that the span changes exceeded the 15–percent limit specified in the Brandt literature. The internal DPT capillaries required adjustment to achieve the larger span adjustments. Both Mr. Chatterjee and he were aware that the larger adjustments would not cause the DPTs to fail totally, but could result in DPTs that would no longer be as accurate as the published specifications set forth. Brandt stated that it would not honor the warranty if it determined that any damage resulted from inter-

nal adjustments. Mr. Pinkston also asserted that Brandt wrote Mrs. Bobbitt a letter after the meeting to record what was stated. (The letter is not in evidence.)

The contracting officer prepared to discuss a list of questions at a July 18, 1989 meeting in order to allow her to determine whether the new Ultratech CVRs would meet the FDA performance specification, or whether another manufacturer should be considered. She noted that Ultratech's latest submittal of June 29, 1988, was rejected because of insufficient information on the CVR construction and also the damper. The damper was manufactured by one of the Hamlin Companies (the new owner of Ultratech). Her questions related to the following areas: CVRs, AMSs, control panels, and scheduling. Kirlin informed the contracting officer that her questions would not be answered during the meeting, but would be provided at a later date.

A pattern of change and counterchange bedeviled all the interactions between the parties undertaken to complete this contract. A July 18, 1989 meeting reflects that this activity crescendoed. The minutes, which both parties sponsored in evidence, are prolix. The following captures the higher points.

Representatives from the following entities participated in this meeting: FDA, LBC & W, Syska & Hennessy, plaintiff, Kirlin, Ultratech, Brandt and Air Monitor. The contracting officer began by asking Mr. Pinkston to discuss who made the adjustments to the DPTs back in spring 1986. Before he answered, Mr. Pinkston informed her that Ultratech, Inc., no longer existed and that the new owners did not wish to be liable for any problems related to the old Ultratech.

Mr. Grandchamp interrupted, requesting that the reason for the adjustments be presented. The adjustments were made because there was a great differential between the control panel readings and the actual flow being delivered to the diffusers. He suggested that the problem resulted from failure to straighten the airflow, both up and downstream of the CVRs, caused by the fact that the ductwork was not and could not be installed per the manufacturer's recommen-

dations. When the calibration was carried out, everyone, including the FDA personnel, was in agreement as to which DPT adjustments were needed and the procedure by which they were to be implemented. He asserted that the number of DPTs and the allowed percentage of calibration were never discussed.

At this point the contracting officer asked Mr. Rowe of LBC & W whether he was aware at that time that the adjustments were as large as they ultimately were. Mr. Rowe's understanding was that originally only 25 percent of the DPTs would have to be adjusted. He did not recall that the adjustment was necessitated by the duct layout. The reason for the adjustment was characterized at that time as marrying the transmitter and CVR as a system. The procedure for performing the adjustments came from Mr. Pinkston and not from the FDA's resident engineer, as Mr. Grandchamp had suggested. Mr. Grandchamp stated that Mr. Rowe never voiced any objections to the procedure, and Mr. Rowe responded that he had agreed to performing minor adjustments to marry the units. Mr. Grandchamp informed those present that he did not recall a 25–percent figure. Mr. Rowe stated that the 25–percent figure was given originally and that later on the FDA was told that all of the units required adjustment.

The contracting officer asked who had performed the adjustments, noting that under the contract specifications only the original equipment manufacturer was designated to perform them. Mr. Pinkston had performed the adjustments with the assistance of Kirlin personnel and, for a short time, Brandt's Mr. Beistel. Mr. Pinkston explained that although each DPT had a span adjust knob, additional re-spanning was required. He accomplished this additional re-spanning by manipulating the internal capillaries located inside of the DPTs. The DPTs, he stated, were calibrated so that the control panel gauge correlated with calibrated flow hood [18] readings measured at the diffusers. He suggested that the greater than anticipated

spans resulted because the transmitters were adjusted down low in the low-operating range of the DPTs.

When asked by the contracting officer whether the adjustments would affect the performance of the DPTs, Mr. Pinkston responded that the DPTs, after the adjustments, may not perform to the actual published specifications. Since Module I was a constant volume system, he believed his adjustments were made at the constant volume operating point, so that the units would produce correct readings at that point even if the DPTs were slightly out of specifications over the entire instrument range. He had checked the DPTs after adjusting them and they were operating over the proper range. He also stated that approximately one year prior to the meeting, Ultratech performed a "quick check" and found that all but ten of the DPTs were "basically ... operating." [19]

Brandt's Messrs. Thompson and Chatterjee stated that they had communicated with Mr. Pinkston as detailed above. While both agreed that no damage would result from Mr. Pinkston's span changes, both also agreed that his adjustments could cause a significant amount of nonlinearity in the instruments. Mr. Thompson stated that the instrument would be accurate at the airflow to which it was adjusted, but that the further the instrument operated from that particular flow, the greater the error would be. Mr. Chatterjee explained that a normal customer adjusts the span about 15 percent by turning a dial on the instrument. In contrast, Mr. Pinkston changed the span, as no customer could, by entering the DPT and adjusting an internal capillary. Mr. Grandchamp questioned whether the adjustments would have been so great if the design airflow was achieved at the diffusers. Mr. Pinkston answered that, in his opinion, they would not. He stated that the DPT adjustments were recorded on the transmitters. Mr. Pinkston explained that the DPT span should be thought of as a yardstick, having a span of 36 inches. At zero differential pressure the

18. A calibrated flow hood is a tent-like device with an airflow measuring station at the bottom. The hood captures and measures the airflow exiting a diffuser.

19. He stated that most of these ten DPTs sustained water damage and were repaired.

DPT would have an output of 3 psi, and, at full span, an output of 15 psi. These outputs, he explained, were the standard for the industry. He defined linearity as the straightness of a graph where the zero differential pressure is 3 psi; the span is the factor that would produce 15 psi. If the instrument were perfectly linear, the resulting line would be perfectly straight.

When the contracting officer asked whether the instruments were linear after the adjustments were made, Mr. Pinkston stated that Ultratech had really only tested for linearity in a very broad sense. It saw that the zero differential pressure indicated zero CFM and that the operating differential pressure indicated the correct corresponding operating CFM.

Mr. Sanchez, Vice–President of Syska & Hennessy, noted that during testing at ETL Testing Laboratories some of the eight units tested were found to be contaminated. Mr. Thompson stated that the contamination came in through the instrument air system. He explained that a system that is shut down for an extended period of time can experience condensing and drying out. When the system is brought back on line, contaminants are blown through the instrument air system directly into the instruments. Although he could not identify the cause, he understood that the system had been shut down. He informed those present that contamination can be avoided by flushing out the system before it is reconnected to the instruments. The contracting officer asked whether this was done, and Mr. Grandchamp responded that he was not sure whether or not the instrument air was shut down or whether the system was purged prior to start-up. Mr. Grandchamp asked whether climate control could add to this problem and was informed that wide temperature variations do cause condensation. Mr. Chatterjee added that a technician had stated that the contamination was the result of water residue and scaling.

When the contracting officer questioned whether DPT repairs could be made in the field, Mr. Thompson informed her that if as many DPTs were contaminated as it appeared from the ETL testing, the work would be beyond the scope of field repair.

Repairing a large number of units would take longer than building new ones. Any units adjusted more than 15 percent (or beyond the dial adjustment) should be re-ranged by replacing the first stage, thereby allowing the instrument to operate within specifications over the entire range of the DPT. When Mr. Grandchamp questioned whether this adjustment could be performed in the field, Mr. Chatterjee suggested that it was possible if only a few units required it. Mr. Pinkston compared the process to doing "brain surgery in a MASH unit."

Mr. Chatterjee asserted that if the span required adjusting from 50 to 100 percent, the instrument would not be the source of the problem. The manufacturer, he stated, should be consulted before making any adjustments when large span adjustments appeared to be necessary. He also stated that the contamination was not caused by the respanning performed by Mr. Pinkston, but agreed that some of the units may have been damaged by water. After being asked by the contracting officer, Mr. Grandchamp informed her that she would have, within three or four weeks, the status of the DPTs based on a quick check to be performed by Ultratech.

When questioned regarding the difference between the Brandt Model Pi–DPT 2200 and 2300 DPTs, Mr. Pinkston stated that the only real difference was that the 2300 came without two spring-biased diaphragm comparators, one for the zero adjustment and the other for the set point controller. He explained that Ultratech later installed these two comparators.

The contracting officer stated that another concern was whether the gauges also needed to be checked. Mr. Thompson asked Mr. Pinkston whether he intended to put every transmitter back to its original span. Mr. Pinkston answered that, except for the fact that the old Ultratech simply used the duct area as the CVR area, they would be returned to the original span. The difference between the effective area and the nominal area, which was used for the original installation, would be slight; because the DPTs were not standard span transmitters, they could select transmitter spans to three signif-

icant digits. He suggested that this would prevent the redialing of about 600 gauges. Messrs. Thompson and Chatterjee agreed with Mr. Pinkston that if all of the DPTs were returned to their original span, the gauges would function properly so long as the design CFM could be achieved.

Mr. Hoffman asked Mr. Pinkston whether he felt that the CVRs would measure incorrectly only in the Module I installed ductwork or in any setting. Mr. Pinkston stated that he suspected they would read incorrectly in either setting. Mr. Pinkston suggested that the accuracy of the CVR, as well as the configuration of the ductwork, contributed to the problem. Mr. Rowe questioned whether the DPTs could be recalibrated back to their original span if the effective area would have changed. Messrs. Thompson and Chatterjee agreed that the DPTs would have to be respanned again, after being returned to their original values, because the calculated differential pressure would now have a different value as a result of new effective areas.

Mr. Hoffman also asked how Ultratech, portraying itself as an expert, could have made the fundamental error of using nominal area rather than effective area. Mr. DeBaun, President of Air Monitor, stated that it was a basic fact of textbook physics known for many years that the pitot array (the total pressure manifold and static pressure probe) is taken into account when measuring a cross-section, because the airflow velocity speeds up around the array. He also stated that the smaller the CVR, the greater the effect the pitot array would have on the effective area. The casing could not be produced to the exact size, but a net area calculation could be made. He stated that since volume equals velocity multiplied by the area, when sizes are small, the area becomes the predominant variable.

Mr. Chatterjee agreed, stating that every Brandt flow station was marked with the effective area. He described effective area as the standard airflow measurement, since it is needed to calculate the airflow. The area is not the area of the duct, but the effective area through which the air travels. Mr. Stephenson questioned whether the specifications mentioned effective area. The answer was that they did not. He also asked whether Air Monitor published its effective area calculations. Again, the answer was negative. The contracting officer noted that both manufacturers had stated that they were aware of the need to take the effective area into consideration. Mr. Hoffman suggested that the specification did not need to state the effective area. Mr. DeBaun added that because no standard size CVR existed, it was not feasible for a manufacturer to put the effective area in its literature. This would only confuse purchasers. He asserted that it was Air Monitor's responsibility, as the manufacturer, to advise the customer what the free area would be. Mr. Pinkston took the position that the CVR pressure drops listed on Drawing M–65 were calculated using the width times the height, not by using effective area. These pressure drop numbers were taken directly from Air Monitor's literature.

The contracting officer next asked whether the stand-alone AMSs were functioning properly. Mr. Pinkston responded that they were measuring within ½ percent when pitot traverses were taken about a year or so earlier. Mr. Grandchamp stated that Kirlin would check the stand-alone AMSs for proper calibration.

Other topics discussed during the meeting were Ultratech's proposed use of Hamlin dampers and Kirlin's understanding that the Ultratech CVRs were released into production. Mr. Pinkston stated that Ultratech had switched to the Hamlin damper from the Pacific Air damper because of the delivery schedule desired by the FDA. Apparently, Ultratech had already cut the metal, the tubing, and the manifolds for 555 CVRs. In addition, the static pressure probes had been made. The contracting officer informed Ultratech and Kirlin that no production approval had been given.

The discussion also focused on Ultratech's submittal. Ultratech proposed to send its prototypes to AMCA for testing, but asked that it be allowed to test the remainder at a test lab set up at its facility. The FDA desired leakage data for the Hamlin damper, and Ultratech and Kirlin stated that testing the units would take too long. Ultratech and Kirlin also suggested that leakage data were

unnecessary because the dampers would not be closed or sealed when the system was in operation.

Mr. Pinkston later stated his understanding that the specifications were no longer completely in effect. The contracting officer responded that the specifications remained 100 percent in effect. Mr. Pinkston stated his belief that it was not possible to meet the amended specifications. Ultratech's only deviation from the specifications was the use of elliptical damper blades, rather than interlocking blades. (This deviation was allowed by the FDA during final CVR reprocurement.) It was his opinion that the interlocking blades could not meet the pressure drop requirement. Mr. Rowe stated that, based on the original specification, opposed-blade dampers should be used where possible.

The contracting officer asked what type of quality control Ultratech would implement in the new CVRs. Ultratech suggested 100–percent testing of all CVRs with respect to maximum pressure drop and the other criteria from Drawing M–65. Mr. Pinkston stated that the original "L" dimension of Drawing M–71 was taken from the end of the AMS section and included the damper. Drawing M–71 was amended in April 1983 so that the "L" dimension no longer included the damper. To the best of his knowledge, Ultratech was unaware that an amendment was made. Mr. Pinkston stated that the "L" dimension varied on some units from 1.75 to as much as 3.75 inches. The CVRs could not be changed to meet the "L" dimension because redesigning all the ductwork to accommodate longer CVRs would be required.

The contracting officer declined Mr. Grandchamp's request for partial acceptance of the facility, stating that it would only be accepted as a whole. Kirlin then stated that, in order to avoid problems that could arise if the equipment remained idle, it would not prepare other parts of the facility for turnover.

When asked, Mr. DeBaun stated that Air Monitor's CVR design either met or exceeded the specifications. He stated that Air Monitor used 4–inch Ruskin damper blades, rather than larger blades. The only question Air Monitor raised regarding potential specification noncompliance was whether it was good practice to weld the damper linkages inside the frame, since this made them inaccessible. Mr. DeBaun noted that Air Monitor had known for years that the damper section had to be enlarged for the smaller-sized units. He also suggested that each unit should be tested and stated that Air Monitor had tested the CVRs submitted for compliance with Drawing M–65. Smaller damper blades worked better with respect to the "L" dimension because the damper would be further from the AMS section. Mr. DeBaun believed Air Monitor's units could meet the "L" dimension, but he had not confirmed this point. He stated that Air Monitor used a standard AMS section of 8 inches, and Mr. Rowe quickly calculated that, based on this standard size, the "L" dimension could be satisfied.

Brandt's Mr. Chatterjee clarified that the distance of concern for the "L" dimension is the distance between the tip of the damper blade and the AMS section. The size of the damper blade thus affects the "L" dimension and also unit performance. Like Air Monitor, he stated that Tek–Air/Brandt's CVR delivery schedule depended on Ruskin's ability to supply the damper. Mr. Chatterjee explained that, although every unit submitted to the FDA was factory tested, it was not Tek–Air's normal practice. He also informed the FDA that Brandt's standard industrial AMS section is 12 inches, and that Tek–Air manufactured its commercial CVRs. He stated that Tek–Air could manufacture an 8–inch AMS section.

The contracting officer asked both Air Monitor and Brandt what action would be taken with respect to adjusting the DPTs. Mr. DeBaun stated that the pressure drop problem should have been identified before the units went into production. Mr. Rowe stated that he did not learn about the unit pressure drops until after the CVRs were installed and the systems were started. He stated that the CVR components had pressure drop information, but that he was unaware of the resulting pressure drop when the components were assembled to become the CVR. Mr. DeBaun also stated that he would not have altered the DPT spans based

on system inaccuracy without the full knowledge and consent of the engineers. He explained that the DPT is a quantitative (measuring) device and most problems usually occurred outside of the DPT within the system. He also stated that he would not have used a balancing device (the flowhood) to set a quantitative device because the latter is supposed to have greater accuracy.

Mr. Thompson stated that if airflow readings varied greatly from design, a problem existed somewhere, but not with the instrumentation. The entire system should have been checked out, and no DPT adjustment should have occurred until that problem was already solved. Mr. Chatterjee added that as soon as Ultratech found that it had to adjust the transmitters 99 percent or more, it should have come to the engineer and stated that a problem needed to be addressed. He suggested that the work should have stopped and that Ultratech should not have tried to use a "band-aid fix."

Mr. Stephenson asked what the FDA needed in order to approve the Ultratech units and stated that he was unsure what criteria had to be met. He asserted that none of the three manufacturers' units met the amended specifications. The contracting officer responded that the FDA required answers to the questions that Kirlin would not address during the meeting and data related to the Hamlin damper. The contracting officer also stated that there was concern that the Ultratech unit could not meet the "L" requirement because of its proposed use of a new 9½ inch damper. Mr. Grandchamp requested that Kirlin be allowed to send representation to witness the ETL testing of Air Monitor's sample CVRs. Syska & Hennessy's Mr. Sanchez agreed.

The contracting officer addressed two letters to plaintiff on July 21, 1989. The first letter advised plaintiff that the FDA considered two areas of investigation essential. First, the condition of all DPTs must be investigated immediately. She informed plaintiff that to date none of this testing had been accomplished, except for the ETL testing, which took place at the FDA's direction. The repair or replacement of many or all of the DPTs, she noted, would affect significantly plaintiff's proposed schedule for completion. Second, the AMSs also must be tested to determine whether they performed within the contract specifications. She pointed out that the AMSs were constructed by Ultratech in a manner similar to the defective CVRs. If the AMSs were also defective, replacement would also be required. The contracting officer requested that the DPT and AMS information be submitted to her before August 15, 1989.

The second letter of July 21 advised plaintiff that the May 19 letter conditionally accepting CVR replacement with revised Ultratech equipment was not operative because plaintiff failed to comply with the conditions of acceptance. Based on later Ultratech submittals and the information from the July 18 meeting, it appeared that Ultratech could meet performance specifications only if it deviated significantly from the specifications. The contracting officer also stated that whether Ultratech possessed the resources to properly construct, manufacture, and test units without modifying the other elements already in the Module I system was not clear. It was never the FDA's intention to allow significant deviation from the performance specifications. While the FDA might permit some minor variation, it would not rise to the level submitted by Ultratech.

The contracting officer communicated that the FDA had not yet approved the Ultratech submittals and had never authorized the manufacture of CVR units. She expressed her regret that Ultratech had begun work on fabricating the units, but informed plaintiff that the FDA could not make a decision prematurely.

The contracting officer directed plaintiff to obtain proposals from Ultratech, Air Monitor, and Tek–Air/Brandt [20] and present them to the FDA with both technical and cost proposals by August 10, 1989. These proposals must contain a complete description of their proposed quality control measures, a

---

20. Brandt, again in conjunction with Tek–Air, submitted proposals for supplying the reprocurement of CVRs.

proposed schedule, and a detailed description of their manufacturing resources. These proposals were not to deviate from the amended specifications in any major way, except the FDA would permit the units to fit into the existing ductwork to avoid major reconstruction.

In a letter of August 4, 1989, plaintiff's L. Ronald Thompson responded to the contracting officer's second letter of July 21. Plaintiff did not consider the contracting officer's letter or the submissions to be within contractual procedures and requirements. Plaintiff's interpretation of the contracting officer's oral instructions issued during the July 18 meeting was that plaintiff was to obtain proposals that would be in accord with the original specifications, as amended by Amendment No. 6, but the overall length of the CVRs would conform to the existing actual duct dimension. He noted that the contracting officer had stated that the proposals could not deviate from the amended specifications in any major way, but that other minor deviations would be considered. Plaintiff was unsure how it should, or the FDA intended to, evaluate the acceptability of the proposed units.

Mr. Thompson requested the criteria that were to be applied to the new proposals by August 10, 1989, to ensure a fair and objective evaluation. It was imperative that the confusion created during prior submittals and testing of all three manufacturers' CVRs be avoided. He suggested that once the FDA provided plaintiff with the necessary guidance, plaintiff anticipated that all of the proposals would be required to comply with the original design specifications as amended. All submissions should clearly indicate and explain all deviations from the requirements, provide all reference and supporting data that may be required, and certify the ability to satisfy design and performance requirements. Plaintiff requested formal proposals for review from Air Monitor and Tek–Air/Brandt by August 10, 1989.

Mr. Thompson also forwarded Kirlin's request that the FDA provide a written summary of all non-compliant elements of the latest Ultratech submittal no later than August 10 and suggested that, if this time frame were met, plaintiff would resubmit the Ultratech CVR by August 15. Further delay would result if the FDA failed to provide this information in a timely manner. The FDA's failure to respond timely "would be consistent with the indecisive direction we have received on this and other issues and would leave us in the untenable position of guessing how to achieve contract compliance to your satisfaction." He reiterated plaintiff's belief that it had performed its contractual obligations in every instance and objected to what he termed the contracting officer's "continued vacillation in resolving issues of alleged non-performance." He asserted that without clear guidelines and decisions it would be "virtually impossible" to meet the completion and acceptance of Module I by February 1, 1990.

On August 9, 1989, the contracting officer responded to Mr. Thompson's letters, which, she stated, questioned her specific direction for the correction of the Module I HVAC deficiencies. (Only one letter is in the record.) She questioned why he would ask for further direction and basic contract interpretation so late into the performance of the contract, particularly when much of the clarification requested repeatedly had been explained during meetings and in letters over the last year. She referred Mr. Thompson to her correspondence since August 1988 and to the meetings during which the FDA clarified specifications which, she asserted, had not changed since the 1983 bid opening.

She suggested that Mr. Thompson's need for further written direction demonstrated plaintiff's continued failure to investigate and correct its deficiencies. For example, plaintiff was directed to inspect and correct the deficient DPTs, but to her knowledge, had failed to do so. She found this puzzling since plaintiff became fully aware during March and June 1989 of the potential magnitude of the DPT problems based on DPT failure during testing at ETL. The FDA continually had been forced to investigate the myriad problems of substandard construction and equipment because of plaintiff's unwillingness to perform these and other crucial obligations which had delayed acceptance of the facility. In addition to the testing of the

**230**

DPTs at ETL, she stated that the FDA had conducted a field inspection, the findings of which she attached to her letter.

With respect to the DPTs, she noted that Ultratech failed to comply with the contract requirement that only the original equipment manufacturer could modify components. While she had been assured by plaintiff that the adjustments had been made in the presence of Brandt, it was admitted at the July 18 meeting that Ultratech and Kirlin employees had performed almost all of the adjustments. She recounted that Brandt was not advised of the magnitude of the adjustments before they were performed and that it was alarmed after learning the extent of the adjustments. According to Brandt, any DPTs that received adjustments over 50 percent required re-ranging. Attached findings confirm that the first stage of the DPTs had to be replaced and be returned to Brandt for refurbishment per the contract specifications. She stated that the record would demonstrate that until May 1988 (and then at her request) plaintiff had not presented a static pressure profile for any system. She had yet to receive this information for Air System Nos. 5–13, even after multiple requests.

The contracting officer suggested that plaintiff continued to rely on Kirlin for interpretation of the HVAC deficiencies and that Kirlin had failed to provide an accurate interpretation. For example, Kirlin had stated incorrectly, when requesting FDA approval of DPT adjustments back in March 1986, that the flow hood readings were considered to be the benchmark upon which all calculations were based, that accurate reading of airflow at one constant setting was all that was required, and that the proposed adjustments guaranteed accurate readings. She also noted that, originally, the FDA was informed that only 25 percent of the DPTs would need adjustment, yet in April 1986, Capt. Rolofson was informed that every DPT required adjustment. He was told that these adjustments were necessary because the damper was only one diameter away from the AMS, but should have been 2½ diameters away. Capt. Rolofson then instructed plaintiff to have Ultratech explain why all CVRs needed adjustment and to guarantee that the

field adjustments would not affect CVR life or function. At that time plaintiff was also asked to demonstrate that the CVRs would operate plus-or-minus 50 percent over the set point and maintain a constant linear relationship.

The contracting officer next assailed plaintiff's assertion that the correction of the airflow control elements was entirely outside the scope of the original contract. She recounted how Mr. Pinkston admitted (at the July 18 meeting) that the original CVR failed to follow the formula on Drawing M–71 (the "L" dimension) describing the minimum clearance between the damper and the sensing probe and that this failure resulted because Ultratech was unaware of Amendment No. 2. The FDA's own performance testing revealed that Ultratech's mistakes resulted in static pressure losses approximately ten times those designated in the contract and a complete failure to measure airflow with accuracy. This occurred despite Ultratech's assurance during the shop drawing submittal process that its CVRs could measure airflow within 2 percent accuracy.

Next, the contracting officer related Ultratech's failure to follow the specifications and its own submittal regarding the static pressure probe, the honeycomb air straightener, dampers, "L" dimension, and sealing of dampers. Additional destructive testing was planned, but she expected that these major errors were representative of all of the units. Plaintiff's statement that remedial work was outside of the scope of the original contract demonstrated that the chief problem during the last 3½ years was plaintiff's total failure and refusal to assume the role of general contractor, allowing Kirlin to delay and disrupt the progress of the mechanical work.

The contracting officer requested that plaintiff respond to her unanswered technical questions by August 15, 1989. These questions had been posed at the July 18 meeting, yet plaintiff acted as if it had never seen them. She asserted that plaintiff's letters and her conversation with plaintiff's Industrial Division Vice President Terry G. Seay demonstrated plaintiff's inability to manage the project or to control the actions of its subcontractor. She rejected plaintiff's asser-

tion that the FDA had arbitrarily chosen to complicate the CVR reprocurement process and denied that the FDA had constantly vacillated, leaving plaintiff unsure as to what it should submit. After the FDA undertook CVR testing, plaintiff and Ultratech offered a new submittal on June 19, 1989, with an unknown and unproven Hamlin damper. The Hamlin damper was potentially substandard and required testing because performance data was nonexistent. She also found unsubstantiated plaintiff's statements that one of the CVRs that met specification requirements during ETL testing contained a Hamlin damper.

The contracting officer recounted that she had attempted to mitigate plaintiff's damages on October 28, 1988, by allowing replacement of only the small CVRs in Air System No. 2 with compliant Ultratech CVRs. A submittal (also noncompliant) was not forthcoming until December 2, 1988. Plaintiff forwarded a second submittal on January 10, 1989, which was also unacceptable. An important deficiency was plaintiff's failure to heed the technical formula of Drawing M–71. She noted how Ultratech had stated at the July 18 meeting that its CVRs could not meet the Drawing M–71 "L" dimension. She asserted that the FDA under no circumstances could accept a CVR that so deviated from the performance specifications.

While the FDA thought that Ultratech's new submittal included dampers with published performance data, the contracting officer stated that it appeared clear from its June 19, 1989 submittal that this was not the case. She asserted that the history of CVR submittals from December 2, 1988, to June 19, 1989, demonstrated that Ultratech lacked the necessary experience and skills to present equipment compliant with the specification's performance and technical requirements. She gave Ultratech one final opportunity to present a compliant submission by August 10, 1989, or any extension thereof.

She characterized as unfounded Ultratech's suggestion that the introduction of Air Monitor and Tek–Air/Brandt into reprocurement served only to complicate the resolution of HVAC deficiencies. Ultratech had made little or no progress balancing the HVAC

system after almost one year and had still not produced a compliant CVR. The FDA had been forced to inspect and test the larger-size CVRs, which Kirlin stated had no static pressure losses and which it would not discuss at the July 18 meeting after being told that they also caused large static pressure losses. The procrastination and delay resulted solely from Kirlin's attempt to protect its legal position by impeding the correction of deficient work. Plaintiff, she asserted, had contributed to this delay by failing to manage, investigate, test, or correct the work in a proper manner.

She suggested that, contrary to Mr. Thompson's statements, both Air Monitor and Tek–Air/Brandt had stated at the July 18 meeting that they could meet the original amended contractual specifications, including all performance requirements. If plaintiff had taken a proper approach, the Air Monitor CVRs could have been installed months earlier. In addition, the contracting officer asserted that if plaintiff had undertaken all of the corrections from the April 1988 Syska & Hennessy report, investigated the DPTs back in March 1989, or investigated and performed the Air System Nos. 5–13 airflow profiles in a timely manner, the problems could have been corrected and a realistic completion date negotiated. Instead, plaintiff continued to present arguments rather than actions in response to FDA's directives. She cited how the removal of the defective CVRs was being postponed because of plaintiff's preference for continuity of removal and replacement. She would not tolerate Mr. Thompson's indifference to her direction.

Finally, the contracting officer asserted that her decision to allow plaintiff to submit the Ultratech equipment was based on incorrect and inaccurate information furnished to her during the prior year. The submittals from additional manufacturers were a reaction to Kirlin's statements that it was unable to meet the contractual specifications or perform the testing necessary for its proposed CVRs. She reiterated her directives from her letters, stating that plaintiff had to provide the requested submittals by the August 10 deadline. Further, plaintiff was to provide the information regarding the deficien-

cies of the DPTs and AMSs by August 15, 1989.

Mr. DeBaun responded to Mr. Grandchamp's submittal request with an informational copy of Air Monitor's submittal to the contracting officer dated August 15, 1989. Air Monitor proposed using a Ruskin CD–60 low-leakage control damper with airfoil-shaped, opposed blades. Under the proposal some units would contain an expanded damper casing and each unit would be individually tested. Mr. DeBaun indicated that a partial shipment of about one third of the units would be made within six to eight weeks after the receipt of order, submittal approval, and notice of release of fabrication. The remainder would be completed in an additional four to six weeks.

Ultratech submitted its Revision No. 4 on August 16, 1989, complete with a description of manufacturing and quality control procedures. All CVRs would be tested for airflow accuracy and pressure drop at the Ultratech airflow testing facility. A page describing Ultratech's capabilities noted that Ultratech, Inc., had been purchased in 1987 by the Hamlin Companies, one of which was the Hamlin Sheet Metal Company established in 1962. This company employed nine full-time welders and approximately 200 employees, which it suggested would be available to assist Ultratech Industries. Ultratech's CVR testing was to be "similar to [an] AMCA Standard 500 test." The same instrumentation as that proposed by AMCA would be used, except for a small variation in the flow sensor. Ultratech proposed that each of the first 33 prototype units would be tested at its operating air volume point and at two points above and two points below that point. The rest of the units would be tested using the same instrumentation at the operating point and only one point above and below.

A submittal note stated that the "L" dimension would be greater than specified and that all pressure drops would be at or below the CVR schedule of Drawing M–65. Ultratech proposed two options for dampers, both using the original damper actuators. The first option proposed using a Ruskin CD–50 with a 6–inch frame similar to model CD–40, allowing flanged connections to be used for mounting rather than the hat-channel frame. Substantial data for the Ruskin units were submitted. The second option proposed using Ultratech's own damper, manufactured by Hamlin. The proposal stated that this damper was "practically identical" to the Ruskin damper, but that performance specifications for leakage and pressure drop did not exist. Ultratech stated in the proposal that the values for its product would be close to those of Ruskin because of similarity of design. A one-page drawing/specification was submitted for the Hamlin damper. Delivery could begin in six weeks, with approximately 60 units per week shipped for 16 weeks after approval.

The contracting officer notified plaintiff on the same date as Ultratech's submittal, August 16, 1989, that she had yet to receive the submittal, AMS, or DPT data. She reminded Mr. Thompson that he had assured her that the test reports for AHU Nos. 5–13 would be available on August 21. She also noted that she had yet to receive the answers to her technical questions presented at the July 18 meeting, even though these were originally promised on July 21 and were due not later than August 15. Based on Mr. Thompson's letter of August 10 (not in the record), which stated that the CVR proposals and submittals would be supplied on August 22, she stated that the FDA would reluctantly agree to extend the date of receipt of all previously requested information to August 22, 1989. She listed all of the information that she expected to receive on that date and emphasized that she could not permit any additional delay of the Module I project.

Mr. Chatterjee sent a Tek–Air/Brandt submittal to Mr. Grandchamp on August 17, 1989. Brandt proposed using a modified Ruskin CD–50 low-leakage control damper with a flanged damper frame, airfoil blades, and no blade stops. Dampers smaller than 12 inches would contain only one airfoil blade. Brandt suggested a quality control program that included a design certification regimen and an engineering design conformance regimen. These regimens included pressure drop and airflow measurement accuracy testing, among other tests.

Brandt suggested improvements from the specifications in a few areas. First, Brandt suggested the use of an airfoil blade for dampers less than 12 inches. Second, the Brandt units would contain an enlarged damper section on all CVRs to meet the maximum pressure drop criteria of Drawing M–65. Third, Brandt stated that the CVR damper blade seals would be extruded vinyl and the bearings stainless steel. Fourth, Brandt suggested that, rather than welding all seams, the damper section and the AMS section would be bolted and sealed into position for ease of maintenance and future access. Fifth, the total length of the CVR would be governed by maintaining the "L" dimension as specified in Drawing M–71. Mr. Chatterjee presented a delivery schedule whereby delivery would begin ten weeks from approval, with the balance to follow within an additional four to six weeks.

On August 21, 1989, Mr. Grandchamp forwarded to the contracting officer Mr. Pinkston's DPT on-site inspection report. Mr. Grandchamp informed her that Kirlin had directed that Ultratech order 39 replacement DPTs; had inspected the instrument air installation for leaks or deficiencies and found none; and had replaced the air dryer cartridges, drying out any evidence of water. He stated that Kirlin would ensure that no moisture was present in the CVRs upon system start-up. Finally, Mr. Grandchamp requested that the FDA return for storage all CVRs tested at ETL Testing Laboratories or removed from the project.

In his report Mr. Pinkston stated that Brandt's Mr. Beistel and he inspected 157 of the 185 control panels containing DPTs on August 2–3, 1989. He would not give recommendations or state the source of any problems; the report should be considered a damage report with only "very simple conclusions being made." In testing the DPTs, he stated that they observed whether the DPTs would respond to a change in input and a change in zero adjustment. "[O]bviously" a complete test for correct span and entire operation would not be feasible given time constraints. He also suggested that the number of control panels tested was a suffi-cient sample to demonstrate the general condition of the panels.

Mr. Pinkston noted that evidence of water was found in 23 of the panels inspected. He stated that 16 of the panels contained water in the panel drip-well when inspected. The areas near the compressor on the lower floors showed water contamination. They tested one of 31 failed DPTs (having no output signal) taken from panels with water contamination. He explained that the lack of an output signal indicated that contamination might have been present in the air supply. Upon testing the failed DPT, they found water residue in the internal tubing, low output even after opening the comparator and zero capillaries (indicating severe contamination), and increased output after clearing the third stage supply restrictor and opening the second stage capillary. Based on his inspection, he stated that both Ultratech and Brandt agreed that water from the instrument air supply caused severe damage to the DPT. The other 30 DPTs were not inspected because all displayed the same symptoms.

Mr. Pinkston noted that they found one panel with no air supply connected to it and that other DPTs had a few other "difficulties." He suggested that a closer inspection performed prior to final start-up would likely reveal more problems and concluded with the statement that only about 10 percent of the transmitters demonstrated contamination through the instrument air supply.

In a letter to plaintiff dated August 22, 1989, Mr. Grandchamp responded to the list of questions from the July 18 meeting and the contracting officer's August 9 letter. Kirlin "strongly contested" the contracting officer's "characterization" that Kirlin had not followed the specifications and shop drawings and then proceeded to respond to each area set forth by the contracting officer in her August 9 letter. Mr. Grandchamp stated that the length of the static pressure probe under the Industrial Ventilation Manual would be 7.48 inches. He suggested that Ultratech had used a shorter probe than was set forth in the manual because the duct configuration and limited CVR space pre-cluded using the 7.48–inch probe suggested

for all sizes of CVRs. The incorrect sensing port spacing on the probes, he explained, resulted from the need to use a shorter probe. He commented that any damage to the static pressure probes most likely occurred during CVR removal and destructive testing. Mr. Grandchamp also stated that crimped probe tips were similar to bullet-shaped tips; the importance of using a bullet shaped probe tip was never brought to Kirlin's attention during any phase of the project.

Mr. Grandchamp again suggested that any damage most likely occurred during CVR removal and testing. Some variance in tube diameter should be expected because of the normal tolerances of the tube manufacturing process. At this point Mr. Grandchamp became more defensive in his responses. He stated that some seepage of sealant into the honeycomb area was inevitable and added that he was unaware that the contract called for zero seepage. The fact that the securing screws protruded into the honeycomb made for a more stable unit. He requested that he be advised if the contract required that the screws be of a certain length. Regarding continuous welding, Mr. Grandchamp stated that "all-welded" construction does not require continuous welding and asserted that the units were fabricated in accord with the submittal and specifications. No industry standard addressed the positional relationship between total pressure manifolds and the static pressure probe; he requested that the FDA indicate which specification section discussed such a relationship.

Mr. Grandchamp reviewed the history of Kirlin's recommendations and the FDA's actions regarding the airflow problems in response to the contracting officer's assertion that Kirlin caused the delay. He asserted that Kirlin had followed all of the contracting officer's directives, including, under protest, the fan replacement. Kirlin had paid thousands of dollars responding to these directives. He suggested that it now appeared that the FDA was adopting one of the recommendations that Kirlin and Ultratech made back in July 1986, before the project was originally scheduled for completion. During the July 18 meeting the FDA denied that the CVR design problems were brought to the

FDA's attention back in 1986. (Actually, the discussion focussed on whether the problems had been pinpointed to the CVRs, which the FDA denied.)

Mr. Grandchamp also answered the FDA's questions presented to Kirlin before the July 18 meeting. He stated that the Hamlin damper had not been submitted previously. The original CVRs were tested for leakage and individual components were tested. He stated that the CVRs were manufactured in accordance with the specifications and were approved by the FDA; therefore, no pressure drop testing was performed. Kirlin was unaware of what testing may have been performed by the FDA during the approval process.

Mr. Grandchamp also asserted that Ultratech had followed the quality control procedures of its approved submittal of August 29, 1984. Kirlin had not approached any other manufacturers, noting that it was the FDA that had communicated with Air Monitor and Brandt. Mr. Grandchamp stated that Kirlin's October 1988 statement that the larger-sized CVRs did not need to be replaced had already been discussed and was based on the post-fan-replacement Comfort Control balance report.

Also on August 22, 1989, Mr. Grandchamp forwarded to plaintiff submittals from Ultratech, Air Monitor, and Tek–Air. Kirlin reserved its rights to file for a cost adjustment for complying with directives it considered to violate the submittal process and applicable regulations. He informed plaintiff that Kirlin was presenting only the Ultratech submittal for approval, since the FDA's May 19 letter had approved the Ultratech CVRs tested by ETL Testing Laboratories. These were the only CVRs of which he was aware that had passed the FDA's performance criteria and been approved by FDA. The Air Monitor and Brandt submittals, he noted, were being forwarded because Kirlin was directed to do so. These submittals were for the FDA's information only.

Mr. Grandchamp pointed out the deviation from the specifications in all three of the submittals. All contained expanded damper sections which, he suggested, did not comply with the height and width requirements of

Drawing M–65; none were fabricated by all-welded construction in a single factory-fabricated housing; all of the proposed dampers were made of galvanized steel or aluminum, rather than steel; none of the pressure probes met the standard length of the Industrial Ventilation Manual; and none of the damper blades was interlocking. Finally, Mr. Grandchamp questioned Air Monitor's delivery schedule, noting the relative size of its sheet metal shop as compared with Ultratech's. He also noted that the Ultratech submittal invited the FDA to inspect its manufacturing facilities.

The contracting officer sent plaintiff a cure notice on September 1, 1989. Plaintiff's failure to present evidence of corrections to the HVAC system, failure to meet the milestones of its own proposed schedule, failure to present realistic and accurate evidence of investigation of the HVAC system, and failure to follow her directives were conditions endangering the performance of the project. The FDA was considering partial termination of the airflow portion of plaintiff's contract because the "lack of progress and diligence" in remedying the airflow distribution work was "clearly endangering" the project's completion. The majority of the milestones that plaintiff provided on July 14 had not been met. As an example, she asserted that the CVR removal was to be completed by September 1, but had never begun, and that plaintiff had also disregarded her directives to remove the CVRs irrespective of any schedule.

The contracting officer again complained that she had not received complete information that she had requested before August 15, a date extended at plaintiff's request to August 22. She noted five areas in which the material she received either failed to address the concerns or was "severely deficient:" 1) Ultratech's proposed use of three different dampers (only two damper options were actually provided); 2) the DPT report's failure to address the ability of the DPTs to meet the contractual performance criteria; 3) the failure to submit the report on the status of the AMSs requested at the July 18 meeting (plaintiff's offer to supply the report within two weeks was deemed unacceptable); 4) the

AHU Nos. 5–13 Report contained data obtained when the exhaust fans were not operating; and 5) the severely deficient answers to her technical question. She directed that the deficiencies be cured within ten days or the FDA might partially terminate plaintiff's contract for default.

In a September 8, 1989 letter to plaintiff, Mr. Grandchamp referenced a September 7, 1989 facsimile transmission wherein Kirlin requested the design engineer's "marked-up copies" from Kirlin's August 22 submittals, so that Kirlin could send the information to the CVR manufacturers. The receipt of this information, in turn, would allow Kirlin to respond to the FDA's September 6 cure notice dated September 1. Mr. Grandchamp asserted that the cure notice lacked detail supporting the FDA's allegations that all three CVR manufacturers' submittals were incomplete and inadequate. The FDA's refusal to release the comments was severely impeding Kirlin's ability to respond.

By facsimile transmission dated September 11, 1990, Comfort Control sent Mr. Grandchamp what it termed an "F.D.A. QUICK CHECK" comparing stand-alone AMS pitot traverse readings with the Ultratech panel readings for the stand-alone AMSs of Air System Nos. 5–13. The last page listed the percentage difference between the two readings. This difference varied from a high of 106.8 percent to a low of 74.5 percent, with an average reading of 89 percent.

Mr. Bast forwarded to the contracting officer a September 18, 1989 letter from Mr. Day, President of Kirlin, and requested a copy of test results from additional CVR testing that had taken place at ETL. Mr. Day expressed outrage that Syska & Hennessy had conducted additional CVR testing after the July 18 meeting without any notification to plaintiff, Kirlin, or Ultratech. Brandt's Mr. Thompson had confirmed to Kirlin's counsel that, after the July 18 meeting, Tek–Air/Brandt forwarded additional sample CVRs to Syska & Hennessy; although Brandt was not advised when testing would occur, Brandt received raw testing data by facsimile transmission from Syska & Hennessy on August 17, 1989, one day subsequent to a second test on the Brandt samples. He had been informed that additional testing was performed on Air Monitor and Ultratech CVRs.

Mr. Day expressed to plaintiff that Kirlin was "dismayed" that the FDA would ignore the chain of contractual privity by dealing directly with vendors, while excluding Kirlin and Ultratech. The FDA and its consultants promised at the July 18 meeting to notify Kirlin before any additional testing was conducted and to grant Kirlin the opportunity to have a representative present. He stated that these activities "raised serious issues" regarding the "propriety" of the FDA's CVR reprocurement efforts. It was "obvious" that the FDA had already decided to no longer work with either Kirlin or Ultratech and had commenced dealing directly with Air Monitor and Brandt.

Mr. Day charged that the collusive nature of the FDA's activities had greatly decreased the "integrity of the reprocurement process." The FDA's action demonstrated that neither Kirlin nor plaintiff would be dealt with fairly and that the contracting officer was predisposed to terminate the mechanical portion of the contract regardless of Kirlin's or plaintiff's response to the cure notice. Kirlin would not be bound by any test results carried out by the FDA without Kirlin's notification or attendance. If the FDA relied on the results of this testing in selecting the reprocurement CVRs, Kirlin would view such action as a material breach of its subcontract. Mr. Day requested that the FDA maintain for Kirlin's inspection all sample CVRs tested and forward all data and reports generated by any testing that had taken place since July 18.

By facsimile transmission of September 21, 1989, Contracting Officer Dean forwarded to LBC & W's Mr. Rowe, Mr. Bast's response to the cure notice. Mr. Bast's response, in turn, forwarded seven documents, one each from Kirlin, Ultratech, Brandt, and Comfort Control, and three from Air Monitor. (The record contains only the Kirlin and Ultratech documents and two copies of the Comfort Control report.)

Mr. Day responded for Kirlin in a letter also dated September 21, 1989, to the contracting officer's cure notice, disputing the assertion that none of the CVRs had been removed on the date of the cure notice. Kirlin had removed more than 250 of the smaller-sized CVRs from Air System Nos. 1–4 at the time of the cure notice and had since removed an additional 150. He informed the contracting officer that he expected that all of the CVRs would be removed by the end of October, at which time Kirlin would be forced to demobilize until the reprocurement CVRs arrived.

Mr. Day also stated that Kirlin had intended to test Air System No. 2 after replacing only the smaller-sized CVRs in an attempt to see if the system could perform without replacing all CVRs. He stated Kirlin's belief that actual system testing would show that the larger-sized CVRs could achieve the FDA's performance criteria. If this approach proved unsuccessful, ample time remained for the release, fabrication, and shipment of all CVRs, because the smaller-sized CVRs would have arrived in sequence. He explained that Kirlin had been foreclosed from carrying out this plan.

Mr. Day also assailed the contracting officer's CVR replacement schedule, which had new CVRs arriving well after the old CVRs were removed. This sequence created labor inefficiencies that would not exist if the new CVRs were delivered when the old CVRs were removed.

Mr. Day noted that the FDA had produced substantive comments more than two days after the cure notice issued and then only after Kirlin's repeated requests. He asserted that Air Monitor's submittal failed to meet the FDA's "L" dimension requirements, even though it was apparent that Air Monitor had been in direct contact with the FDA and the other vendors to the exclusion of Kirlin. Air Monitor had presented a revised submittal addressing comments not yet received by Kirlin. Moreover, two of Air Monitor's letters showed direct carbon copies to the FDA. Mr. Day asserted that this contact with the FDA demonstrated that the contracting officer apparently was disregarding her own arguments that the specifications be performance and not design-based. If the FDA continued such actions, Kirlin and the other vendors should be permitted to participate to avoid any "appearance of impropriety."

Ultratech should be allowed to provide the reprocurement CVRs, he argued, because: It had provided the lowest responsive bid, thereby allowing Kirlin to mitigate the FDA's damages; it was the only manufacturer whose equipment passed ETL testing; it had submitted a schedule comparable to that of the other vendors; it provided the most thorough submittal of the three manufacturers; and it had the most experienced employees. Kirlin would carry out the reprocurement of whichever CVR the FDA directed, but asked that this directive be in the near term. Finally, Kirlin's termination would only result in further delay until a new contractor could be hired or the CVRs could be purchased directly from a manufacturer.

Mr. Day asserted that the DPT report met the objectives discussed during the July 18 meeting. He also suggested that the DPT calibration should not be based on the CVR effective area until after a reprocurement CVR was selected. The damage to the 39 DPTs resulted from water, as was discussed at the meeting and in the report. Based upon the evidence available to Kirlin, he stated, no additional DPTs were damaged. In an effort to finish the project, however, all DPTs were sent back to Brandt to be inspected, cleaned, and calibrated, as required.

Mr. Day communicated that Kirlin was continuing to have the CVRs tested and certified by Ultratech. Contrary to the contracting officer's assertions, the exhaust fans were operating during the testing of Air Systems Nos. 5–13. He also suggested that any additional information that might be deemed necessary could be extrapolated using the relevant fan laws.

In closing, Mr. Day asserted that Kirlin was in full compliance with all directives issued by the contracting officer. The only obstacle to project completion was the FDA's failure to indicate which CVR plaintiff and Kirlin should procure. Kirlin would continue to comply promptly with all directives and proceed diligently to finish the project, while at the same time mitigating the FDA's damages. Finally, Mr. Day asserted that no basis existed to terminate Kirlin for default; should Kirlin be terminated, however, it would immediately seek legal redress.

Ultratech asserted in its response to the cure notice that it had the best experience possible—familiarity with the project. This was the largest project of its kind, rivaled only by the NIEHS project, which was supervised by Ultratech's present Technical Director, Mr. Pinkston. Its CVRs contained the maximum "L" dimension possible under the fixed dimensional constraints. These constraints included the thickness of the airflow straightener vanes, the length of the static pressure probe, the size of the damper and the length of the CVR. Ultratech would provide a Ruskin damper with a CD–40 frame, yielding a pressure drop lower than the CD–50 hat-channel frame. Incompatibility problems could arise from installing another manufacturer's CVRs.

Comfort Control noted in its response that not just the supply side, but all fans were energized and delivering maximum performance during the balance testing of Air System Nos. 5–13.

Per plaintiff's request made at a September 29, 1989 meeting, the contracting officer forwarded the FDA's preliminary findings regarding plaintiff's response to her cure notice. She informed plaintiff that the submittals gave her an adequate basis for deciding upon a reprocurement CVR. Plaintiff had failed to provide information about DPT linearity needed to coordinate the DPT and CVR reprocurement schedules. Sending the DPTs to Brandt did not comply with the cure notice, because she was not provided with information regarding performance of the in-place DPTs. Plaintiff's failure to provide the information regarding whether the AMSs could meet the contract requirements was not justified by the contradictory reports plaintiff allegedly received. Kirlin's response that it would clean, test, and certify the AMSs failed to provide the contracting officer the information needed to determine a reasonable schedule for completing the project.

The contracting officer found insufficient progress with regard to the preliminary balance report for Air System Nos. 5–13. She had directed that the preliminary balance profile include field performance data for all

fans within these systems. Although Kirlin stated that the exhaust fans were operating during the testing, she was given no data on exhaust fan performance. She needed such information to make a determination whether any repair or replacement of defective equipment would be required and to determine a reasonable schedule for replacement. The contracting officer still found the answers to her technical questions insufficient. Some of the answers provided were "incomplete, inaccurate or totally erroneous in their present form."

Mr. Kabrick, plaintiff's President and General Manager, informed Mr. Day in a facsimile transmission dated October 17, 1989, that Kirlin's portion of the contract was being terminated. He explained that plaintiff had been advised repeatedly by the contracting officer that Kirlin had failed to carry out the HVAC portion of the contract with due diligence and that the work performed was done carelessly and incompetently. In addition, the FDA had communicated its uncertainty whether Kirlin could fulfill its performance obligations and would terminate the same portion of the prime contract if plaintiff did not remove Kirlin. Plaintiff interpreted the FDA's statements as a directive to remove Kirlin from the project and that, as a result, plaintiff was terminating Kirlin. Plaintiff intended to take over this work and Kirlin would be liable for all additional costs, including any penalties.

The contracting officer informed plaintiff in a letter dated October 19, 1989, that the FDA would not proceed with a Default Termination based upon plaintiff's plan of corrective action presented at an October 17 meeting. The plan appeared to be a reasonable response to her cure notice. She expressed her understanding of plaintiff's October 17 meeting position as follows: First, Kirlin would be removed from the project through default termination procedures; second, plaintiff would replace the defective Ultratech CVRs with Air Monitor products; third, plaintiff requested that the FDA release the remaining retention; and fourth, plaintiff would present a realistic completion schedule as soon as possible.

The contracting officer noted that the FDA believed that it could not order plaintiff to terminate Kirlin for default. It was plaintiff's decision whether to terminate a subcontractor. She emphasized that the FDA believed that both Air Monitor and Brandt should be considered as suppliers for the reprocurement CVRs, so that sole source negotiation problems could be avoided. She had not selected a replacement CVR and would accept any equipment which met the contract specifications approved during the submittal process (noting that Air Monitor failed to meet the "L" dimension requirement). The contracting officer could not release all of the retention immediately because plaintiff's surety first had to be in full agreement. The contracting officer suggested that a workable arrangement could be discussed at an October 25 meeting at which time a date for the receipt and approval of new submittals could be established. Finally, she noted that in allowing plaintiff to proceed in the above manner, the FDA considered that it was mitigating plaintiff's damages and proceeding to the most expeditious completion of the project.

On November 1, 1989, as a result of meetings with the FDA, plaintiff issued a request for proposal for a new reprocurement CVR from Air Monitor and Brandt. (The exhibit is not in the record.) By inter-office correspondence of November 2, 1989, plaintiff's L. Ronald Thompson informed Mr. Seay, plaintiff's Industrial Division Vice President, that Mr. Grandchamp had confirmed that Comfort Control testing showed inconsistencies between the stand-alone AMS readings and the Ultratech panel readings. He noted that Ultratech apparently was going to remove and repair the AMSs at the factory. He related Mr. Grandchamp's opinion that the repairs would cost about $100.00 per unit, while replacement would cost between $1,000.00 and $1,500.00 per unit. Mr. Thompson suggested that no further testing be performed. Mr. Pinkston had confirmed the original plan of removal, repair, test, and reinstallation. After speaking with Mr. Pinkston, he believed that Mr. Pinkston knew where the problems existed and could perform the repairs. Mr. Thompson sug-

gested that they should discuss these options with LBC & W's Mr. Rowe.

On November 9, 1989, Brandt's President, Ronald B. Thompson, sent plaintiff's Mr. Thompson the DPT data from testing of 60 of the units. Based on the data, Mr. Thompson recommended that all DPTs be removed and tested at Brandt for either repair or replacement. The testing revealed that nine of the 60 units needed replacement, 46 or 47 could be rebuilt and four simply calibrated. The new CVR specifications were needed before he could proceed with the above. A comment on one transmitter calibration sheet noted that the feedback capillary had been "opened too much" in the field.

In a letter of November 13, 1989, plaintiff's Mr. Seay sent the contracting officer a summary of discussions that took place at Brandt. The DPTs would be sent to Brandt; it was plaintiff's intent that all of the DPTs be returned to the original contract specification requirements. Under this plan any subsequent adjustment would be performed by Brandt in the field. Comfort Control would obtain a fan test profile for both the supply and exhaust fans in Air System Nos. 5–13. Mr. Seay requested that Mr. Rowe provide a work scope statement so that it would be clear to everyone the extent of testing needed and the proper report format. He informed the contracting officer that all of the stand-alone AMSs had been removed, but the static pressure measuring stations had not. Plaintiff intended to reinstall the refurbished DPTs into the existing control panels and then conduct a complete instrument check of each panel. Mr. Seay reminded the contracting officer that the two control panels tested at ETL Testing Laboratories needed to be returned to the job site. Hamilton & Spiegel was fabricating and installing temporary duct closures for the CVRs and stand-alone AMSs that had been removed. This work would be completed within a week and the heat would then be turned on.

Air Monitor presented a November 14, 1989 proposal in response to the November 1 request for proposal. Brandt responded with a November 15, 1989 proposal.

In a November 22, 1989 letter, the contracting officer noted that Brandt must submit a new sample pitot array, and Air Monitor a new static pressure array, but neither needed to send entirely new submittals or new sample CVRs. Three of the five review comments for Air Monitor's sample CVR included the following: The 16–gauge Ruskin CD–60 damper frame was acceptable because it was the new standard in the industry; the securing screws for the honeycomb air straightener protruded several inches into the honeycomb material; and the static pressure array did not conform with the Industrial Ventilation Manual in that the sensing ports were not located correctly on the probe.

The review comments for Brandt's sample noted four areas in which the pitot array did not comply with the specifications: The bullet-nose tip was not of an ellipsoidal shape as required by the Industrial Ventilation Manual; the total pressure manifold had only four measuring points instead of the 16 required; static pressure probes were required to be located at least once every 36 square inches; and the sensing ports on the static pressure probes were incorrectly located. Another comment pointed out that the honeycomb air straightener material was deformed. Both manufacturers were also given the minimum CVR length that would allow their proposed unit to meet the "L" dimension of Drawing M–71.

In its responses to the contracting officer's review comments forwarded by plaintiff to the contracting officer on November 27, 1989, Air Monitor stated that in order to meet the FDA's interpretation of the "L" dimension, all CVRs must be lengthened by 2 inches. Brandt also stated that its overall length dimension was being revised to meet the "L" dimension.

The contracting officer informed plaintiff by letter of November 30, 1989, that both vendor submittals were approved as noted (Air Monitor had one notation and Brandt, six) and that plaintiff could select either vendor. One comment on the Brandt sample noted that an ellipsoidal tip was not required, but asserted that Brandt's tip was rough and therefore unacceptable. On December 12, 1989, Brandt submitted a revised submittal. (This exhibit is not in evidence.) On Decem-

ber 14, 1989, plaintiff informed the FDA that Brandt would provide the reprocurement CVRs.

On January 26, 1990, the contracting officer, other FDA representatives, and personnel of plaintiff attended Brandt's factory testing of its CVR production units. By letter of February 1, 1990, plaintiff confirmed in writing the contracting officer's oral approval to put the Brandt CVRs into production. (This exhibit is not in evidence.) Mr. Harmon, of HC Yu & Associates, plaintiff's expert, testified at trial that a data sheet from a February 1, 1990 test report of Brandt's CVR test data suggested that the 4–x 4–inch CVR failed testing even after the unit's gasket was trimmed. The honeycomb air straightener may have been changed to use ¾-inch hexcells because the unit failed multiple times during this testing. In a letter to plaintiff dated February 3, 1990, the contracting officer approved the use of ¾-inch hexcells, instead of ⅝-inch for the Brandt 4–x 4–inch CVRs.

On September 28, 1990, the contracting officer wrote plaintiff, accepting the Module I facility with the exception of noted deficiencies, incomplete items, and latent defects. Contrary to its prior statement, the FDA partially accepted Module I.[21]

## DISCUSSION

### I. Design specifications

■ Plaintiff has sued based on a breach of the implied warranty of specifications. Detailed design specifications contain an implied warranty that, if they are followed, an acceptable result will be produced. *United States v. Spearin*, 248 U.S. 132, 137, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). The first issue to be resolved is whether the specifications were performance or design based. The Federal Circuit has defined the difference between design specifications and

performance specifications. Performance specifications merely describe a result that the contractor is to achieve and leave it up to the contractor to decide how to accomplish this result. *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed.Cir. 1987). Design specifications, on the other hand, "explicitly state how the contract is to be performed and permit no deviations." *Id.* They tell the contractor in precise detail "the materials to be employed and the manner in which the work is to be performed." *Blake Constr. Co., Inc. v. United States*, 987 F.2d 743, 745 (Fed.Cir.), *cert. denied*, — U.S. ——, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993).

■ The CVR specifications for the Module I project essentially were design based. The specifications were detailed. The documented history of the specifications and amendments demonstrates that the contractor was given detailed instruction explaining CVR construction. Moreover, the conduct of the parties reinforces the court's interpretation that the CVR specifications were design based. When the low airflow problems first arose, and again during CVR reprocurement, plaintiff and its subcontractors were not permitted either to locate or implement an alternative that simply performed. They were instructed consistently that any reprocurement CVR must meet all of the requirements of the original and amended specifications. While a few minor deviations were allowed in several areas, for the most part these deviations were granted towards the end of reprocurement when the FDA was striving to complete the facility. Because the FDA failed to permit plaintiff to treat the specifications as performance based, defendant cannot now argue that the specifications were drafted as such. The FDA must abide by the meaning the parties gave to the contract during its performance. *See Sperry Corp. v. United States*, 845 F.2d 965, 970 (Fed.Cir. 1988).

**21.** Comfort Control received a facsimile transmission from Robert G. Thompson, Project Director for TKLP, Inc., containing a request for proposal related to performing services for TKLP for its overall proposal to FDA to provide architect/engineer services to study the mechanical/electrical performance of the Module I facility. Mr. Hoffman, the FDA's Project Engineer,

testified that this request for proposal responded to the need for accreditation as an Animal Care program by the American Association for Accreditation of Laboratory Animal Care. The FDA's Scope of Services stated that one of the major concerns included "[c]ontinuing problems with the HVAC systems, including humidification equipment."

## 1. *Defective specifications*

The documented reprocurement history demonstrates the difficulties in complying with the CVR specifications experienced not only by Ultratech, during both the original submittal and later reprocurement phases, but also by Tek–Air/Brandt and Air Monitor during the CVR reprocurement. On March 10, 1988, the FDA, through LBC & W, sent requests for proposals for reprocurement of 12 CVRs, six each from Air Monitor and Tek–Air Systems. On August 1, 1988, the contracting officer directed that all Ultratech CVRs be replaced with Air Monitor products. Again on September 22, 1988, the contracting officer directed replacement with Air Monitor CVRs. On October 28, 1988, the contracting officer conditionally accepted Kirlin's proposal that only the smaller CVRs be replaced and that the CVR reprocurement be competitive. Then, on March 17, 1989, the contracting officer rescinded the conditional acceptance of partial CVR replacement based on destructive testing and the Ultratech CVR's failure to meet design requirements and performance criteria. In the same directive, the contracting officer ordered that the reprocurement CVRs comply with the contract requirements and undergo a submittal and testing process prior to acceptance by the FDA. Finally, in a letter dated November 27, 1989, the contracting officer informed plaintiff that both the Air Monitor or the Brandt CVRs were approved and that plaintiff could select which manufacturer would supply the reprocurement CVRs.

Some 18 months elapsed in obtaining a CVR that the FDA considered could achieve the design requirements and performance criteria. While Kirlin was not directed to replace all CVRs until August 1, 1989, a full 15 months elapsed before approval was given; two of the three manufacturers had begun the procurement of 6 CVRs three months earlier. During this period the submittal process progressed from a design-based to a performance-based process. LBC & W's Rocky K. Styer informed Tek–Air/Brandt that the dampers could be mechanically attached to the AMS portion to form a single housing unit. Air Monitor had recommended against welding since it would prevent access to the damper linkages. The FDA previously had interpreted the project specifications to require the CVR housing to be welded, which would not permit mechanical attachment of a damper section to the AMS section of the CVR. A May 11, 1989 memorandum to Mr. Styer from George K. Rowe also suggested that the damper blade style should be optional, so long as the leakage and control requirements were met. Again, the project specifications stated that an opposed-blade damper with interlocking edges was required. The finally approved CVRs both employed airfoil-style damper blades, which have no interlocking edges.

Robert H. Morris, qualified as an expert for defendant in the engineering and manufacture of airflow controls and representative devices, testified that he was the author of many of the specification provisions related to CVRs approximately 12 years ago when he was employed by Air Monitor. It was his opinion that the damper portion of the amended CVR specifications indicates that an airfoil-style damper blade should be employed for the project. He so testified despite the fact that an amendment to the specification specifically removed the requirement of using an elliptical (airfoil) blade.

John J. Harmon, P.E., a practicing engineer for 45 years and a professional engineer for 36 years, who qualified as an expert in the design of airflow control systems and the commissioning of those systems, testified for plaintiff as to the manner in which he would have approached the low airflow problem. Mr. Harmon would have begun his examination, as he had done when Kirlin hired him in the summer of 1988, by analyzing the data obtained at the project, including Seneca's CVR pressure drop data presented to the FDA and LBC & W in plaintiff's August 15, 1986 letter recommending proposed solutions. He compared the pressure drops gleaned from the testing with those of the contract documents and found that it was obvious, especially on the smaller CVRs, that the pressure drops were high. He related that he had examined the Seneca CVR pressure drop data (through a CVR) and that it appeared to him that the damper was the problem. He then tried to find manufacturer

data for CVRs, because a designer usually designs a system around a product. He found that Air Monitor's pressure drop data corresponded exactly with the maximum pressure drop data of Drawing M–65. It was his opinion that LBC & W had relied blindly on Air Monitor's bad data, which failed to take into account the fact that a large-size CVR would have less restriction than a smaller CVR. Mr. Harmon therefore concluded that the product built in accordance with the specifications could not achieve the data on the drawing.[22]

■ While it is unclear whether achieving the CVR performance required from the specifications was impossible, it is clear that the specifications were defective. Three major CVR manufacturers experienced great difficulty in supplying a compliant CVR during reprocurement. The court also deems relevant that the specifications eventually were relaxed from an initial rigid interpretation requiring strict compliance in an apparent attempt to hasten the FDA's occupation of Module I. Moreover, the original project specifications required no testing of CVRs.

It is noteworthy that while the Module I specifications contained no provision for certification or testing of CVRs, the earlier National Institute of Environmental Health Sciences ("NIEHS") Research Triangle Park project in North Carolina contained specification provisions requiring that the air measuring and control system (which includes CVRs) be certified to within plus-or-minus 2–percent flow accuracy. The certification was to be based on tests of normal production stock items performed in an approved independent testing laboratory and on apparatus capable of providing self-verification of performance. The specifications explained self-verification of performance as checking one unit against another, as well as against a recognized flow standard.

Paul S. Pinkston, Ultratech's technical director and an expert in airflow measurement and control, including sensing and instrumentation, as well as a former Brandt Industries employee for six and one-half years prior to

working for Ultratech, testified for plaintiff that the design engineering firm for the Research Triangle Park project included personnel from LBC & W—Vincent A. Megna, P.E. and Rowe. Mr. Pinkston was familiar with the NIEHS project because of his employment at Brandt, which had supplied DPTs and other instrumentation for the project. No plausible explanation appears why the Module I project did not require testing or certification of CVRs when the design engineering teams of both projects included some of the same individuals and testing was required on the NIEHS project.

The documented history of the Module I project recounts that the specifications required the CVR manufacturer to submit an 8– × 8–inch, or greater size, sample CVR for FDA inspection. The original samples submitted by Ultratech were not admitted into evidence because they disappeared; neither party shouldered the blame and each charges the opposing party. Although the court could not inspect the original samples in order to determine whether they should have been accepted, the court was able to ascertain whether LBC & W should have taken notice that the total pressure manifold and the static pressure probes were not correctly positioned with respect to one another. No question exists that LBC & W examined the inside of the CVRs, because a discussion ensued during the submittal process about Ultratech's submittal using a multi-point static sensing array, rather than a single point static sensor (static pressure probe), which was required by the specifications. In order to gain access to view these CVR components, the honeycomb air straightener must be removed. Therefore, LBC & W did remove the honeycomb air straightener during a subsequent review and should have discovered the incorrect probe positioning when verifying that Ultratech had complied with the static pressure probe specification.

The airflow pressure drop problem also should have been discovered. While LBC & W questioned Ultratech regarding how the damper frame obstructed airflow, it failed to

---

**22.** Robert O. Brandt, Jr., inventor of the DPT and plaintiff's expert in airflow management and control, testified that a CVR compliant with the

trade publications referenced in the specifications must measure 28 feet in length. The CVRs in evidence are from 1 to 2 feet long.

follow through with investigating this potential problem. LBC & W apparently accepted Ultratech's reply to the submittal comment, which stated that the damper frame was the smallest available that met all of the specification requirements and that the frame would not pose as great an obstruction on the larger-size CVRs. Mr. Megna did testify that he believed that Ultratech's low AMS pressure drop might offset an increase in pressure drop caused by the damper frame. Testing still should have been performed, even if not required by the specifications. The specifications did require that the airflow products be proven designs or be subject to independent testing. Kenneth W. DeBaun, President of Air Monitor, stated during the July 18, 1989 meeting that the pressure drop problem should have been discovered during the submittal process before the units went into production. This statement corroborates that the pressure drop caused by the damper frame should have been discovered during the sample submittal process.

Moreover, the FDA and LBC & W harbored reservations about whether Ultratech had the experience and manpower to complete the project successfully. During the submittal process, LBC & W's concerns were increased after speaking with one of Ultratech's references. Messrs. Hoffman and Megna testified that they traveled to North Carolina for a site inspection of Ultratech's production facilities. Mr. Megna was "rather startled" by the facility. His first impression was that the facility looked like "a large garage" without any of the large production or testing facilities that he would have expected to see. FDA's Mr. Hoffman testified that Mr. Bobbitt of Ultratech demonstrated a CVR that appeared to operate properly. After this apocryphal verification of Ultratech's capabilities, the FDA approved Ultratech as the specialty subcontractor for the airflow system work.

It was the opinion of Mr. Morris that a Ruskin Model CD–60 damper, available commercially at the commencement of the project, would have performed satisfactorily and at the same time complied with the contract specifications. Plaintiff moved to strike Mr.

Morris' testimony related to the CD–60 damper based on surprise. The specifics of Mr. Morris' testimony were not revealed in defendant's response to plaintiff's discovery requests or at any time before trial. The court grants plaintiff's motion because the information came to light after discovery was closed and because the conclusion appears to have been made with the benefit of hindsight. A Ruskin CD–60 damper was included in an approved submittal during reprocurement, but not by the same manufacturer in its original submittal.

### 2. *Substantial compliance*

 Although the court has found the design specifications to be defective, plaintiff still may not recover if it cannot prove that it complied with the specifications. The implied warranty attached to design specifications only applies if the contractor complies with the specifications. *Al Johnson Constr. Co. v. United States,* 854 F.2d 467, 469 (Fed. Cir.1988) (citing *United States v. Spearin,* 248 U.S. 132, 39 S.Ct. 59).

The contract specifications referenced various trade publications to show proper CVR manufacture. It has been noted that Mr. Morris authored a number of the CVR specification provisions when he worked for Air Monitor. Section 15920, ¶ 2.03 required that the static pressure probe be bullet-nose shaped, as detailed in a referenced page of a trade publication. Another portion of the CVR specification stated that the AMS portion of the CVR had to "be installed in strict accordance" with the guidelines set forth in another publication.

Mr. Morris testified that the Ultratech CVRs were not built of uniform quality, nor in accordance with the publications set forth in the specifications. He based this testimony upon his own inspection of more than 50 CVRs and approximately seven stand-alone AMSs removed from the project and a survey of additional CVRs performed under his direction. In his view it appeared that "the [I]ndustrial [R]evolution never reached [Ultratech]." Instead of supplying 33 different "families" of CVRs, as contemplated under the specifications, there were over 500 different types because of inconsistencies in manu-

facture. His opinion regarding the inconsistencies of manufacture was based not only on what he observed, but also upon the fact that the DPT spans, after the Ultratech respanning of spring 1986, were checked at Brandt for recalibration or replacement and were found to have different ranges. If the CVRs were of uniform manufacture, presumably there would have been only 33 spans, or close to that number. Testing at ETL revealed the same inconsistencies with respect to another three CVRs.

Mr. Morris also testified as to physical problems that he had observed with respect to the CVR manufacture. He stated that Ultratech's installed honeycomb air straightener was often crushed in a manner that suggested that it was not cut to the correct dimension before installed into the CVRs. The court observed visual evidence of crushed air straighteners and agrees with Mr. Morris' conclusion. Ultratech also failed to comply with the specifications regarding the static pressure probe. The units supplied by Ultratech were not manufactured correctly with a proper tip or the proper type of copper: Some units had semi-bullet-shaped tips, but others had tips that were simply crushed or smashed closed. The latter tips were made of soft copper, rather than the hard-drawn copper designated in Ultratech's approved submittal. James T. Maciupa, draftsman for Ultratech, testified in a deposition based on an exhibit that "it looked like" Ultratech began using soft copper static pressure probes, rather than hard copper. Mr. Morris also noted that the static pressure probe tip was positioned incorrectly behind, rather than in front of, the total pressure manifold, which caused a higher than normal static pressure reading. He also testified regarding errors in the number of holes in the total pressure manifolds and special static pressure probes, as well as errors in the tubing diameter used for the manifolds and probes.

Mr. Morris was a particularly knowledgeable and engaging witness. Although, assuming that plaintiff's motion to strike had not been granted, the court would have found his testimony regarding Ultratech's supposed prescience in proposing the Ruskin Model CD–60 unpersuasive, Mr. Morris' views concerning compliance with the specifications were not contradicted by credible, consistent evidence. Mr. Morris' testimony is corroborated by Capt. Rolofson's examination of the units when he and Mr. Rowe performed destructive testing and an examination of CVRs in January 1989. The court also perceived Ultratech's lack of quality workmanship through close inspection of the Ultratech CVR physical samples. Ultratech was required under the contract to be a specialty subcontractor, yet failed miserably at constructing CVRs in compliance with the specifications.

Even if the specifications issued by FDA were flawless, the CVRs and DPTs supplied by Ultratech were so poorly manufactured that they could not be deemed compliant. Ultratech's failure to produce compliant equipment was caused by its slip-shod manufacturing and novice-like workmanship and was not attributable to the faulty specifications. For this reason the defective specifications cannot be held to be the source of plaintiff's damages.

## II. *DPTs*

Two issues arose regarding the DPTs: first, whether the original DPTs supplied to the Module I project were selected properly; second, whether Mr. Pinkston's adjustments, or, more appropriately, span modifications, of the DPTs during spring 1986 caused delay in remedying the low airflow problem or damaged the DPTs themselves. The CVRs and DPTs are related in that the output from the CVR total pressure manifold and static pressure probe go directly to the DPT input. Problems in one unit can thus cause the appearance of problems in the other.

### 1. *Proper selection*

The issue concerning proper selection of DPTs implicates the controversy that arose during the project regarding whether the nominal area or the effective area should be used in calculating the DPT spans. Mr. De-Baun, President of Air Monitor, explained at the July 18, 1989 meeting that the area calculation is important because it is used to calculate air volume, which is the product of the

velocity times the area. Mr. Pinkston testified that at the time the CVRs were built for the Module I project, Ultratech used the nominal CVR area in square feet, which was calculated taking the product of CVR width times the CVR height (both in inches) and then dividing the product by 144 to convert square inches to square feet. Mr. Pinkston also testified that sometime around 1987 Ultratech realized that it needed to apply effective, rather than nominal, area during a project at Vandenburg Air Force Base. After this project Ultratech used an equation that accounted for the area taken up by the total pressure manifolds and static pressure probes.

Mr. Pinkston testified that, during his employ, Brandt used a 98–percent factor to account for the honeycomb air straightener. He asserted that other than Brandt's 98–percent factor, the standard practice in the industry was to use the nominal CVR area in calculating the DPT spans. Plaintiff presented exhibits supporting this testimony. According to Mr. Pinkston's interpretation of these exhibits, LBC & W used nominal area in performing calculations for the Module I project. Air Monitor consistently used nominal area in its calculations, even into the CVR reprocurement. Then, on May 15, 1989, Air Monitor sent Syska & Hennessy a letter stating that its new CVR had a calculated net free area (effective area) of 0.1886 square feet, a reduced CVR area figure.

Mr. Pinkston also testified that Brandt's July 12, 1988 reprocurement submittal used nominal areas or at most a 1–percent correction factor for what Brandt labeled "effective area." A close examination of the Brandt submittal, however, reveals that Brandt's "effective area" varied from 1 percent to 4 percent. Based on the above, Mr. Pinkston opined that the use of nominal area was the industry standard during the early time frame of the Module I project.

Swadesh Chatterjee, Brandt's General Manager and an employee at Brandt for 14½ years, testified that in 1983 it was Brandt's practice to calculate effective area for selecting DPTs. He testified that the effective area calculation was based on the free area of the honeycomb air straightener and the area

of the probes. The transcript of the July 18, 1989 meeting is consistent with Mr. Chatterjee's testimony. He stated during the meeting that every Brandt flow station (CVR) contained a label listing the effective area. He also described the effective area as the effective area through which the air travels, not the cross-sectional area of the duct. This explanation is the more credible.

### 2. DPT modifications during early spring 1986

The second issue is whether Ultratech's DPT modifications during the spring of 1986 either caused delay in remedying the low airflow problem by requiring recalibration of the units or damaged the DPTs, thereby necessitating replacement. Mr. Pinkston testified that during start-up of the equipment Ultratech noticed that the airflow into the rooms was consistently low. He investigated the problem by instructing Seneca to take pitot traverse readings, which agreed more or less with flow hood readings obtained in the rooms. These investigations, he testified, prompted a suspicion that the CVRs were generating erroneous readings. By checking the DPT inputs and outputs, he was able to rule out the DPTs and the gauges as the cause of the erroneous readings. Mr. Pinkston also testified that once the DPTs were no longer thought to be the source of the problem, attention focused on the CVRs.

During a March 10, 1986 meeting, Mr. Pinkston informed those present that he believed that the duct configuration was causing the erroneous readings. He proposed adjusting the DPTs to compensate for the erroneous CVR readings. Using calibrated flow-hood readings as a benchmark, the DPT spans were adjusted (the AMS portion of the CVR has no adjustment capabilities), so that the gauge reading agreed with the flow-hood reading. He explained that because of the possibility of interaction from the adjustments, personnel repeated the adjustments to ensure that the zero adjust resulted in a reading of zero when no flow was present and a reading that agreed with the hood at the operating point (at the low airflow condition). Mr. Pinkston stated that personnel

really could not measure the new span, so they calculated the new span and tagged it on the DPTs inside the DPT cabinets.

Ultratech, under the direction of Mr. Pinkston, performed the adjustments during the spring and early summer of 1986. Mr. Pinkston stated that personnel began the adjustments with the DPT span adjust knob; if that was insufficient, they crimped open the feedback capillary to allow additional feedback to further adjust the span. He considered that he left the DPTs in a safer, or the best possible, condition wherein they would be less likely to become damaged because they had adjusted the negative feedback, which lowers, or desensitizes, the gain of the instrument.

As the documentary evidence demonstrates, Mr. Pinkston's span adjustments greatly exceeded what the FDA had been led to expect. Mr. Chatterjee testified that overadjusting or overspanning the DPTs beyond 15 percent would cause the instruments to become nonlinear and unstable. The transcript of the July 18, 1989 meeting is consistent with Mr. Chatterjee's testimony. Messrs. Chatterjee and Thompson stated that the adjustments could cause a significant amount of nonlinearity in the instruments. According to Mr. Thompson, a non-linear DPT would be accurate at the particular airflow at which the DPT was adjusted, but would be increasingly inaccurate the further it operated from that particular flow. The significance of DPT nonlinearity is that the Ultratech panel gauges would give erroneous readings, invalidating any reliance on them, and that the airflow system would likely fail to function as designed, including difficulties in setting the system into automation.

a. *Whether delay was caused by the DPT adjustments*

The issue whether the modifications caused delay, in turn, involves the August 28, 1986 system test. George K. Rowe, first LBC & W's draftsman, then designer and later engineering technician during his 18–year employment with the organization, testi-

fied that he performed a field test because Kirlin's August 15, 1986 letter failed to give "good, firm direction" regarding the low airflow problem. During the August 28 test, AHU Nos. 1 & 4 were combined to produce sufficient airflow. Mr. Rowe believed that the panels were reading accurately because they had just been calibrated. The Ultratech control panel gauges indicated that the CFM flowing to the furthest room and surrounding area was at design and that the damper was partially closed to control airflow.[23] He determined from this test that the system was working and that the fans were not producing the capacity required by the contract documents. Mr. Rowe also testified that, although Seneca was present at the test, no pitot traverses were made during the test. Instead, he relied on the Ultratech gauges, which he again stated had just been calibrated.

During cross-examination Mr. Rowe was asked why he relied on the instruments even though he was aware that the manufacturer had asked for a proposed modification two weeks before. He responded that Ultratech was requesting a damper modification, not an AMS modification. According to Mr. Rowe, the damper was a separate component that regulates airflow, but does not measure it. He also stated that he interpreted Ultratech's August 1986 recommendation to indicate that the system would work if sufficient airflow could be supplied. Mr. Rowe failed to recall Kirlin's October 1, 1986 letter in which Kirlin expressed its opinion that even if design airflow and static pressure were supplied, neither the design airflow at the outlets nor the CVR static pressure drop would be met.

Although Mr. Pinkston testified that he knew Ultratech might be required to recalibrate the DPTs again, he thought that attempting to correct the air measurement problem was worthwhile, since some of the adjustments may have corrected the problem. He was uneasy about some of the adjustments because the calibrating was performed at such low airflow. Daniel B. Beis-

**23.** The controller output gauge, which displays the percent of the control signal sent to the damper, indicated that the damper was partially

closed. This signified that the damper was functioning to control the airflow passing through the CVR.

tel, an eight-year employee of Brandt instruments, testified that he worked at Module I recalibrating the DPTs under Mr. Pinkston's instruction. Mr. Beistel stated that he asked Mr. Pinkston whether what the personnel were doing was "right" or whether the DPTs "would work" after making such large span adjustments. He testified that Mr. Pinkston stated that the adjustments would work for the time being, but would not work for any flow or load changes on the system.

Mr. Pinkston testified that Kenneth L. Credle, the FDA's mechanical inspector and an independent contract employee after his retirement from the United States Department of Housing and Urban Development in 1984, was present during the DPT adjustments and recorded his observations. He discussed the adjustments with Mr. Credle many times and never intended to conceal anything from the FDA. Mr. Rowe's testimony corroborated that Ultratech concealed nothing with respect to the DPT adjustments. Mr. Rowe did testify, however, that he was unaware that the adjustments would affect the performance of the DPTs and that Mr. Pinkston never stated that the adjustments performed by Ultratech possibly could affect DPT linearity or accuracy.

Mr. Credle testified that, while he was aware that some adjustments were being performed on the DPTs, he usually just stood back and observed "what he could see." He could not remember anything in particular about what physical adjustments were made to the DPTs. Whether the adjustments might affect linearity or accuracy was not his primary concern; Mr. Credle was trying to write down what he read on flow meters with respect to the airflow requirements. He was more concerned with the results than how the results were obtained. Mr. Credle witnessed and signed off on ductwork high-pressure leak tests that were performed. When questioned how many he witnessed, he stated that he was relatively sure that the number was more than one and could have been many, but he could not recall whether just a few or many were performed. Mr. Credle was an elderly, enfeebled gentleman. Based on Mr. Credle's testimony, demeanor, and appearance, it is difficult to imagine that

even eight years ago he could have been the FDA's watchdog, ensuring that the activities carried out at Module I were performed as they should have been. Certainly, through this witness defendant could not offer probative evidence that would provide any reasonable basis for a finding that the FDA competently supervised the adjustments to the DPTs.

When questioned by the court regarding LBC & W's conduct, defendant's expert Mr. Morris described Mr. Rowe's reliance upon only the Ultratech gauges during the August 28 test as "the most strange bizarre thing." He testified that Mr. Rowe ("[p]oor George") performed a "very small test;" he looked at the panel gauges ... and "never did very much." He also stated that Mr. Rowe took "blind faith" in the fact that the gauges were working.

The documented history of the project and Mr. Rowe's testimony demonstrate that Mr. Rowe and the FDA relied upon the August 28 test in determining that AHU Nos. 1–4 were undersized and, more significantly, that the CVRs were not the cause of the low airflow problem. Notwithstanding the fact that plaintiff's August 15, 1986 letter of recommendations included a proposed modification to the CVRs and also a CVR test based upon pitot traverse readings that showed the pressure drops through the CVR were excessive, LBC & W eliminated the CVRs as even a contributory source of the problem based on one simple test. The FDA pursued the fans even though this was the most time-consuming of three of plaintiff's August 15, 1986 proposals. The CVRs were the least time consuming remedy proposed by plaintiff.

Based on the testimony of defendant's expert on CVRs, Mr. Morris, and the documented history of the Module I project, the court finds that the FDA received more than adequate notice that the CVRs, at the very least, should have been examined to determine whether they were contributing to the low airflow problem. The FDA failed adequately to examine and investigate potential sources of the problem identified by plaintiff. Therefore, the court finds that Ultratech's adjustments were not the cause of delay in

remedying the airflow problem. Rather, the FDA's own incompetence in addressing the problem contributed independently to the delay.

b. *Whether plaintiff is responsible for recalibration caused by DPT span adjustments and/or repair or replacement due to water contamination*

Brandt's Mr. Chatterjee testified that an overadjustment beyond 15 percent would have the effect of making the DPTs nonlinear and unstable. Messrs. Thompson and Chatterjee also stated during the July 18, 1989 meeting that the adjustments could cause a significant amount of nonlinearity in the instruments.

Mr. Chatterjee testified about a Brandt record of calibration data obtained from testing performed on DPTs removed from the Module I project. In comparing the spans of the DPTs as shipped from Brandt to the spans when received after removal from the project, one DPT examined had a 345–percent change in span. With an input equal to its new span, this unit produced only a 7.41 psi output, rather than the 15 psi that should be produced at full span. Mr. Chatterjee explained that Brandt kept a record of all of the instruments that were rebuilt or replaced. The record revealed that 93 DPTs were replaced (14.8 percent) and 535 (of the 628 total shipped to Brandt) were rebuilt. According to Mr. Chatterjee, a partial summary of recalibration work performed at Brandt prepared by the FDA conformed with the Brandt recalibration data. The summary, which covers some 370 of the total 628 DPTs, reveals that only 12 DPTs were adjusted less than 100 percent and that six DPTs were adjusted above 500 percent. The remaining 370 DPTs were adjusted between 100 and 500 percent. The minimum adjustment listed was 62 percent; the maximum adjustment, 586 percent. Mr. Beistel testified that the DPT spans were adjusted anywhere from 1 percent to 100 percent or greater.

Robert O. Brandt, Jr., inventor of the DPT, who qualified as an expert for defendant in airflow management and control, testified that, while the DPT front panel adjust knob allowed the span to be adjusted basically plus-or-minus 30 percent, he considered, and the manufacturer specifications recommended, that the DPTs should not be adjusted in the field more than plus-or-minus 15 percent. He explained that the extra adjustability should remain unused because of the months and years of system recalibration that would be required subsequently. Mr. Brandt expressed that, rather than trying to adjust the unit too much, or beyond 15 percent, either the DPT or the first stage should be changed. He also testified that an adjustment that exceeded 30 percent would not be acceptable because linearity would be affected. He added that between a 50– to 100–percent change in span, the top end of the transmitter will cease to function, and at a 100 percent change in span a severe output limit would ensue.

The documented history of the project reveals that DPT testing took place at ETL Testing Laboratories on June 21, 1989. This testing could not be completed because the majority of the DPTs appeared to be damaged. An inter-office memorandum from plaintiff dated June 23, 1989, recorded that Brandt's Mr. Beistel attributed the damage to the period of inactivity and that the units must be dismantled and cleaned because of water contamination. Both Brandt's Messrs. Thompson and Beistel informed those present at the testing that the DPTs would require recalibration as a result of the overadjustment.

The transcript of the July 18, 1989 meeting recorded that Albert Sanchez, Vice President of Syska & Hennessy, stated that some of the eight DPTs tested at ETL were contaminated. At trial, however, Mr. Beistel testified regarding the ETL testing of the DPTs. After excessive signals were fed into the instruments, only two of the eight DPTs tested reached full output. Messrs. Thompson and Beistel determined that the DPTs would not work because the DPT spans were "so far out of adjustment." Mr. Thompson stated during cross-examination that most of the DPTs tested at ETL were out of calibration and that some were contaminated. It was Mr. Chatterjee's testimony that Ultra-

tech's DPT respanning would not cause any contamination.

Mr. Pinkston testified that he worked very closely with Mr. Brandt in developing DPTs similar to those in Module I. He performed the initial testing, wrote the manufacturing assembly and quality control procedures, and developed the instruction manuals. Mr. Brandt was of the view that either the DPT or the first stage should be changed, rather than trying to adjust the span beyond 15 percent. He also testified that Mr. Pinkston, while employed as his Field Service Manager, was familiar with the DPTs, including internal capillary manipulation, and that he believed that Mr. Pinkston possessed the technical knowledge needed to obtain a greater than 30–percent change in span by capillary manipulation and to ascertain whether linearity was affected thereby.

Mr. Brandt also testified that in a nonstandard CVR application, such as Module I, in-place calibration would be required. He described in-place calibration as calibrating the DPTs to either a "catcher (flow) hood" or another similar device. The DPTs required calibration upon arrival to the job site—preferably with a CVR since they would function together—because the unit would have been subjected to serious thermal cycles when traveling to the job by air. He added that three to five calibration passes might be required, but that, by the final calibration pass, the DPTs should be within the recommended plus-or-minus 15–percent span adjustability. He also testified that the accepted practice is to calibrate near the operating range of the device (typically in the neighborhood of 75 percent of full scale), not well below design. This reduces the risk of amplifying a small error when the operating point airflow is achieved.

Even with the additional testimony of Mr. Brandt, the purpose behind Ultratech's overspanning of the DPTs is unclear. If the purpose of the DPT overspanning was to check to see if there were problems with the CVRs, which has never been suggested, it would seem to have been more prudent to have waited until something closer to design airflow could be obtained. Mr. Brandt testified to this effect. While Mr. Pinkston took the position that he was expected to take action to correct the discrepancy between the pitot traverse readings and the CVR panel gauge readings, it defies logic that he would overspan the DPTs to the extent that he did. The transcript of the July 18, 1989 meeting relates that all of the CVR manufacturers stated that the DPTs should not have been overspanned. Messrs. Thompson and Chatterjee of Brandt strongly expressed that the large DPT span adjustments were an obvious sign that the problem was not DPT related. Mr. Pinkston himself testified that he had ruled out the DPTs as the source of the problem.

Mr. Pinkston also admitted that when he joined Ultratech, after working for Brandt, he examined the Ultratech CVRs and noticed that the total pressure manifolds and static pressure probes had a wider diameter than those used at Brandt. He noticed that Ultratech's static pressure probe was located downstream from the total pressure manifold at that same time and was aware that Brandt's was located upstream. Mr. Pinkston knew that Ultratech used crimped-tip static pressure probes, but asserted that testing had revealed that the crimped type worked rather well. It is difficult to imagine that Mr. Pinkston did not have some idea that the Ultratech CVRs had problems and that these problems were not limited to the damper portion. If Mr. Pinkston truly possessed the expertise that he and plaintiff would have the court believe, it is difficult to reconcile his actions in adjusting the DPT spans to the extent that Ultratech did, especially given Mr. Brandt's testimony.

The court received other testimony concerning whether Brandt had revoked its warranty for the DPTs. During a meeting initiated by Brandt, after it became aware of the extent of respanning that had occurred at Module I, Brandt's Ronald B. Thompson testified that he told Ultratech that Brandt would no longer honor the warranty of the instruments because Ultratech had adjusted the DPTs outside of their stated accuracy range. Brandt was concerned that the DPTs had been spanned outside of the 15– or 20–percent manufacturer's recommendation. The witness also stated that it might be

possible for Ultratech or Brandt to put the DPTs back into specification so that the warranty would not be voided. On the other hand, Brandt's Swadesh Chatterjee testified that to retain the warranty it is Brandt's standard practice to change the first stage pi valve when adjusting the span more than 15 percent. He stated that Brandt informed Ultratech at this meeting that DPTs with adjustments much more than 15 percent would not be under warranty. Mr. Chatterjee later testified that, when the DPT span is adjusted greater than 15 percent, the warranty would be voided no matter who performed the adjustment.

The documented history of the Module I project reflects that some of the DPTs received water contamination. Mr. Thompson voiced during the July 18, 1989 meeting his suspicion that the contamination came in through the instrument air system. He suggested that a system that is shut down for an extended period of time can experience condensing and drying out, which leaves contaminants from the water. Later, when the system is restarted, contaminants are blown through the instrument air system directly into the DPTs. When Gary L. Grandchamp, Vice President of Kirlin and formerly Senior Project manager with responsibility for the Module I project, questioned at the meeting whether climate control could add to this problem, he received the answer that wide temperature variations do cause condensing (water condensation). Mr. Chatterjee added that a Brandt technician had stated that the contamination was the result of water residue and scaling. Mr. Thompson also noted that the above condensing could be avoided by flushing out, or purging, the system before reconnection to the instruments. When the contracting officer questioned whether or not this operation had been performed, Mr. Grandchamp stated that he was unsure whether the air system was shut down or whether the system had been purged prior to the 1988 start-up. He stated that he would verify this matter. (The record reflects no verification.)

The documented history also relates that Mr. Grandchamp forwarded an Ultratech DPT on-site inspection report to the contracting officer on August 21, 1989. Mr. Grandchamp informed the contracting officer that Kirlin had inspected the instrument air installation for leaks and deficiencies, had found none, and had replaced the air dryer cartridges drying out any water present. He stated that Kirlin would ensure that no moisture was present upon CVR start-up. Mr. Pinkston testified that Ultratech knew that what he believed was a compressor or air dryer failure had occurred and that there was some water present. In the above-mentioned Ultratech DPT on-site inspection report, Mr. Pinkston noted that there was evidence of water in 23 of the panels inspected. He also stated in the report that 16 of the panels contained water in the panel drip well and that the areas near the compressor on the lower floors showed water contamination.

William H. Hoffman, the FDA's Project Officer for the design and construction of Module I and a mechanical engineer with eleven years in the private sector and over 30 years in federal employment, testified with respect to the contamination of the DPTs. He explained that the control air system was to be equipped with a dryer that not only filtered, but also dehumidified, the instrument air. The specification required that the unit be equipped with condensate drains. He testified that the project's condensate drains became plugged because of inadequate maintenance and that condensate had backed up into the control air system.[24]

■ Both the documented history of Module I and the testimony of both parties' experts demonstrate that Ultratech's overspanning activities did not damage the DPTs permanently. Recalibration of the DPTs was required because of the extent of respanning. Brandt was required to perform other DPT repair work or replacement because of water contamination. The court finds that the weight of evidence lodges responsibility for water contamination with plaintiff.

24. Defense counsel questioned whether the DPTs would have required such significant span adjustments had the CVRs been constructed properly in the first place, but no evidence was elicited on point.

III. *Fan (AHU) replacement*

The documented history of Module I showed that the FDA ordered plaintiff to replace AHU Nos. 1–4. Based on the August 28, 1986 test, Messrs. Rowe and Hoffman determined that the fans, not the CVRs, were the cause of the low airflow problem. At the October 1, 1986 meeting, LBC & W's Mr. Megna asserted that the York units were not the high-pressure fans contemplated by the contract specifications and the second submittal. At the same meeting York asserted that the design of the fan transition exceeded current SMACNA requirements and impeded fan performance. John E. Leigg, a representative from Hamilton & Spiegel, plaintiff's sheet metal subcontractor, stated that York's proposed explanation of a standard transition was neither common nor standard in the field. The record of the October 1 meeting creates the impression that LBC & W, specifically Messrs. Rowe and Megna, was defending the August 28 test.

As Director of Engineering at LBC & W, Mr. Megna was Mr. Rowe's supervisor. Although Mr. Megna testified, he never discussed the August 28, 1986 system test. Therefore, what role Mr. Megna played is unclear. As Mr. Rowe's supervisor, however, it is clear that Mr. Megna did nothing to stop LBC & W and FDA from relying completely on this one test in concluding that the fans were the problem. Further, Mr. Megna stated during a February 16, 1988 meeting that he could not believe that the CVRs could create such a large pressure drop. This predetermination that the CVRs could not be a cause of the low airflow problem may have prevented LBC & W from investigating the CVRs.

Mr. Hoffman testified that the August 28 test suggested by Mr. Rowe "made sense" to him. He stated that the primary focus of the test was the fans. While Mr. Hoffman testified that the test "made sense" to him, he had suggested earlier during a July 21, 1986 meeting that augmenting airflow from AHU No. 4 would result in inclusive test results, because it would not reveal whether more static pressure were required to push the airflow through the ductwork.

In early October 1986, York notified Kirlin that it would speed up one of the fans in an attempt to overcome the inhibitions of the system design and effects. On October 14, 1986, plaintiff's Senior Vice President, Fred M. Butler, informed the FDA that Kirlin was proceeding with fan replacement. Based on testing on October 22, 1986, York determined that the modified fan could meet the design CFM and static pressure requirements. York informed Mr. Grandchamp in a letter of December 2, 1986, that larger motors were required for AHU Nos. 2 & 3 and might be required for AHU Nos. 1 & 4 to keep them within the safe current operating range.

At a December 4, 1986 meeting, the FDA informed Kirlin and York that certified fan curve test data was required before the modified York fans could be approved for application in Module I. York's Mr. Humen indicated that the only way the specified CFM and static pressure could be met was with the 100 hp motor.

In a letter to plaintiff dated December 15, 1986, Contracting Officer Broome directed plaintiff to replace the AHU No. 4 York fan with a Trane fan. Mr. Broome informed plaintiff that, if "this test" revealed that the existing work was defective, it would be at no cost to the FDA. The FDA notified plaintiff that additional information was required to consider York's modifications for approval.

On January 15, 1987, Gary G. Wilkins, York's Zone Sales Manager, advised Mr. Grandchamp that a York fan tested at an AMCA facility met the specification requirements operating at 1,425 RPM and using less than 75 Bhp. The testing revealed that the unit produced 9.28 inches static pressure at 35,430 CFM. This data, however, was generated while the fan was operating at approximately 1,541 RPM, rather than at the 1,400 rating. On March 2, 1987, the contracting officer informed plaintiff that the FDA could not accept the modified York unit or the AMCA results.

Mr. Sanchez of Syska & Hennessy concluded that testing of the Trane fan installed in AHU No. 4 conducted on March 16, 1987, demonstrated that the Trane unit "apparently" could meet the design requirements. He

recommended that all of the York units be replaced with Trane units, stating that the tests "apparently" had indicated that the distribution system was not at fault for the low airflow. He suggested testing comparisons between the York and Trane units in order to make a more definitive recommendation from more conclusive data. Asserting that the March 16 tests showed the Trane fan capable of meeting the design requirements and noting that neither plaintiff nor its subcontractor was able to show that the York fans met the performance criteria of the contract, the contracting officer in a letter of April 2, 1987, directed plaintiff to replace AHU Nos. 1–3 with Trane fans. Contracting Officer Dean notified plaintiff that its Trane fan submittal was approved and that it should proceed with ordering the Trane fans, but that a decision would be made regarding fan installation immediately after a York fan test, which was expected to take place within four to six weeks.

The York fan test was delayed because Syska & Hennessy sent the York fan up to ETL Testing Laboratories in Cortland, New York, which was incapable of performing an AMCA-certified test because it lacked the appropriate test equipment. Further, it was not even an AMCA-certified test facility. Although everyone present agreed that test results obtained at ETL would not be binding in court, all agreed that the test should be completed. The test results showed that the modified fan basically met the design requirements, but those present agreed that an AMCA-certified test still was required. Mr. Sanchez, surprisingly, closed a letter to Mr. Hoffman stating that the testing only indicated that the modified fan could likely meet the system requirements, but that it was "not unreasonable" to speculate that the unmodified York fans would be unable to meet the system requirements operating at the lower speed nearer 1,355 RPM.

On November 30, 1987, Mr. Sanchez sent the contracting officer the Syska & Hennessy draft report from the Buffalo Forge test of the York unit. The York unit was tested twice, once modified and once non-modified. Mr. Sanchez concluded that the non-modified fan was incapable of meeting the system requirements and was a marginal selection based on York's catalog data. The catalog data showed that the manufacturer did not recommend operating the unit above 8 inches static pressure, and a York factory note states that units with variable inlet vanes must be operated below the solid line on the performance table. Mr. Sanchez asserted that the note clearly indicates that the limiting speed is below 1,400 RPM. He calculated that the York unit must operate at 1,464 RPM to deliver the required airflow and static pressure. Based on the testimony of both parties' fan experts, discussed below, this calculation was erroneous.

On the whole, the FDA was not well served by its consultant Syska & Hennessy. Not only did Syska & Hennessy fail to check to see whether an AMCA-certified test could take place at ETL before having the York unit shipped up to Cortland, New York, but Syska & Hennessy also erred in calculating the 1,464 RPM velocity required to achieve the design requirements. Syska & Hennessy's latter error will be developed during Mr. Harmon's and other expert testimony discussed below.

In marked contrast to the FDA's lack of an effective approach to problem solving stood the testimony of plaintiff's expert Mr. Harmon. This witness was most impressive. He exhibited a command of his subject, a convincing manner of explaining it, and a can-do attitude that was absent from the LBC & W and FDA personnel who testified. Acknowledging that Mr. Harmon had the benefit of hindsight as to events occurring before 1988, the court nonetheless found compelling his testimony concerning what could have been achieved had the FDA and its design engineer (and later Syska & Hennessy) approached the problem of ferreting out why the airflow system would not balance with a coherent, positive trouble-shooting methodology. Although the court notes that the type of problem solving advocated by Mr. Harmon may be the product of hindsight, the stunning absence of a systematic approach in this case cannot be explained away so easily. The court finds that Mr. Harmon's basic point is well taken.

Mr. Harmon testified that the airflow problem should have been addressed with a system-wide approach, after learning how the parts of the system make the system function as a whole. According to Mr. Harmon, the FDA and its design engineer started focusing on the individual pieces of the system—the CVRs and the fans—instead of looking at the whole system. In support of his statement that LBC & W should never have focused on the fans, he noted that LBC & W stated that there was nothing wrong with the CVRs, when it was "obvious" that there was a problem with the CVRs.

In evaluating the design of Module I back in 1988, Mr. Harmon noticed that LBC & W failed to include a safety factor when it added up the system elements in making the AHU pressure calculations. He described this failure to include a safety factor as "totally unrealistic." Mr. Harmon testified that, using the floor plans, he had arrived at a figure of 34,728 CFM for the CVRs in Air System No. 2. He explained that the engineer allowed only 34,800 CFM, or 72 CFM extra, for leakage, for that same system. It was his opinion that the engineer should have accounted for leakage and that normally an engineer would add a 10–percent safety factor for air quantity and another 10–percent safety factor for static pressure. He noted that the assumption that there would be no leakage was "unconscionable" considering the great distance of ductwork, the 75 CVRs, the 75 reheat coils, the 75 balancing dampers, the 75 automatic dampers, the AHU casing and the three sets of AHU coils—all of which penetrate the airflow traveling through the ductwork. He also stated that the total system was allowed 3–percent figure leakage under the specifications, a figure he felt was very optimistic. He testified that the 3–percent figure would yield an allowance of over 1,000 CFM, much greater than the 72 CFM allowed by LBC & W. Mr. Harmon opined that he would have used a 10–percent tolerance or safety factor for a project as critical as this one and that a minimum of 7½ percent is recommended by AMCA. Although the date of this AMCA recommendation was not established, the expert stated that no major changes emerged in system

design for airflow between the time Module I was designed in 1982 and ten years later.

Mr. Harmon testified that selecting a fan is the last part of the design process. In general, a rough selection is made at first and the static pressure estimated; later, as the design becomes more refined, the design engineer arrives at better answers. In looking into the airflow problem, Mr. Harmon would have examined the project data, found the CVR pressure drop problem, and investigated into the CVRs. The fans would have been the last part of the system that he would have examined.

Mr. Harmon also gave his opinion that the York fan passed the Buffalo Forge test because the unit was within the AMCA and ARI tolerances for speed. In order for a fan to become certified by AMCA or ARI, the unit must be within certain tolerances. Since the normal tolerance is plus-or-minus 5 percent on fan speed and the Buffalo Forge test was significantly below the upper limit of the speed range, the fan passed the test.

It was also Mr. Harmon's view that the static pressure readings obtained by a test and balance technician are almost meaningless in evaluating fan performance because good readings are difficult to obtain. He noted that defendant's fan expert James (J.) Barrie Graham co-authored a publication that stated that "published fan curves cannot be used with a reasonable degree of accuracy for determining system performance through the measurement of fan static pressure." Mr. Harmon suggested that the published curves could be used to determine the operating point on the curve by measuring the system flow. He asserted that the static pressure readings were not worth the time and effort that it takes to get them, because they yield incorrect values.

Mr. Harmon explained that the fan laws apply to both fans and systems, allowing one to extrapolate from one place to another on a fan curve. In order to perform any extrapolation, one must find out where the fan and the system curves cross. Once this point is determined, the RPM needed to achieve the design criteria can be calculated. He demonstrated that a curve from the Syska & Hennessy draft report had no system line, but

only a system point. He suggested that Syska & Hennessy arbitrarily chose a point on one of the fan curves that corresponded with 7.86 inches static pressure, thus effectively creating a new system curve. According to Mr. Harmon, had Syska & Hennessy plotted the system curve and found where the fan and system curve cross before applying the fan laws, Syska & Hennessy would have calculated the correct value of 1,400 RPM needed to achieve the design condition.

Mr. Harmon agreed with the statement in Kirlin's October 1, 1986 letter that Kirlin would be unable to achieve design airflow and static pressure at the outlets and pressure drop at the CVR, even with the delivery of design airflow and static pressure from the fan. He also stated that he "basically" agreed with Kirlin's statement that the design engineer not only designed a system without taking into account the conditions of its design, but also failed to allow proper tolerances.

David R. Gurock, a mechanical engineer qualified as an expert in fans, air handlers, air handling systems, and their interaction, who testified for plaintiff, was directly involved in the manufacturing and engineering aspects of fans and air handling since 1972. York's Director of Marketing and Merchandise Development for three years, Mr. Gurock has worked with other industrial manufacturers, including Trane. He testified that the AMCA differed from the Buffalo Forge tests in that the AMCA test was performed on a fan made several years after those installed at the site, whereas the Buffalo Forge test was performed on a fan that was removed from the job site. He suggested that while the plot from the Buffalo Forge test does not exactly describe York's catalog curve, the plot describes a better fan curve because the curve was steeper and the unit was able to achieve higher static pressures. A steeper fan curve is preferable because changes in static pressure result in only small changes in airflow.

According to Mr. Gurock, the Buffalo Forge test proved the York fan capable of meeting the specified design requirements at 1,400 RPM. He stated that there is no problem operating the fan at that speed—the stated maximum speed of York's literature— because the maximum speed is a general limitation set intentionally low to meet the normal conditions in which the fan would be applied in the real world. He later testified that this maximum speed includes a safety factor. Based on his analysis, Mr. Gurock stated that the York fans removed from the job site were perfectly capable of exceeding the project design. The Buffalo Forge test demonstrated this capability, and the field measurements of static pressure were inaccurate.

Referring to a graph from the FDA's expert, Mr. Graham, sent to the FDA as supporting his assertion that the static pressure measurements were inaccurate, Mr. Gurock stated that Mr. Graham's graph showed that neither the York nor Trane fan met the design static pressure. The Buffalo Forge test, however, clearly showed that the fan produced 7.5 inches static pressure. He also testified that the laboratory test discussed by Syska & Hennessy's final report of April 1991 found the fan produced 33,948 CFM and 7.48 inches static pressure at 1,368 RPM, while Mr. Graham found that the identical fan produced 34,428 CFM, but only 5.74 inches static pressure in the field. He suggested that the only conclusion that could be drawn was that the field static pressure measurement was inaccurate. The AHU casing could be losing pressure because of air leakage, but the 520 CFM reduction in airflow was not sufficient to cause a 2-inch reduction in static pressure. When questioned why the Trane fan could produce sufficient airflow at the discharge of the AHU, he explained that his concern was that, based on the Trane submittal, its fan should have been operating at 1,550 RPM, but actually 1,607 RPM was required. Therefore, Mr. Gurock asserted that the Trane fan apparently had been operated at an increased speed as both York and he had suggested with regard to the York fan.

On cross-examination Mr. Gurock testified that the AMCA test had a slightly flatter curve than the Buffalo Forge test and that, based on the AMCA test, the fan must turn at 1,424 RPM to meet the project design requirements. In addition, both tests indi-

cated less performance than submitted in the performance table of the approved submittal. The documented history of the project showed that York informed Kirlin, in a letter of January 15, 1987, that, based on the AMCA test, an unmodified York fan could meet the specification requirements operating at 1,425 RPM with the original motor. In responding to a question whether a customer had a legitimate concern that equipment not be operated at speeds right at, or greater than, the recommended limit, Mr. Gurock agreed, but added that if a customer were really concerned, the manufacturer should be asked for the engineering data to back up any manufacturer claims. To his knowledge the FDA never asked York about operating the fans at 1,425 RPM.

Mr. Gurock probably would have chosen a York Model CS–578–FO, instead of a model 666X, because a bigger fan is not necessarily better. He explained that as a fan gets bigger, the intersection of the system resistance curve and the fan curve moves away from the favorable area and into an area of instability. Where excessive pressure is found in the system, a smaller fan turning at a higher speed is generally installed. He noted that the FDA replaced the 36–inch York fans with 33–inch Trane units. The model 578 is a 33–inch fan. During cross-examination Mr. Gurock admitted that the York information supplied to the FDA showed the York model 578 fan was incapable of reaching the operating point of the system, but added that the actual capabilities of the fan in an engineering application can be very different. When customers come to York, it is concerned with the real operating limit of the fan. York reserves the right at a certain operating point, in this case 1,400 RPM, to want customers to ask York so that they can examine the application and approve any increase. York would expect customers to ask if it was safe to operate equipment past a certain point.

Defendant's expert Mr. Graham, qualified in design, application, and testing of fans and air handling systems and a mechanical engineer with approximately 42 years' experience (30 with Buffalo Forge), testified that it was his opinion that AHU Nos. 1–4 should have been replaced. In trouble-shooting a system like Module I with a low airflow problem, one looks for something obvious about the system. He stated that these problems are usually fairly obvious and inexpensive to remedy. The difficulty begins when nothing obvious is wrong. One works in the reverse direction of the airflow, eventually arriving at the source of airflow—the fan. Finally, Mr. Graham stated that if the fan equipment checked out, then the only piece of equipment remaining is the fan.

Mr. Graham spoke with the personnel trouble-shooting the system, who had investigated into the equipment. He stated that they solved some problems, but the airflow problem continued. He asserted that they ran out of other avenues to explore, concluding that the problem could only be the fan. This was the same route that he would have followed in trouble-shooting the system.

Mr. Graham stated, however, that he would have removed and tested the fan in order to isolate it from any system effects. Based on the AMCA test, the York fan must operate at 1,434 RPM to achieve the design requirements. He would not increase the speed to 1,434 RPM because York set an upper limit of 1,400 RPM. The shape of the curve from the Buffalo Forge test did not match York's catalog curve for that fan. He stated several times that he believed that the fan tested at Buffalo Forge was a different fan, although Mr. Gurock denied that York had an opportunity to supply a different fan. According to Mr. Graham, the fan tested at Buffalo Forge would meet the design requirements at 1,400 RPM, but he would not operate the unit at the upper limit. Thus, all fan experts from both sides testified that the York fan could achieve the design requirements operating at 1,400 RPM. During cross-examination, however, Mr. Graham stated that, although he considered himself different from most users because of his experience, he would have asked York about its published maximum speed, including a request for information on how York arrived at its figure.

In Mr. Graham's opinion, a York Model CS–666X–FO, with a 40–inch fan wheel, would have been a better fan selection for

Module I based on its fan curve. He had earlier testified that a recommendation that a 33–inch fan replace the York 36–inch fan would be a "real error" because more horsepower would be required for a smaller fan. During cross-examination Mr. Graham stated that he believed the Trane unit that replaced the York fans in AHU Nos. 1–4 was a 36–inch fan, when, in fact, the Trane replacement fans contained 33–inch wheels. After refreshing his recollection of the wheel size of the Trane fan, he stated on redirect examination that his opinion was based strictly on performance; the revelation did not affect his opinion.

Mr. Graham is a leading expert in the field of his expertise, however, his testimony was not as helpful as that of Mr. Harmon, both in terms of its content and the conviction with which he delivered it.

■ While the FDA based its replacement decision on what was apparently a preliminary Syska & Hennessy evaluation of a test on the one installed Trane unit, the FDA failed to contact York about the possibility of running the York units at 1,425 RPM (based on AMCA test). The FDA directed the York fans replaced before the results of the Buffalo Forge testing were received and before Mr. Sanchez erroneously calculated that 1,464 RPM would be required to achieve the specification requirements. Although Mr. Graham testified that he would not run the York unit at or above York's 1,400 RPM limit, he also testified that someone with his experience would have questioned York about the consequences of speeding the fans up to 1,425 RPM. Further, following Mr. Graham's own methodology of how to investigate a low airflow problem, it is clear that the FDA's conduct was seriously deficient. Mr. Graham testified that the fan is the last element to be examined. Here, the CVRs were never investigated even though plaintiff had alerted the FDA that they were one of several potential airflow problems. The air system design calculations are also suspect because LBC & W failed, in at least one system, to add enough additional airflow to the amount required at the diffusers to allow for the system leakage permitted under the specifications. This would force the fans to produce additional airflow to overcome any permitted leakage. The FDA is responsible for replacing the York fans because it failed to investigate adequately not only the fans themselves, but also the CVRs.

## IV. Government-caused delay

■ Generally, the Government will not be held liable for delay unless the contractor can show that the delay was caused by the Government. *William A. Smith Contracting Co. v. United States,* 155 Ct.Cl. 1, 9–19, 292 F.2d 847, 852 (1961). Where the actions of both parties contribute to the delay, however, " 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.' " *Blinderman Constr. Co., Inc. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982) (quoting *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15, 1944 WL 3694 (1944)). If the causes of delay are concurrent, the contractor cannot recover unless its delay is shown to be separate from that caused by the Government. *William F. Klingensmith, Inc. v. United States,* 731 F.2d 805, 809 (Fed.Cir.1984); *see, e.g., Connell Rice & Sugar Co., Inc. v. United States,* 837 F.2d 1068, 1071 (Fed.Cir.1988) (allowing contractor to present proof that government rice purchasing activities caused delayed performance).

Both parties contributed to the delay in this case. Plaintiff furnished CVRs and DPTs that failed to comply with the contract specifications. The FDA, in turn, failed to trouble-shoot the low airflow problem properly. In an attempt to move the project forward in August 1986, plaintiff, in response to the contracting officer request, made recommendations concerning the system elements that the FDA should investigate in order to resolve the problem. Instead of pursuing some obvious avenues, and in direct conflict with the testimony of fan experts from both parties, the FDA ignored plaintiff's first proposed alternative that required the least amount of time, to wit, that the CVRs be modified to remove the CVR damper frame from the airflow. Instead, the FDA focused on the fans and directed their

replacement before all of the testing data had been received.

The contracting officer asserted to plaintiff that the test of a replacement Trane fan indicated that the Trane unit met the design requirements. Actually, Syska & Hennessy had stated that the Trane unit "apparently" could meet the design requirements, but recommended that testing of both the York and Trane units be undertaken so that a more definitive recommendation could be made. The contracting officer was not justified in replacing the fans based on Syska & Hennessy's "tentative" conclusion. The documented reprocurement history demonstrates that although the FDA initially required strict adherence to the specifications, it changed to a more relaxed performance-based approach as the FDA's desire to occupy the Module I project grew. Plaintiff was not allowed to implement the August 15, 1986 CVR recommendation, even though it was similar to what was ultimately installed into Module I. Not only did the FDA prevent plaintiff from implementing one of its trouble-shooting recommendations, the FDA also failed adequately to perform its own trouble-shooting. Again, contrary to the testimony of defendant's own expert, the FDA focused on the fans, ignoring the test data presented by plaintiff in its August 15, 1986 letter showing excessive pressure drop through the CVRs.

 While a contracting officer is not expected to possess technical expertise, he or she is expected to make rational decisions based on available information. Here, the contracting officer failed to supervise an adequate investigation into the low airflow problem. She was ill-served by her technical advisor and Project Officer, Mr. Hoffman. He was the person who should have supplied her with sufficient information and insight so that she could make informed decisions. Mr. Hoffman testified that plaintiff's August 15 recommendation was "essentially a finger point exercise." Syska & Hennessy was hired as a consultant to the FDA sometime after the December 4, 1988 meeting regarding the fans. Again, Syska & Hennessy did not exhibit common sense in sending the York unit to ETL Testing Laboratories for an AMCA-certified test and then seriously

miscalculated the RPM required to achieve the design requirements. Although a contracting officer has to rely on others in making a technical decision, she is still responsible for her decisions, especially in this case where she relied on preliminary data from her private contractor consultant, which stated that the Trane fan "apparently" met the design requirements. She had no basis to direct installation of Trane fans with so little information.

It is easy to fault plaintiff for its failures in constructing the CVRs and overspanning and permitting contamination of the DPTs, but these failures were not the only cause of delay. LBC & W's inept reliance upon what defendant's airflow control expert called a "very small [August 28, 1986] test" was another separate and independent cause of delay. Testimony from defendant's expert Mr. Morris demonstrated that LBC & W had no basis for relying only upon Ultratech's gauges, especially when LBC & W knew that Ultratech had just adjusted the DPTs. LBC & W's reliance upon the Ultratech gauges was compounded by its determination that the CVRs would function properly when adequate airflow was achieved. This determination was made without any testing of the CVRs and despite the test data presented by plaintiff in its response and recommendations.

 Compensable delays, including apportionable delays, must occur on the critical path of a construction project. *Broome Constr., Inc. v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974). The critical path isolates work elements that drive the completion date. *See generally Wilner v. United States*, 23 Cl.Ct. 241, 245 (1991) (citing cases). Peter A. Warner, a civil engineer with approximately 20 years' experience in construction-related consulting, and President of Warner Construction Consulting, Inc., a firm employing 31 persons, most of whom are engineers and architects, was qualified to testify for plaintiff as an expert in scheduling and delay analysis. Mr. Warner presented his critical path analysis with respect to the Module I project through detailed graphs and charts.

The witness divided the critical path of project delay into three critical periods: fan replacement, CVR replacement, and ductwork repair. According to Mr. Warner's analysis, delay began on April 11, 1986, a date when the project would have been substantially complete except for remedial work. The delay ended on October 30, 1991, when the building was at least partially occupied. The fan replacement period, Mr. Warner testified, continued for 699 calendar days from April 11, 1986, until March 10, 1988, when the FDA issued the requests for proposal for six CVRs. He found that the second period—CVR replacement—lasted 812 days beginning on March 10, 1988, and ending on May 31, 1990, when the Brandt reprocurement CVRs were all installed. Finally, he testified that the third period—ductwork repair—lasted 517 days from May 31, 1990, until October 30, 1991. The delay on the critical path totaled 2,028 calendar days.

Mr. Warner testified that there was other remedial work, not related to the mechanical work, that took place during the delay period. Brick remedial work was performed during the second half of 1987; structural remedial work, from April 10, 1989, through February 21, 1990; ceiling overlay and related paint work, from May 30, 1989, through September 13, 1990; and concrete masonry unit wall paint work, from April 26, 1988, through November 27, 1989. He also testified that additional mechanical work or additional mechanical remedial work was performed during the delay period. The project had moved into a punch-list phase in late 1985, and while other mechanical work extended beyond that time, Mr. Warner was unable to recall specific dates.

Although there were many concurrent activities, the witness considered that no other work performed during the delay period was concurrently critical. In his view a continuous series of HVAC airflow related problems was manifest. None of the other activities, such as the remedial work described above, was continuous or controlled the ultimate end of the project—the occupancy of the building.

Mr. Warner's firm was able to map out the walls of the building with respect to where remedial work had taken place. Such work would have precluded using the particular area where the work was performed, but would not have precluded using either the entire building or a floor of the building. This testimony was not persuasive, since the purpose of the building was to afford long-term holding for animals in individual rooms.

According to Mr. Warner, the DPT issue was not a critical path activity because the issue was not continuous through the delay period and it was subordinate to the low airflow problem. The DPT equipment was subordinate to the CVRs, in his opinion. Stuart Ockman, qualified for defendant as an expert in delay analysis and scheduling, found the DPTs to be the controlling issue for the delay. Mr. Warner explained that the DPT replacement or recalibration was coordinated with the fabrication, manufacture, and installation of the reprocurement CVRs. After tracking the DPT recalibration and replacement activities, he determined that they simply were paced to the activities of the more critical CVR and low airflow issues. Although the timing of the CVR and DPT activities was roughly the same, the DPT timing was not concurrently critical. His opinion that the DPTs were subordinate was reinforced after he had spoken with Mr. Brandt about DPT replacement and recalibration. Although Mr. Warner admitted that he failed to connect adjusting the DPT spans with the airflow measurement problem of the CVRs, his overall analysis is sound.

 The court adopts Mr. Warner's analysis, determining the critical path to run as follows: The fan delay period began on August 28, 1986, after Ultratech had completed its DPT respanning and the date of the Rowe/Hoffman test when the FDA excluded the CVRs from affecting the low airflow problem.[25] The critical path then shifted to the CVRs when the CVR delay period began, as found by Mr. Warner, on March 10, 1988.

25. Although September 9, 1986, was the date when Mr. Rowe informed the contracting officer that, based on the August 28 test, the CVRs would perform as designed when adequate airflow was supplied, this date has no significance insofar as the contracting officer did not specifically act to adopt the advice.

On that date the FDA issued the requests for proposal for six CVRs each from Air Monitor and Tek–Air/Brandt. The court does not rely on Mr. Warner after this date. The critical path shifted once again when the ductwork repair period began on March 20, 1990, on which date the FDA directed replacement of all turning vanes according to Mr. Ockman's delay analysis. The ductwork delay ended on October 30, 1991, when the Module I project was substantially complete. The parties shall utilize these dates in calculating the amounts of delay damages.

## V. *Damages*

In *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987), the Court of Appeals for the Federal Circuit stated: "The claimant bears the burden of proving that fact of loss with certainty, as well as the burden of proving the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than speculation." *Id.* at 767 (quoting *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962)).

■ In cases of concurrent delay, where both parties contributed significantly to the delay period by separate and distinct actions, justice requires that the cost of the delay be allocated between the two parties proportionally. The Court of Claims in *Dynalectron Corp. (Pac.Div.) v. United States*, 207 Ct.Cl. 349, 518 F.2d 594 (1975), addressed a dispute similar to the one at hand. The contractor attempted to manufacture jamming antennas for the United States Department of the Air Force under specifications that later turned out to be impossible. The contractor, however, failed to communicate to the Air Force knowledge of the impossibility, thereby compounding the delay. The court allocated the cost of the delay equally between the two parties, the effect of which was to force the Government to "retain[ ] its liability for issuing defective specifications," while allowing the Government to carry "only a share of the damage assessment because of plaintiff's contributory errors." 207 Ct.Cl. at 367, 518 F.2d at 605.

■ Apportioning liability when delay is caused by separate and independent actions of the Government and the contractor is supported by abundant precedent. If the delays can be segregated, responsibility can be allocated between the parties. *Fischbach & Moore Int'l Corp.*, ASBCA No. 18146, 77–1 BCA ¶ 12,300, at 59,224 (1976), *aff'd*, 223 Ct.Cl. 119, 617 F.2d 223 (1980). In *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81 (1964), the Court of Claims explained that the basis of this policy is the Government's "ever present obligation" to act reasonably and in good faith:

It would be intolerable if the Government could disregard that responsibility, or were free to stretch its tardiness for however long it fancied, without sterner control than the mere prolongation of the completion date of the contract. The rule is, rather, that, when the Government's delay in furnishing work or material stems from its failure to do what it should under the particular contract, it will have to respond in damages for the resulting additional outlays which are proved to have been caused the contractor.

167 Ct.Cl. at 536, 338 F.2d at 85. With respect to the Module I project, the Government failed to act reasonably.

The FDA's reliance solely upon the Ultratech gauges during the August 28, 1986 test was unreasonable. The failure to at least look into the CVRs, after plaintiff had presented information showing the existence of a problem, was unreasonable—especially in light of both parties' expert testimony that the fans should be the last piece of equipment examined. The contracting officer's directive to install the Trane units, while asserting that Syska & Hennessy's preliminary and tentative findings showed the Trane fan capable of meeting the design requirements, was unreasonable, if not precipitous.

Mr. Grandchamp testified during four days. The fact that he was the most persistent witness does not account for the forceful effect of his testimony; rather, the conviction, professionalism, and sincerity that the witness brought to the proceedings are responsible for the confidence that the court reposes in Mr. Grandchamp. His testimony,

coupled with the documented history of the project, demonstrates that the FDA did not act reasonably in addressing the problems that beset the mechanical work. Kirlin's subcontractor Ultratech was a dog in the manger, and both Kirlin and plaintiff bear ultimate responsibility for Ultratech's poor manufacture of the CVRs and overspanning of the DPTs. However, the Government has formidable power to compel contractors to remedy problems and complete a contract to the Government's satisfaction. This power carries the corresponding responsibility of reasonable exercise. In this case the FDA mindlessly ignored the design engineer's documented lapses; did not take reasonable steps to obtain a grasp of the problem; and ran Kirlin and plaintiff into the ground with demands for information that the FDA reasonably required, but that the FDA sought in a disorganized, repetitive fashion and without a reasonable plan of how to put it to use; and over time relaxed standards during the reprocurement, an advantage that plaintiff was not accorded for years. All this occurred despite the contracting officer's access to a design engineer, a technical advisor, and an outside consultant. The court cannot ignore the human factor in contractual relationships. Kirlin and plaintiff were represented by individuals who, the record reveals, were not treated reasonably by the FDA. The result was that these individuals, after a protracted period, became uncooperative. This lack of cooperation was excusable in the circumstances.

■ Delay damages are apportioned, or allocated, according to both parties' contribution to the delay period. Defendant is responsible for delay caused by FDA's failure to take reasonable action into investigating the low airflow problem and implementing a solution. Defendant is also responsible for the delay that the FDA caused by requiring plaintiff to pursue the false lead concerning the fans.

Plaintiff, on the other hand, is responsible for the reasonable time period involved in remedying the CVR and DPT problems. Plaintiff is also responsible for Kirlin's growing recalcitrance in failing to provide complete balance data for AHU Nos. 5–13.

The court has allocated the responsibility for delay at 60 percent for the FDA and 40 percent for plaintiff.

### 1. *Kirlin's claims*

Unless otherwise noted, Kirlin's proof of the amount of damages was sufficiently specific to justify an award.

#### a. *Outstanding change orders*

The first item of damages consists of seven work items claimed by Kirlin. Mr. Grandchamp testified that plaintiff was required to install four additional smoke detectors into rooms. Kirlin claimed $3,968.00 for this revised smoke detector work. The court awards the full amount to Kirlin because the FDA contested neither this claim nor the amount.

Kirlin also submitted a claim for $7,618.00 due to additional work related to a cooling tower revision. Mr. Grandchamp testified that the manual valve was changed to automatic control. Defendant provided a document showing that Kirlin received compensation for this change order; therefore, the claim is denied.

■ Mr. Grandchamp testified that Kirlin was required to make the perchloric washdown system fully automatic and to change the way the spray nozzles, or heads, were fed, because the sumps could not handle the flow of water that came out of them. Kirlin claimed $48,892.00 for this claim. Mr. Hoffman testified that the parties could never come to an agreement. (Mr. Hoffman stated on cross-examination that he believed that they agreed to pay something around $38,000.00.) Because Kirlin presented no documentary evidence, proof of damages is insufficient with respect to this claim.

Kirlin also claimed that it should be compensated $6,140.00 for installing an elevator recall system, so that the elevators would return to the first floor at the fire marshal's command. Mr. Hoffman contested this claim, stating that he had looked through all of the cases on the project and could not find any reference to such a claim. Again, the

court must deny this claim because of Kirlin's failure to submit any documentary support.

Mr. Grandchamp testified that Kirlin sought additional compensation of $2,258.00 because, after the FDA had reviewed the shop drawings, it relocated eyewashes, which required relocation of piping. Mr. Hoffman contested the claim, stating that the fountains were incorrectly provided and installed. He asserted that the fountains were of opposite hand from what they should have been and that Kirlin admitted its error and agreed to make the correction. The FDA contested liability, but not the amount. The court finds that Mr. Grandchamp was more credible on this issue and accepts his explanation of liability. Therefore, Kirlin is entitled to its claimed amount.

The next item was a claim by Kirlin for $3,701.00 for a change in material for the final duct connection of the fume hoods. Defendant produced a document showing that Kirlin had been paid for this change order; therefore, the claim is denied.

Finally, Kirlin claimed $4,517.00 because the contract did not indicate that Kirlin would be required to install a gas vent system for the gas boilers. Because the FDA did not contest this claim, Kirlin shall recover the claimed amount.

b. *Fan claim*

Some of Kirlin's categorical items of damages did not indicate accurately the work for which Kirlin claimed damages. Where possible, the claimed damages were ascertained from testimony that identified the equipment and services for which Kirlin seeks recovery. The claim amounts applied below are those amounts reduced by Kirlin during Mr. Grandchamp's testimony. Kirlin made reductions for these items (and its corresponding markup) for which it could not find an invoice supporting the claim.

 Because the FDA improperly replaced the fans, Kirlin is entitled to receive in full its claimed amounts incurred as a direct result of fan replacement that Kirlin was not already required to perform under the contract. Therefore, Kirlin's claim for $144,-360.00 for replacing AHU Nos. 1–4 is granted in full. Mr. Grandchamp stated that the "York claim" in the amount of $95,538.00 related to York funds expended for investigating and removing the York fans and shipping them to Pennsylvania. During cross-examination he stated that he was certain that this amount included the cost of providing the information in plaintiff's August 15, 1986 letter, but was unsure whether the cost of York's modifications also was included. Kirlin is entitled to recover the full amount, excluding the cost of the modifications initiated by York for which no initial charge was made.

 Kirlin claimed extended overhead costs based on the *Eichleay* formula.[26] In order to apply the *Eichleay* formula, a contractor must show that compensable delay occurred and that the contractor could not have taken on any other jobs during the contract period. *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669, 673–74 (Fed.Cir. 1992). If the former is established, the contractor must show specifically that it was on standby for the delay period and that it was unable to take on other work. *Interstate Gen. Gov't Contractors v. West*, 12 F.3d 1053, 1056 (Fed.Cir.1993). Based on the documented history and Mr. Grandchamp's testimony, Kirlin was in a state of uncertainty because it could not foresee how long the project would remain uncompleted. Certainly, Kirlin could not accept additional work because of its vast financial and resource commitment to the FDA project. Kirlin is entitled to receive 100 percent of its extended home office overhead during the fan delay period and 60 percent during the CVR delay period.

Mr. Grandchamp testified that Kirlin started up the various systems at the project for a turnover date during the month of June 1986. He stated that some equipment required maintenance once started because it would become damaged if left idle. He testified

26. *Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA ¶ 2688 (1960), *aff'd on reconsid.*, 61–1 BCA ¶ 2894 (1960).

persuasively that some of the equipment at the project deteriorated because it remained idle for an extended period or periods.

### (i) *Category 1 delay damages*

■ The FDA has a right to the satisfactory performance of one-time required contract work whether during a delay period or subsequent thereto. Kirlin is not entitled to recover damages that fall into this category because it already owed the equipment or services to the FDA. Kirlin is entitled to be compensated at 60 percent, however, when the FDA required re-performance of work that already had been performed in anticipation of turning over the project to the FDA, unless this rework resulted from Kirlin's failure to supply compliant CVRs or DPT's of the proper span.

### (ii) *Category 2 delay damages*

Kirlin is entitled to receive 100 percent of the costs, including time-driven delay costs, incurred during the fan delay period that are associated with work falling into this category—for example, maintenance of equipment.

### (iii) *Category 3 delay damages*

■ The parties bear responsibility for delays in the time-driven tasks that were not one-time contract items. For any work, other than that associated with the CVRs or DPTs, required to be performed two times or more, Kirlin is entitled to recover 60 percent of its claimed costs.

Mr. Grandchamp testified on cross-examination that the "consultant's fees" claim for $19,300.00 was associated with the fan repair. Therefore, Kirlin is entitled to recover this claim in full. The claim for CVR recalibration is denied in full based on Kirlin's failure to provide compliant CVRs. Kirlin's claim for "deionized water restart" in the amount of $1,342.00 will depend upon the category in which it belongs. The "distilled water restart" claim for $1,627.00 is also dependent upon its category. The $31,831.00 claim for "chiller and cooling tower cleaning" requires the same analysis, as does the "recalibrate automatic temperature control ["ATC"] and energy management control system ["EMCS"]" claim in the amount of $98,097.00. The "boiler maintenance and clean-

ing" claim for $36,252.00 appears to be hybrid; boiler maintenance may be category 2 and 3 and cleaning may be category 1. The "rebalance air system" claim in the amount of $124,634.00 is a category 3 item.

Kirlin is entitled to full recovery during the fan delay period and 60 percent as category 3 items for the following items: "air compressor maintenance" in the amount of $660.00; "chemicals and water treatment," $4,958.00; "air filter replacement," $3,016.00; "temporary heat consumption," $49,395.00; and "labor expended in HVAC repairs," $131,041.00. Mr. Grandchamp testified that this last claim was for Kirlin's costs in maintaining equipment during the delay. The claim for "initial investigation into HVAC problems" in the amount of $29,651.00 fails because plaintiff did not supply compliant CVRs.

### c. *CVR claim*

Because of its failure to supply CVRs that complied with the specifications, Kirlin cannot recover the following damages: $185,183.00 for "CVR removal and testing;" $669.00 for "CVR travel and testing;" or $16,807.00 for "consultant's fees."

The analysis described above with respect to the fan claim will also be applied to the "recalibrate ATC and EMCS" claim for $66,991.00 and the "start-up costs" claim in the amount of $10,743.00. Per Mr. Grandchamp's testimony these costs were incurred after September 1988. Therefore, any costs which Kirlin was required to bear multiple times are category 3 damages.

Kirlin shall receive 60 percent for the following claims during the delay period: "maintenance and operation" in the amount of $58,717.00; "extended field office" for $3,195.00; "extended warranty" for the actual cost of $190,000.00, as testified to by Mr. Grandchamp; and "extended home office overhead" in the amount of $318,356.00.

The "punchlist" claim in the amount of $32,020.00 is denied because of plaintiff's failure adequately to support the amount.

## 2. *Plaintiff's claims*

Unless otherwise stated, the amount of plaintiff's damages has been proved with sufficient specificity to justify an award.

Avram S. Tucker, C.P.A., qualified to testify for plaintiff as an expert in construction claim accounting and related administration matters. He joined Peterson Consulting Limited Partnership ("Peterson") in 1981, where he is an Executive Vice–President with national responsibility for government contracts and construction work. Of both parties' experts in all fields, his testimony stood out and is entitled to the highest regard.

Mr. Tucker was familiar with the type of accounting and management system used by plaintiff because of prior work when he was retained by the owner of a large power plant for which Guy G. Atkinson, plaintiff's parent corporation, was the civil contractor. Peterson reviewed 81 percent of the documentation supporting plaintiff's claim. (It did not review Kirlin's claims.) This percentage was larger than Mr. Tucker normally would review.[27] He also testified that no litigation fees or costs are included in plaintiff's claim.

Plaintiff did not seek a portion of its extended home office overhead based on an *Eichleay*, hybrid- or modified-*Eichleay* formula. Mr. Tucker calculated plaintiff's home office overhead by analyzing plaintiff's financial records to arrive at home office costs as a percentage of all job costs. He then obtained an average of these percentages for the years 1987 to 1990 to arrive at a home office overhead rate of 4.3 percent. Mr. Tucker stated that an *Eichleay* formula would yield at least double the amount of home office overhead costs that plaintiff is claiming. Based on Mr. Tucker's testimony, 4.3 percent of plaintiff's project costs are recoverable as home office overhead.

Thomas A. Tennison, plaintiff's Project Controls Manager and later director for completing remedial work for the FDA project, and an accountant, testified regarding plaintiff's cost accounting system. Mr. Tennison replaced plaintiff's L. Ronald Thompson at the project in November 1990. Mr. Tennison testified that plaintiff had demobilized from the project site believing that it had completed all work. After receiving a default notice, plaintiff returned to the project.

Mr. Tennison stated that he participated in the preparation of plaintiff's claim after reviewing time cards, invoices, packing slips, subcontractor pay requests, and journal entries and also after consulting with project personnel. He reviewed the claim (seeking costs incurred from October 1, 1989, through September 30, 1990) several times after the claim was submitted in order to determine that the costs were mechanical and belonged in each of the accounts. Mr. Tennison reviewed the "continued mechanical work" costs (incurred post-September 30, 1990) that accumulated when the FDA continually directed that additional mechanical work be performed as the project continued. All of the latter costs were accumulated into one account; plaintiff seeks only the "mechanical system completion" portion of these costs. The witness reviewed every invoice for this mechanical work that occurred after September 30, 1990.

According to Mr. Tennison, four of the "project direct costs" from the period October 1, 1989, to September 30, 1990, increased after the claim was submitted because subcontractor invoices were received later. During redirect examination of Mr. Tennison, plaintiff reduced its claim by estimated percentages with respect to a portion of its claimed overhead, which items included some direct costs during this same period, because a portion of the claimed costs were incurred for work performed on other than the mechanical portion of the project. In addition, plaintiff deleted interest on its facilities cost of capital. Mr. Tennison's confusing testimony whether the isolation dampers plaintiff was directed to install were either incorrectly selected by plaintiff or incorrectly specified by the design engineer dooms this item, and plaintiff cannot recover for it.

---

27. Mr. Tucker was concerned with findings of the Defense Contract Audit Agency that plaintiff's claims lacked support. He found the support for questioned items, but acknowledged that it was hard to find.

### a. *Claim for period October 1, 1989, to September 30, 1990*

The first items discussed are identified in plaintiff's 400–level accounting codes. Plaintiff is entitled to receive in full its costs associated with "tech consultants" and "testing," excluding any costs incurred because of noncompliant CVRs and DPT respanning and contamination. Sixty percent of plaintiff's costs are recoverable for up to 80 percent (per Mr. Tennison's claim reduction) of the amounts reflected in its summary in the following categories (again, excluding any costs resulting from the CVR or DPT issues): project salaries, office hourly, project travel, temporary living, insurance/taxes, owner's trailer, general overhead, construction services, and services. Plaintiff shall receive 60 percent of up to 90 percent (per Mr. Tennison's claim reduction) of its claimed utilities/services costs, excluding those attributable to the CVR and DPT issues.

The next items are identified in plaintiff's 500–level accounting codes. Plaintiff cannot recover for the CVR/AMS replacement units because of its failure to supply compliant CVRs or AMSs. Recovery is denied for replacing/rebuilding the DPTs because plaintiff allowed Ultratech to overspan the DPTs and permitted the DPTs to become water contaminated by not servicing the equipment properly. Moreover, Mr. Tennison admitted during cross-examination that these costs were not a component of the additional work claim submitted to the contracting officer. Plaintiff is entitled to 60 percent of its claim for Brandt's servicing of the DPTs, excluding any costs associated with recalibrating or cleaning.

Mr. Tennison testified that the Hamilton & Spiegel costs were incurred for ductwork modification, a portion (which he could not state) of which resulted due to the length of the CVRs ultimately installed. Accordingly, plaintiff cannot recover damages for the "Hamilton [&] Spiegel CVR work" because the ductwork modification resulted from lengthening the CVRs to achieve the "L" dimension. The costs for the Envirocon work are denied because the FDA was entitled to purging of the instrument air system. The claim for Comfort Control air balance

and testing work is granted only to the extent that this work is category 3.

The portion of the Johnson Control costs related to disconnecting and connecting the CVRs during replacement is denied because of plaintiff's failure to supply compliant CVRs. Plaintiff is entitled to 60 percent of the costs associated with recalibrating equipment; this recalibration was required, in part, because the equipment sat idle during the delay periods. Plaintiff is also entitled to 60 percent of the boiler room operation and maintenance costs because this equipment was required to be operated and maintained during the delay period once it was started up for the originally estimated June 1986 turnover date. Plaintiff's claim for "Kirlin boiler work" is denied to the extent that it represents double recovery. There is insufficient evidence to grant plaintiff the Trane fan replacement costs. Plaintiff cannot recover the costs for the Hamilton & Spiegel ductwork because of its failure to comply with its own approved sheet metal standards for ductwork. The issue is discussed later in this opinion in connection with defendant's counterclaim.

### b. *Claim for period after September 30, 1990*

Plaintiff claims six items for mechanical costs incurred after September 30, 1990. Mr. Tennison testified that invoices supported 100 percent of these costs and that the original contract costs were not included. He also stated that the costs all resulted from rework directed by the FDA. The first is costs for Brandt's DPT refurbishment. Mr. Tennison believed that Brandt had been called to the project on three different occasions. He also stated that "some" of the newly installed DPTs needed to be recalibrated. No basis appears for allocating between "some" of the DPTs and the rest. Therefore, this claim is denied.

Mr. Tennison testified that the second item resulted from Comfort Control's performing SMACNA leak testing and final balance testing, the amount attributable to the former is denied; the latter is a category 3 item, excluding ductwork costs. The next item is

Complete Air Filter Company's replacement of AHU air filters. Mr. Tennison testified that installation of two different sets of air filters was required. Because these filters had to be replaced because of time delay and the FDA was entitled to a new set at project turnover, plaintiff is entitled to 60 percent of the costs for replacing the first set of air filters.

The fourth item is costs to complete ductwork from Hamilton & Spiegel. Mr. Tennison testified that all of these repair costs were directed based on a Syska & Hennessy report. None of these costs can be recovered because plaintiff materially failed to comply with the specification requirements related to ductwork. The next item is costs from Johnson Controls for mechanical system calibration and testing. Mr. Tennison stated that these costs resulted from recalibrating all of the instrumentation after all of the rework on the systems was performed. Mr. Hoffman questioned the Johnson Controls costs because to his knowledge the EMCS system was not started before these costs were incurred. The evidence is not consistent with his position. Plaintiff is entitled to 60 percent of only rework costs, unless the rework resulted from Kirlin's failing to supply compliant CVRs or supplying overspanned DPTs.

The final item is costs from Thornton Mechanical for completing mechanical punch list items. Mr. Tennison testified that these costs were incurred for operations and maintenance costs, including boiler room work, repair work directed by the FDA, insulation work for AHUs, and work in assisting Syska & Hennessy's review of ductwork. Plaintiff is entitled to 60 percent of any maintenance costs resulting from time delay; any ductwork-related costs are excluded.

On redirect-examination Mr. Tennison testified that certain costs (set forth below) were included in the claim that were listed on the contracting officer's letter of September 28, 1990, as "incomplete or deficient." Plaintiff shall exclude the following costs from its claim, unless they were incurred for rework that did not result from Kirlin's failing to supply compliant CVRs; supplying overspanned DPTs; or repairing ductwork, in which case they shall be recoverable at 60 percent of the claimed amounts: the carbon monoxide exhaust system at the loading dock (contracting officer's no. 8); the investigation and repair of water exiting from AHUs in Mechanical Equipment Room No. 1 (contracting officer's no. 9); the cooling towers problems (contracting officer's no. 12); and the written certification for the deionized water, distilled water, and boiler feed water treatment systems (contracting officer's no. 13).

Mr. Tennison testified on cross-examination that plaintiff considered as warranty work the costs relating to the cooling tower work listed in plaintiff's letter to the contracting officer dated November 26, 1990 (no. 12 in the letter). He stated that he was unsure what work had been performed after the equipment sat idle. Plaintiff is only entitled to 60 percent of any rework costs for this work because it resulted from non-fan related time delay. Plaintiff is entitled to only 60 percent of the costs of retesting the emergency showers, which Mr. Tennison stated had been tested in 1986, because of the period during which they sat idle during the delay (no. 21 in the letter). Finally, plaintiff cannot recover for the EMCS training costs because Mr. Tennison could not state whether it was completed in 1986 (no. 25 in the letter).

Because plaintiff failed to supply compliant CVRs, General Provision 3 with respect to costs incurred in an attempt to comply with defective specifications is inapplicable. General Provision 3, as modified by General Condition Clause 17 of the contract, sets forth that plaintiff is not entitled to profit on work performed by subcontractors. Therefore, plaintiff is entitled only to its own profit.

3. *Syska & Hennessy's counterclaim*

Defendant counterclaims in the amount of $649,121.85 for Syska & Hennessy's consulting (investigation) and testing work. The contracting officer testified that the FDA was entitled to have the Syska & Hennessy work performed under the contract General Provision Clause 10 entitled "INSPECTION AND ACCEPTANCE." The pertinent portion of subparagraph (d) states, as follows:

The Government reserves the right to charge to the Contractor any additional cost of inspection or test when material or workmanship is not ready at the time specified by the Contractor for inspection or test or when reinspection or retest is necessitated by prior rejection.

This language, according to the contracting officer, entitles the FDA to compensation for the amount that Syska & Hennessy billed.

Although the contracting officer presented Syska & Hennessy's unitemized statement and apparently the corresponding invoices, she failed to testify with specificity as to why plaintiff is responsible for the costs and why the costs were incurred. The statement was not admitted as a summary under Fed. R.Evid. 1006. In marked contrast to the damages testimony of Kirlin and plaintiff was the brevity, conclusory nature, and sketchiness of the contracting officer's concerning the Government's counterclaim. The contracting officer categorized the invoices as either "consulting [sic] testing" or "litigation purposes." Defendant would never have allowed a contractor to shoulder its burden with such a meager showing; no reason exists to relax the standards for the Government, although it is woe to the fisc when a statement this huge in amount and vague in context is paid.

Sydney H. Reiter, P.E., a ten-year employee of Syska & Hennessy, who qualified as an expert for defendant in the field of mechanical systems inspections, testified with respect to his findings during inspection of the Module I project HVAC system. The focus of his employment has been the study of air conditioning and mechanical systems for existing buildings; one of his specialties is inspecting HVAC systems.

Syska & Hennessy's inspection work was performed during February and March 1991. Mr. Reiter stated that it had been determined prior to his coming to the project that leakage was present. He showed through vivid photographic evidence how the ductwork and other sheet metal equipment provided to the FDA project failed to comply with plaintiff's own approved sheet metal duct standards. One failure was that AHU plenum ductwork seams insufficiently were held together by fewer than required screws (those present were improperly lined up to each other), and welds were placed improperly so as to be structurally useless. Other failures included missing portions of joints, which allowed leakage and decreased structural strength; providing parallel, rather than opposed-blade, dampers, which reduced the sealing effect of the blade tips coming together when closing; improper distance between turning vanes and damaged vanes, which caused increased pressure drops at turns in the ductwork; placing holes into ductwork during rebalancing that were never plugged; sagging ductwork; improper spacing between hangers supporting ductwork hanging from ceilings; and several instances where there was evidence that airflow was leaking out of ductwork because of the manner of dust accumulation.

Although plaintiff suggested that the SMACNA duct standards allowed for different casing assembly methods and that single thickness conventional casing panels could deflect up to 1 inch, consistent photographic evidence demonstrated plaintiff's failure to supply sheet metal work in compliance with its own approved standards. Plaintiff also asserted through testimony of Mr. Leigg, a former 23-year employee of Hamilton & Spiegel, now employed with another sheet metal contractor, that a particular portion of ductwork was damaged because of overpressurization when the FDA was attempting to achieve sufficient airflow at the outlets. Mr. Reiter opined that the portion of ductwork was torn and not caused by a "blow out," because other pictures of different ductwork show flat ductwork and also a tear. He suggested that overpressurization would have "bellied" out the duct. This particular damage, in his view, resulted from "weight" or "pulling," which caused the joint itself to brake. The court finds Mr. Reiter's testimony more persuasive.

Plaintiff also asserted that because no SMACNA leak testing was performed prior to the work, no available quantitative data showed that the ductwork was not within the overall 3 percent leakage contract requirement before the remedial work was performed. Comfort Control's Mr. Margolis

testified that there was no improvement in airflow after the remedial work was performed. Mr. Reiter responded that while 15 rooms had low airflow based on Comfort Control data in 1990, after the remedial work only 5 rooms still had deficient airflow. Two of these rooms were in different branches of Air System No. 3, and two were on branches of Air System Nos. 1 & 2. He also stated that Syska & Hennessy did not outline the work to be performed, but informed plaintiff to "make the repairs," which, he stated, plaintiff performed in a very business-like manner.

To the extent that the FDA can isolate the expenses related to Mr. Reiter's investigation into the sheet metal failures, defendant is entitled to recover these costs. The remainder of the Syska & Hennessy costs are unrecoverable due to failure of proof.

## CONCLUSION

Plaintiff shall recover damages consistent with the foregoing, and defendant is entitled to a limited recovery on its counterclaim consistent with the foregoing. Accordingly,

**IT IS ORDERED,** as follows:

1) By March 18, 1994, the parties shall file a stipulation of damages due to plaintiff on its claims and to the Government on its counterclaim. The stipulation shall correspond amounts to the applicable date of plaintiff's three claims.

2) The parties' agreement with the amounts recited in the stipulation shall signify only that the amounts were developed pursuant to the court's instructions.

3) The Clerk of the Court shall enter judgment consistent with the stipulation reflecting the following dates for the receipt of plaintiff's certified claims: Plaintiff, February 1, 1991; Kirlin (fans), October 14, 1988; Kirlin (CVRs), January 15, 1991. Each party shall bear its own costs.

## ***ORDER***

May 4, 1994

Defendant moved on March 7, 1994, for partial reconsideration of the opinion issued on February 18, 1994. Thereafter, plaintiff cross-moved for partial reconsideration.

### I. *Defendant's motion for reconsideration*

Defendant's motion advances five grounds. First, defendant contends that the settlement agreement executed on September 20, 1993, incident to trial, bars all of plaintiff's claims for delay, except for a portion specifically reserved under the agreement. Second, the court lacks jurisdiction under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988 & Supp. IV 1992) (the "CDA"), to entertain the claim that was reserved because it was not presented in a claim to the contracting officer. Third, the court lacks jurisdiction under the CDA to entertain any of plaintiff's other claims regarding critical path delay, extension of contract, or breach of the duty of good faith because plaintiff's delay and related expenses claim included in its Third Amended Complaint (the "delay and related expenses claim") was the only claim submitted to the contracting officer that included a claim for critical path delay or contractual extension for completion damages. Fourth, plaintiff's failure to notify the FDA of nonconformities in the equipment that it delivered to the project precludes any recovery by plaintiff for delays along the critical path. Fifth, the Government should not be liable for any damages that occurred after March 20, 1990, the date on which the court found that the CVR delay period ended. Defendant informally presented a sixth ground,[1] asserting that it was contrary to precedent for the court to use a "jury verdict method" of allocating responsibility for concurrent delays. Each ground will be discussed in turn.

1. Defendant argues that an eve-of-trial settlement agreement between the parties bars all of plaintiff's delay and related expenses claim, except a portion specifically reserved by plaintiff in the settlement agreement. In its motion for reconsideration, defendant takes occasion to argue for the first

---

1. Although defendant stated that it was presenting five grounds for its motion, defendant's informal argument in footnote 1 will be treated as an additional ground.

time that the court lacked jurisdiction to decide issues allegedly settled out of the case. Although issues of subject matter jurisdiction cannot be waived, it is distressing that defendant did not alert the court to such an important issue until after the court had rendered its opinion. At the insistence of defendant, the court was not involved in the settlement and still has not seen the settlement agreement. A Stipulation of Partial Dismissal was filed, but the court remains unapprised of the details of the settlement agreement itself.

Defendant asserts that the issues encompassed by the settlement agreement are moot or non-justiciable and, therefore, that the court lacked jurisdiction to consider them in deciding the case. *See Powell v. McCormack,* 395 U.S. 486, 495–97, 89 S.Ct. 1944, 1950–51, 23 L.Ed.2d 491 (1969). More particularly, defendant argues that plaintiff's delay and related expenses claim, which sought recovery for delay along the critical path caused by unreasonable contract administration and which was settled, included all of its claims for delay-related damages. The court agrees that it has no jurisdiction to decide issues settled out of the case. The question becomes whether the settlement agreement encompassed all of plaintiff's delay-related claims.

Curiously, defendant emphasizes that *"[t]he Court's opinion nowhere addresses the effect of the settlement upon Tyger's or Kirlin's potential recovery for Government-caused delays."* Def's Mot. filed Mar. 7, 1994, at 12 (emphasis in original). Defendant, however, failed to bring the matter to the court's attention before, during, or after trial in the post-trial briefing on issues that the parties identified for further briefing. During trial substantial evidence was received into the record with respect to time-driven delay damages along the critical path. Not only was this evidence received from plaintiff, but also from defendant. Moreover, defendant was insistent that the settlement agreement not be discussed during trial. The following colloquy between defense counsel and the court is representative of defendant's position with respect to discussing the parties' prior settlement:

THE WITNESS: ... And I understand that as part of the terms of the settlement this is something that would be allowable and therefore it's included in the claim.

Each of these items—

MR. RICE: I'm going to object to the characterization of the settlement. I don't think that's appropriate here particularly as to "what's allowable" and I would move to strike. It's something that's related to hearsay.

THE COURT: Well, since I haven't been privy to any of this—

MR. RICE: Exactly. That's the reason that I wish it stricken from the record.

THE COURT: Could we use the word agreement on what would be presented and not presented? I gather that there's been some sort of an agreement about what—

MR. RICE: There's been an agreement it will not be presented and we've filed a stipulation of dismissal.

THE COURT: No, no, no. I'm not talking about an agreement that it will or will not be presented. I'm saying do you have an agreement about which of Plaintiff's costs will be presented?

MR. RICE: Yes, Your Honor.

Transcript of Proceedings, *Tyger Constr. Co., Inc. v. United States,* Nos. 468–88C, 526–88C & 90–134C at 2176–77 (Fed.Cl. Nov. 15, 1993) (hereinafter "Trial Tr."). In light of defendant's litigating position with respect to any discussion of the settlement agreement, it would appear disingenuous for defendant now to argue that the court never addressed the impact of the settlement agreement on plaintiff's or Kirlin's recovery.

Plaintiff's Third Amended Complaint in No. 468–88C, filed April 15, 1993, contained a "BRICK CLAIM," a "CEILING PAINT CLAIM," a "CMU WALL PAINT CLAIM," a "MECHANICAL CLAIM," a "DELAY AND RELATED EXPENSES CLAIM," a First Cause of Action for "Breach of Contract," a Second Cause of Action for "Cardinal Change," and a Third Cause of Action for "Fraud and Negligent Administration." The Stipulation of Partial Dismissal filed on September 21, 1993, dismissed with prejudice the

"BRICK CLAIM," the "CEILING PAINT CLAIM," the "CMU WALL PAINT CLAIM," the "DELAY AND RELATED EXPENSES CLAIM," (except the $710,-133.00 portion,[2] plus interest and mark-up specifically reserved), and the Third Cause of Action for "Fraud and Negligent Administration."

Plaintiff, on behalf of Kirlin, submitted the latter's fan claim to the contracting officer on October 14, 1988. Later, on January 15, 1991, plaintiff submitted Kirlin's CVR claim to the contracting officer. Then, on February 1, 1991, plaintiff submitted to the contracting officer its own claims: a delay and a mechanical claim (the "1991 mechanical claim"). In its Third Amended Complaint, plaintiff alleged the facts surrounding plaintiff's 1991 mechanical claim and Kirlin's CVR and fan claims in the section captioned "MECHANICAL CLAIM" (the "1993 mechanical claim"). Plf's Third Am.Compl. ¶¶ 34–46. This 1993 mechanical claim did not otherwise vary from the 1991 mechanical claim.

Defendant notes that the Stipulation of Partial Dismissal removed plaintiff's delay and related expenses claim, except the portion specifically reserved—mechanical work amounting to $710,133.00. Defendant contends that because this settled portion of the delay and related expenses claim alleged that the FDA's unreasonable administration of the contract[3] resulted in 1,901 days of delay along the critical path, plaintiff should not be able to recast its 1993 mechanical claim as one seeking delay damages. Doing so would allow plaintiff to circumvent the settlement agreement and thereby recover for delay. Further, Kirlin is barred under the settlement agreement from independently pursuing a delay claim against the Government. Defendant argues that the basis of plaintiff's 1991 mechanical claim implied defective design only. No delay-related damages were sought, and Kirlin failed to claim or address critical path delay.

Plaintiff responds that the settlement agreement did not encompass its 1993 mechanical claim. Plaintiff rejects the notion that it has recast its claim and counters that it is defendant who has recast the settlement agreement in seeking to bar claims that plaintiff had retained expressly. In fact, plaintiff's 1991 mechanical claim, which plaintiff incorporated by reference into its 1993 mechanical claim, alleged delay damages. This 1991 mechanical claim noted specifically that any home office overhead recovered in this claim would be adjusted out of the delay claim submitted to the contracting officer. While plaintiff's and Kirlin's claims could be characterized as based on defective design, they had other bases, all of which included elements of delay, and, as will be discussed below with respect to the third ground of defendant's motion, the contracting officer understood that plaintiff was claiming damages for delay as part of the various claims particularized in the Third Amended Complaint.

Defendant makes a great deal out of the fact that plaintiff stated in its 1991 mechanical claim that the costs cited therein did not include costs incurred by plaintiff for delay in completing the project. Those costs, plaintiff stated, were included in its claim for delay-related expenses.

Plaintiff responds that the settlement agreement specifically reserved its 1993 mechanical claim and the settlement documents themselves reveal that the agreement was not intended to remove recovery for delay-related damages from the 1993 mechanical claim. The language of the 1991 mechanical claim with respect to recovery for home office overhead noted above supports plaintiff's position.

a. The 1991 mechanical claim

The 1991 mechanical claim made allegations with respect to time-related damages,

---

2. This $710,133.00 portion consisted of costs incurred after October 1, 1990, that were excepted from the delay and related expenses claim.

3. During the pre-trial conference, the court advised the parties that the competence of government personnel was not a factual issue to be

tried as a basis for liability. Transcript of Proceedings, *Tyger Constr. Co., Inc. v. United States,* Nos. 468–88C, 526–88C & 90–134C at 83 (Fed. Cl. Sept. 24, 1993). The court did note, however, that "we may find out they're incompetent...." at trial. *Id.*

in addition to those that will be discussed below with respect to the 1993 mechanical claim. The 1991 mechanical claim requested compensation for plaintiff's increased costs resulting from the FDA's directives that plaintiff replace, modify, and repair numerous system components damaged as a result of the long delay in an effort to achieve sufficient air flow. The 1991 mechanical claim asserted that the Module I project had been delayed more than four years because of structural and mechanical design deficiencies. Plaintiff sought recovery for its costs in maintaining and then refurbishing the mechanical room equipment. Plaintiff also asserted that rework costs were incurred both because of the inadequate mechanical system design and the FDA's multiple directives issued in attempts to rectify the design defects through experimentation. Finally, plaintiff asserted that it was a cardinal change to its contract for the FDA to give directives requiring large portions of the project to be rebuilt that already had been completed in accordance with the contract. Again, plaintiff stated in the 1991 mechanical claim with respect to home office overhead that it would adjust the delay claim submitted to the contracting officer if extended home office overhead were recovered in the 1991 mechanical claim.

Plaintiff's 1991 mechanical claim sought recovery of costs incurred during the one-year period from October 1, 1989, to September 30, 1990. The entire 1991 mechanical claim consisted of two account code series—a 400 and a 500 series. The $710,133.00 portion that was excepted from the former delay and related expenses claim under the settlement agreement consisted of mechanical costs incurred after October 1, 1990. These costs were accumulated into one account. Kirlin's fan and CVR claims are not part of the accounts or costs listed above.

b. The 1993 mechanical claim

The 1993 mechanical claim also alleged time-related damages. The claim discussed the deterioration of equipment that was caused by the "great amount of time" that elapsed after the original installation of equipment. Plf's Third Am.Compl. ¶ 44.

Further, plaintiff alleged that it refurbished and replaced many other mechanical system components in attempting to deliver a functioning system to the FDA. As noted above, plaintiff also incorporated by reference its 1991 mechanical claim into its 1993 mechanical claim.

Defendant contends that the testimony of one witness directly refutes plaintiff's argument with respect to recovery of delay damages in the 1993 mechanical claim. Def's Br. filed Apr. 8, 1994, at 1 n. 1. According to defendant, Mr. Tucker, plaintiff's construction claim accounting expert, *specifically testified that, due to the parties' settlement, the results of his analysis of activity and time related site support costs were not allowed to be considered in the mechanical claim.* *Id.* (citing Trial Tr. at 2155; emphasis in original). Mr. Tucker actually stated that his testimony would address the determination of activity and time-related site support costs with respect to the 1993 mechanical claim. Trial Tr. at 2155. To do so he analyzed delay damages over a period exceeding one year. He also stated in effect that it was his "understanding" of the settlement that the results of this analysis that went beyond the one-year period no longer were to be considered as part of the 1993 mechanical claim. *Id.* He then proceeded to testify, without objection by defendant, how the amounts listed in the 400 account code series included specific costs related to mechanical work and indirect or project overhead costs.

This point deserves elaboration. Mr. Tucker testified that plaintiff's claim was quite conservative and that he would have obtained a much higher figure for damages by using a calculation that was based upon time-related activities over the entire delay period, rather than the one-year period of plaintiff's 1991 mechanical claim. He explained that he understood that the parties' prior settlement "limited" the amount that could be claimed under this series of accounts to the amount that plaintiff had set forth in its 1991 mechanical claim. *Id.* at 2155, 2171. While the 400 account code series could not be recalculated to include costs incurred outside the one-year period, the

amount submitted included time-related costs incurred during this period. Therefore, Mr. Tucker's analysis is consistent with plaintiff's position that it preserved delay-related damages in its 1993 mechanical claim. In sum, Mr. Tucker testified that time-related costs were limited in time, but not settled out of the case. Mr. Tennison's testimony that plaintiff incurred time-related costs for maintaining and repairing boiler room equipment with respect to the 500 account code series is consistent with this conclusion.

Further, as will be discussed with respect to defendant's third ground, Kirlin sought time-related damages with respect to its fan and CVR claims. Therefore, Kirlin had its own independent basis for seeking delay-related damages, which basis remained in the case after the parties adopted the settlement agreement.

■ Since the court remains unenlightened as to the specific content of the parties' settlement agreement, the court is hesitant to find that plaintiff agreed to settle all delay issues out of the case. Plaintiff asserts that the damages challenged by defendant were reserved under the settlement agreement. It is also undisputed that plaintiff sought damages for delay in claims other than the settled delay claim. By basing its motion on a document that it does not want to put in the record, defendant asks the court to be jurisdictionally clairvoyant. Although it is the burden of plaintiff, as the party invoking the court's jurisdiction, to establish jurisdiction, defendant may not rest on an unsupported allegation when the record developed in this case supports plaintiff's position on jurisdiction. Despite many opportunities to do so, defendant has not put the settlement agreement in the record. Jurisdiction cannot be waived, but defendant may not base a jurisdictional argument solely on its characterization of a document that has not been presented to the court.[4] Therefore, defendant's motion must be denied as to the first ground.

2. Defendant argues that the court lacks jurisdiction under the CDA over the portion of the delay and related expenses claim specifically reserved in the settlement agreement because plaintiff failed to submit such a claim to the contracting officer. According to defendant, at trial Mr. Tennison testified that the majority of the $710,133.00 costs accumulated into one account by plaintiff after September 30, 1990, were the result of post-February 1, 1991 directives. February 1, 1991, is the date on which the certified 1991 mechanical claim was submitted to the contracting officer. While it is true that Mr. Tennison testified that the majority of the work included in the delay and related expenses claim was performed after September 30, 1990, the record does not support a finding that the work resulted from directives given after that date, except in respect of ductwork.

Plaintiff submitted at trial six categories of damages that make up the $710,133.00 in costs: 1) Brandt Instruments—DPT refurbishment; 2) Comfort Control—HVAC balancing; 3) Complete Air Filter Co.—replace AHU air filters; 4) Hamilton & Spiegel—complete ductwork; 5) Johnson Controls—mechanical system calibration and testing; and 6) Thornton Mechanical—mechanical punch list.

Defendant maintains that a significant portion of this claim is a new claim and not a mere increase. The operative facts that give rise to the recovery of these new costs are different, according to defendant, than those that give rise to the recovery of the costs that were originally certified. Defendant cites ductwork directives given to plaintiff on February 27 and April 10, 1991, as precipitating the claimed costs. Mr. Tennison testified that Hamilton & Spiegel; Thornton Mechanical; and, he believed, also Johnson Controls performed ductwork inspections pursuant to the February 27 directive. He further testified that testing performed by Comfort Control and repairs and review of the ductwork

---

4. Defendant states in its motion that the parties have agreed not to put the settlement agreement in the record because revelation of "monetary details" might prejudice the court's disposition of "remaining issues." Def's Mot. filed Mar. 7, 1994, at 14 n. 4. Defendant apparently did not explore the possibility of presenting the settlement agreement with the monetary details expurgated.

performed by Thornton Mechanical were conducted pursuant to the February 27 directive and the April 10 directive, which, in turn, was based on a Syska & Hennessy report.

Plaintiff responds that it properly certified its claims to the contracting officer and that defendant failed to support its assertion that the operative facts giving rise to the claims were different. Plaintiff notes that defendant cited only directives relating to ductwork in support of its argument concerning lack of certification. The ductwork directives issued after submission of its certified claim are irrelevant, plaintiff argues, because the court denied recovery of all costs that were based on damages resulting from the directives.

Defendant raised the issue of certification during trial. Defendant suggested that costs that were received after the date of the original claim be separated, especially those unrelated to issues that were the subject of a contracting officer's final decision. The court informed defendant that, once properly certified, a claim could be increased, but that a new claim could not be added. The court noted that this rule did not refer to components of preexisting claims emanating from the same source and instructed defense counsel to develop further whether the failure to certify related to a new claim or a component of an existing claim. Trial Tr. at 1930–31. Defendant agreed to do so, but never mentioned the issue again until its post-trial brief.

The claims for costs incurred in complying with ductwork directives were not submitted to the contracting officer and were not certified properly. These directives, however, were the only ones cited by defendant. Based on the foregoing, all discussion with respect to ductwork in the opinion shall be deemed stricken.

3. Independent of the settlement agreement, defendant argues that based on the CDA the court lacks jurisdiction to entertain any claim founded on critical path delay, contract extension, or breach of the duty of good faith. Defendant asserts that no other claim submitted to the contracting officer, other than plaintiff's delay and related expenses claim, explicitly claimed damages resulting from critical path delay, contract extension, or breach of the duty of good faith. According to defendant, plaintiff sought only equitable adjustments based on defective specifications.

Plaintiff responds that it never dismissed any delay-related damages or claims except those enumerated in the settlement agreement. Plaintiff insists that it expressly reserved any other damages, including those related to delay. According to plaintiff, it gave adequate notice as to the basis and amount of its claim and it need not have used "magic words" in its claim to preserve these amounts. Plf's Br. filed Mar. 24, 1994, at 9 (citing *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir. 1987)). Plaintiff noted that its First Cause of Action for breach of contract in its Third Amended Complaint, which remains in the case, alleged that defendant breached its contract not only by providing defective plans and specifications, but also by failing to administer the project in a proper manner and by arbitrarily and erroneously denying plaintiff's claims for equitable adjustments for excess costs incurred during the performance of the contract work. Therefore, no question exists, according to plaintiff, that it explicitly identified delay and mismanagement of the project in the factual recitation of its claims. Plaintiff points out that this identification was acknowledged by the contracting officer's consideration of delay and time-related issues in her decision denying the 1991 mechanical claim. In addition, plaintiff notes that the theme of the contracting officer's denial was a lengthy chronology setting forth the trouble-shooting process that was the center of the critical path analyses presented at trial by both parties.

Plaintiff also asserts that Kirlin's fan claim sought damages and time extensions resulting from faulty design and the contracting officer's directives given during the project. The fan claim also put forth that the directive to replace the York fans constituted a change to Kirlin's subcontract. Again, plaintiff argues that the contracting officer's final decision demonstrates that she understood that delay of the project was at issue. She

suggested that plaintiff owed the FDA damages, specifically mentioning liquidated damages.

Finally, plaintiff argues that Kirlin's CVR claim also included claims for delay and delay damages. According to plaintiff, Kirlin sought additional indirect costs resulting from the four-year delay in completing the project, which delay was attributable to the contracting officer's directives to replace the fans and CVRs. Kirlin sought extended home office overhead for all additional costs incurred after September 1986 and for "delays attributable to the causes identified in both the Fan Claim and this claim." Claim of John J. Kirlin dated Jan. 15, 1991 (the CVR Claim), at 50 n. 7. Once again, the contracting officer's final decision denying the claim demonstrates her understanding that delay was at issue. In several responses she stated that any delay was attributable to plaintiff.

■ As discussed above, plaintiff's 1991 mechanical claim pressed damages based upon delay. Kirlin's CVR claim also sought to recover delay-related costs for both the fan and CVR claims. It is clear from the final decisions of the contracting officer that she understood that delay was at issue and not only denied recovery, but also took the position that plaintiff was liable to defendant for damages resulting from delay. The Federal Circuit in *Contract Cleaning* stated that a CDA "claim" is not required to be submitted in any particular form or with any particular wording, but only is required to present to the contracting officer in writing "adequate notice of the basis and amount of the claim." 811 F.2d at 592 (citations omitted). Plaintiff has demonstrated, and the court's independent review confirms, that plaintiff provided adequate notice to the contracting officer that it was seeking recovery based upon delay- or time-related activities. Therefore, defendant's motion is denied with respect to this ground.

4. Defendant argues that plaintiff should be precluded from recovery for critical path delays because of its failure to notify the FDA that some of the equipment supplied to the project did not conform to the contract specifications. According to defendant, a contractor either waives its right to pursue, or is estopped from pursuing, recompense for damages resulting from problems about which it failed promptly to notify the owner. Defendant, noting this issue was raised in its Proposed Joint Statement of Issues of Fact and Law, asserts that the FDA was clearly prejudiced by the lack of notice given by plaintiff and that the FDA might have proceeded in a different manner had it been aware of the non-conforming equipment. Defendant points out that plaintiff's sub-subcontractors must have, or at least should have, been aware of the problems throughout the entire fan and CVR delay periods. Defendant also takes the position that the contracting officer attempted solutions each time that she obtained relevant information.

Plaintiff responds that the cases cited in support of defendant's argument are easily distinguishable from the present situation. Plaintiff is correct. In three of the cases, *Dynalectron Corp. (Pac. Div.) v. United States*, 518 F.2d 594, 207 Ct.Cl. 349 (1975); *Kings Electronics Co. v. United States*, 341 F.2d 632, 169 Ct.Cl. 433 (1965); *Environmental Devices, Inc.*, ASBCA Nos. 37430, 39308, 39719, 93–3 BCA (CCH) ¶ 26,138, 1993 WL 190372 (1993), the contractor attempted to overcome the problems on its own after choosing not to notify the Government. In another case, *Calfon Constr., Inc. v. United States*, 18 Cl.Ct. 426 (1989), *aff'd*, 923 F.2d 872 (Fed.Cir.1990) (Table), this court relied on the Government's evidence of prejudice in barring a claim resulting from the contractor's failure to furnish contractually required notice that the contractor considered work to be the equivalent of a government-ordered change. The Government gave the contractor the opportunity to choose between two methods of performing the work and dispatched a letter to the contractor clarifying the choices and explaining that choosing either method would not result in a change in the contract. *Id.* at 431. In the final case, *Olson Plumbing & Heating Co. v. United States*, 602 F.2d 950, 221 Ct.Cl. 197 (1979), the contractor failed to correct design problems or incorporate the Government's suggestions unless the Government or the subcontractor would guarantee the results.

Further, although the contractor so asserted, no finding was made that poor contract administration increased the delay.

■ Plaintiff notified the FDA of the low airflow problem and also presented its proposed solutions to the problem. Plaintiff correctly states that the evidence developed at trial does not support a finding that the FDA might have proceeded differently if plaintiff had supplied notice of the nonconforming equipment. Not only did the contracting officer fail to testify to this effect at trial, but, even if she had taken that position, it would be squarely contradicted by the history of delays with respect to the remedial work. If nothing else should have impressed defendant from the lengthy recitation of the documented history in the opinion, it should have been clear that the abiding fact of the contract's performance was that for a lengthy period of time no one was able to pinpoint exactly what the problems were. In fact, only through trial was the court able to assign responsibility for the various problems that occurred. That the court ultimately found—after a lengthy, technical trial—that plaintiff tendered deficient CVRs and DPTs does not mean that plaintiff should have come to the same realization a decade earlier. Nor does this ultimate finding excuse the FDA from failing to address the problems that arose in a manner consistent with sound, responsible contract administration. If defendant's argument were accepted and a contractor were foreclosed from monetary relief whenever a court found that it was responsible for supplying deficient equipment, the Government would be absolved of any responsibility for contract administration, irrespective of its consequences. Defendant has failed to demonstrate that the lack of notice prejudiced the FDA, and its motion is denied as to the fourth ground.

■ 5. Defendant next argues that the Government should not be liable for any delay-related damages that accrued after March 20, 1990—the date on which the CVR delay period ended and the ductwork repairs commenced—because plaintiff and Kirlin were found responsible for the repairs. Defendant points out that all of the costs of plaintiff's $710,133.00 claim, as well as other costs, were incurred after this date. Moreover, an unquantifiable portion of plaintiff's 1993 mechanical claim sought costs incurred between March 20 and September 30, 1990.

Plaintiff responds that, under defendant's approach, damages for which the Government was solely responsible would be barred because the work was not performed until the project was delayed by other causes. Plaintiff contends that Messrs. Tennison, Tucker, and Warner all testified that the mechanical damages that plaintiff incurred were a continuation of work that preceded the ductwork delays. Plaintiff further insists that no basis exists for excluding such costs and that these damages could not have been caused solely by issues related to ductwork.

Defendant's argument defies logic. Unless such delay-related costs were driven solely by ductwork delay, no basis for excluding such damages is apparent. Delay damages should not be excluded simply because of the date on which work was performed. Defendant failed to demonstrate why the damages incurred during the ductwork repair period should be excluded. Therefore, defendant's motion is denied as to this ground.

6. Defendant asserts in footnote 1 of its motion that binding precedent forecloses the court from applying "this 'jury verdict method' of allocating responsibility for concurrent delays." Def's Mot. filed Mar. 7, 1994, at 2 n. 1; *see supra* note 1. According to defendant, in *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702 (1944), "the Court of Claims required '*in the proof* a clear apportionment of the delay....'" Def's Mot. at 2 n. 1 (quoting *Coath,* 101 Ct.Cl. at 715 (emphasis in defendant's brief)). Defendant also cites *Commerce International Co. v. United States,* 338 F.2d 81, 167 Ct.Cl. 529 (1964), as supporting *Coath* in requiring clear establishment that "any Government-caused delays [be] separate and apart from all other delays." Def's Mot. at 2 n. 1. Defendant argues that the evidence fails to demonstrate in a clear manner that any Government-caused delays were separate and apart from plaintiff's delays in failing to supply equipment in compliance with the specifications. Defendant next cites *Dawco Construction, Inc. v. United States,* 930 F.2d 872 (Fed.Cir.

1991), for the proposition that "clear proof of injury" is required in order to use the "jury verdict method" to determine damages. Def's Mot. at 2 n. 1.

Plaintiff responds that the court did not apply a "jury verdict method," but instead apportioned fault based on the evidence of record. Plaintiff argues that it presented direct evidence of actual costs and the court evaluated each cost category, thereafter deciding whether to award or deny damages.

Defendant misstates the precedential effect of *Coath.* The quotation actually states the following, "Where both parties contribute to *a* delay neither can recover damage, unless there is in the proof a clear apportionment of the delay...." *Coath,* 101 Ct.Cl. at 714–15 (emphasis added). The Court of Claims found that the delays attributable to the Government failed to alter the general work progress. *Id.* at 714. Therefore, *Coath* is not controlling to the present situation wherein the acts of the FDA and the contractor were found to be separate and independent causes of delay, which the court found could be segregated.

 In *Commerce International* the Court of Claims stated that the contractor's own failures comprised not only a main branch, but also another major branch of what it found to be a concurrent or inseparable delay. The court also noted that the contractor failed to present specific proof of causation and faulted it for not showing how it was damaged by a Government failure to promptly supply drawings. 338 F.2d at 89, 91–92, 167 Ct.Cl. at 543, 546. As stated above, the court found each party in this case to be the cause of separate and independent causes of delay. At trial plaintiff demonstrated how it incurred damages as a result of the FDA's unreasonable conduct in trouble-shooting the low airflow problem. Plaintiff was not allowed to implement or pursue its proposed solutions to the low airflow problem because the FDA pursued fan replacement. The delay, instead of following a straight path, veered substantially off of

what would have been the normal delay path while the FDA personnel acted unreasonably. Defendant cannot argue forthrightly that plaintiff should not recover delay-related damages when the FDA caused significant delay in the resolution of the problems at the Module I project.

In *Dawco* the trial court failed to require the plaintiff to submit an "actual cost claim" when the record failed to show why the plaintiff could not have submitted such a claim. 930 F.2d at 881–82. Plaintiff in this case presented an actual cost claim, and the court apportioned damages based on this evidence. The court did not apply the "jury verdict method" of determining damages. Based on the foregoing, defendant's sixth ground is denied.

## II. *Plaintiff's cross-motion for reconsideration*

In responding to defendant's motion for partial reconsideration, plaintiff cross-moved for partial reconsideration of the denial of recovery for the perchloric acid washdown change order. Plaintiff asserts that sufficient proof existed to justify some award.

Defendant responds that RCFC 59 fails to provide for a cross-motion for reconsideration and that plaintiff's cross-motion is untimely under Rule 59(b).[5]

Plaintiff's cross-motion for partial reconsideration filed March 24, 1994, is denied as untimely under Rule 59(b), which provides that a motion be presented not later than ten days after entry of judgment. On the theory that defendant's motion opened the judgment for purposes of tolling the appeals period, however, the court has considered plaintiff's motion and denies it. It is true that Mr. Hoffman conceded on cross-examination that plaintiff was due approximately $38,000.00, but proof of damages lies with plaintiff. A ballpark approximation will not suffice. The cases cited by defendant support denial of plaintiff's motion on this ground.

---

5. Aware that RCFC 59(b) allows no such filing, plaintiff addressed a letter to the court addressing defendant's response to its cross-motion. The court allowed this letter to be filed by leave April 27, 1994, and made it a part of the record since plaintiff responded to a portion of the transcript that defendant had mischaracterized.

III. *Defendant's request for correction*

 Defendant's April 8, 1994 response to plaintiff's cross-motion requests that the court correct that portion of its opinion stating that the FDA failed to contest the amount of three of the seven change orders. Defendant's request for correction will be treated as a motion to amend or alter the judgment under RCFC 59(d). Under Rule 59(d) such a motion must be filed not later than ten days after entry of judgment. Therefore, defendant's motion is untimely. However, on the theory that the opinion and order were open to all parties for all purposes by virtue of defendant's original motion, the court has considered and rejects this argument.

The three change orders at issue are the following: $3,968.00 for the revised smoke detector work, $2,258.00 for relocating eyewashes, and $4,517.00 for the gas boiler vent system. Defendant argues that because DCAA auditor Awosika testified that she had set out the amount of all of the change orders as unsupported, defendant contested the amount of all of the change orders.

The court did not state that the FDA contested the amount of the gas boiler vent system change order; therefore, defendant's request is inapplicable to this particular change order. Defendant submitted documentation showing that Kirlin had been paid for two of the seven change orders. Of the remaining four change orders, a defense witness testified specifically regarding three of them. In contrast, with respect to the two change orders still at issue, Mrs. Awosika testified without specificity by simply referring to all of the change orders en masse.[6] The grounds cited by defendant do not warrant the corrections for which it has asked. Therefore, defendant's request for correction is denied.

Based on the foregoing,

---

6. Mrs. Awosika's entire testimony regarding the change orders consisted of the following:
 Q You questioned as unsupported $77,000 in change orders. Why did you question that?
 A We requested them to support it. We did not receive anything. We set it out as unsupported. Subsequent to this report I talked to FDA and found that at least two of these

IT IS ORDERED, as follows:

1. Defendant's motion is granted insofar as that portion of the opinion issued on February 18, 1994, dealing with the ductwork repair claim shall be deemed stricken. Defendant's motion otherwise is denied.

2. Plaintiff's cross-motion is denied.

3. Defendant's request for correction is denied.

4. The stipulation called for by ¶ 1 of the opinion issued on February 18, 1994, shall be filed by May 18, 1994.

---

change orders had been settled with Tyger. That is the CT valve claim and the fume hood claim.
Trial Tr. at 2977. During cross-examination she testified only that there was a problem with the quantum for the perchloric washdown change order, but that she could not remember any discussion of figures. *Id.* at 2983.